UNITED STATES DISTRICT COURTHOUSE
SOUTHERN DISTRICT OF NEW YORK

A CERTIFIED COPY
J. MICHAEL McMAHON,

MISCELLANEOUS DOCKET
( Ordered by   DOCUMENT No.

M8-85            ≈ 0 7 - 4 2 7 -    BY

- CLERK

DEPUTY CLERK

| Date | Document # | Proceeding | By |
|------|-----------|------------|-----|
| 01/03/07 | 1 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld Memo of Law of Pepper Hamilton LLP in Support of Motion to Compel Discovery from nonparty Mandiant Corp. | RJM |
| 01/03/07 | 2 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld OTSC that non party Mandiant Corp. show cause before the undersigned in Crtrm. No. 17C US Courthouse, 500 Pearl Street, NY NY, 10am on 1/16/07 why an order not be entered compelling Mandiant to produce documents... and granting such other and further relief... and as further set forth in said OTSC. Ordered, J. Jones. EOD: 1/3/07. | RJM |
| 01/03/07 | 3 | BEST WESTERN INTERNATIONAL, INC., V JOHN DOE etal: Fld Endorsed Letter addressed to Judge Rakoff from Michael G. Zaroccostas dtd 12/27/06 Re: that Defts' Motion to Quash is withdrawn. Ordered, J. Rakoff. dtd 12/28/06. EOD: 1/4/07. | RJM |
| ../04/07 | 4 | IN RE: SUBPOENAS SERVED UPON AMERICAN SECURITIES CAPITAL PTRS., INC. AND OAK HILL CAPITAL PTRS., LP: Fld Stipulation of Continuance... It is hereby stipulated and agreed to continue the foregoing motions to Part I on January 16, 2007 at 11:00am. or as soom thereafter as can be heard. Ordered, J. Jones. EOD: 1/8/07. | RJM |
| 01/04/07 | 5 | MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. V CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP: Fld Notice of Motion by Plaintiff Matsushita Returnable 1/16/07, for an order quashing subpoena, and as further set forth... | RJM |
| 01/04/07 | 6 | MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. V CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP: Fld Memo of Law in Support of Panasonic's Motion to Quash Subpoena Ad Testificandum to Weil, Gotshal & Manges LLP. | RJM |
| 01/04/07 | 7 | MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. V CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP: Fld Declaration of David L. Yohai in Support of Panasonic's Motion to Quash Subpoena Ad Testificandum to Weil, Gotshal & Manges LLP. | RJM |
| 01/04/07 | 8 | JAMES BOWMAN V JAMES A. HOTZ: Fld Notice of Motion to Quash Subpoena for non-party's attendance and for production of documents at deposition. Ret. 1/16/07. Proposed Order attached. | RJM |

UNITED STATES DISTRICT COURTHOUSE
SOUTHERN DISTRICT OF NEW YORK

MISCELLANEOUS DOCKET
( Ordered by  DOCUMENT No. )

M8-85

| Date | Document # | Proceeding | By |
|------|-----------|-----------|-----|
| 01/04/07 | 9 | JAMES BOWMAN V JAMES A. HOTZ: Fld Memo of Law in Support of Notice of Motion to Quash Subpoena for non-party's attendance and for production of documents at deposition. | RJM |
| 01/04/07 | 10 | JAMES BOWMAN V JAMES A. HOTZ: Fld Declaration of Ronald J. Aranoff. | RJM |
| 01/09/07 | 11 | IN RE: DIRECT GENERAL CORP SEC. LIT: Fld Affirmation of David A. Rosenfeld in Support of Motion to admit Greer Spatz pro hac vice. ($25.00 fee paid 1/9/07 Recpt. No. 601898). | RJM |
| 01/09/07 | 12 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld Endorsed Letter addressed to Judge Haight from Elizabeth A. Kenney dated 1/9/07 Re: granted request that the return day of the OTSC be postponed to 1/18/07, at 2pm... Ordered, J. Haight. EOD: 1/11/07. | RJM |
| /10/07 | 13 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld Response of Mandiant Corp. and Royal Indemnity Co. to Order to Show Cause. | RJM |
| 01/11/07 | 14 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld Memo of Law of Charles A. Stanziale, Jr., Chapter 7 Trustee of Student Finance Corp. in Opposition to Pepper Hamilton, LLP's Motion to Compel Discovery from nonparty Mandiant Corp. | RJM |
| 01/11/07 | 15 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld Declaration of Michael S. Waters, Esq. | RJM |
| 01/11/07 | 16 | IN RE: DIRECT GENERAL CORP SEC. LIT: Fld Stipulation & Order that LeBoeuf may file under seal in this proceeding any affidavit that includes any document or information that has been designated "CONFIDENTIAL" under the Protective Order in place in the Direct General Corp. Sec. Lit... LeBoeuf's time to serve affidavits and an answering memorandum of law in opposition to Lead Plaintiffs' motion to compel is extended to 1/16/07 or to two business days after LeBoeuf's receipt of a copy of this Stipulation as "so ordered" by the Court, whichever date is later... and as further set forth in said stipulation and order. Ordered, J. Haight. dtd 1/9/07. EOD: 1/12/07. | RJM |

UNITED STATES DISTRICT COURTHOUSE
SOUTHERN DISTRICT OF NEW YORK

MISCELLANEOUS DOCKET
( Ordered by  DOCUMENT No. )

M8-85

| Date | Document # | Proceeding | By |
|------|-----------|-----------|-----|
| 01/11/07 | 17 | MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. V CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP: Fld Defts' Memo of Law in Opposition to Plaintiff's Motion to Quash Subpoena to Weil, Gotshal & Manges LLP. | RJM |
| 01/11/07 | 18 | MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. V CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP: Fld Declaration of Paul W. Kletzly in Opposition to Plaintiff's Motion to Quash Subpoena. | RJM |
| 01/11/07 | 19 | IN RE: SUBPOENAS SERVED UPON AMERICAN SECURITIES CAPITAL PTRS., INC. AND OAK HILL CAPITAL PTRS., LP: Fld Stipulation of Withdrawal... It is hereby stipulated and agreed by and between the undersigned attorneys for the parties, and subject to the approval of this Court, to withdraw the foregoing motions. Ordered, J. Patterson. EOD: 1/12/07. | RJM |
| 01/11/07 | 20 | MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. V CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP: Fld Memo of Law in Further Support of Panasonic's Motion to Quash Subpoena ad Testificandum to Weil Gotshal & Manges LLP. | RJM |
| 01/12/07 | 21 | EAGLE MARITIME SERVICES, INC. V NEIL TILSON: Fld Stipulation and Order that Deft. Shall pay Plaintiff the sum of $2,000.00 payable to Skoufalos LLC, as attorneys for Eagle Maritime Services, Inc. And EGL, Inc. On or before 12/31/06... and as further set forth in said stipulation. Ordered, J. Haight. EOD: 1/17/07. | RJM |
| 01/12/07 | 22 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld Reply Memo of Law of PEPPER HAMILTON LLP in Support of Motion to Compel Discovery from nonparty Mandiant Corp. | RJM |
| 01/12/07 | 23 | JAMES BOWMAN V JAMES A. HOTZ: Fld Endorsed letter addressed to Judge Haight from Katherine V. Hernacki dated 1/11/07 Re: Granted request to extend return date  of Mr. Sigfried's Motion to Quash Subpoena for non-party's attendance and for production of documents until 2/20/07... Dr. Holtz' response due 1/30/07... reply due 2/13/07. Ordered, J. Haight. EOD: 1/17/07. | RJM |

UNITED STATES DISTRICT COURTHOUSE
SOUTHERN DISTRICT OF NEW YORK

MISCELLANEOUS DOCKET
( Ordered by  DOCUMENT No. )

M8-85

| Date | Document # | Proceeding | By |
|------|-----------|-----------|-----|
| 01/12/07 | 24 | IN RE: DIRECT GENERAL CORP SEC. LIT: Fld Signed Proposed Order for Admission pro hac vice of attorney Greer Spatz on behalf of plaintiffs in the captioned case... Ordered, J. Haight. EOD: 1/17/07. | RJM |
| 01/16/07 | 25 | IN RE: DIRECT GENERAL CORP SEC. LIT: Fld Memo of Law in Opposition to Motion to Compel LeBoeuf... to produce documents in response to lead ptffs' subpoena. | RJM |
| 01/16/07 | 26 | IN RE: DIRECT GENERAL CORP SEC. LIT: Fld Affidavit of John G. Nicolich in opposition to motion to compel LeBoeuf... to produce documents in response to lead ptffs' subpoena. | RJM |
| 01/16/07 | 27 | MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. V CMC MAGNETICS CORP., HOTAN CORP., and KHYPERMEDIA CORP: Fld Declaration of Alan R. Feigenbaum in support of Panasonic's application for attorneys' fees and costs. | RJM |
| 01/16/07 | 28 | IN RE:SUBP., ISSUED TO LIFE SETTLEMENTS CORP., D/B/A PEACHTREE LIFE SETTLEMENTS v SYNDICATE 120 AT LLOYDS'S OF LONDONS, RESPONDENT:Fld Life Settlement Corp.'s.,...N/Motion...purs., to Rule 7.1 will move this Court...on the 30th of January, 2007...for an Order quashing the subp., duces tecum issued to non-party LSC... William C. Silverman, Esq., Greenberg Traurig,LLP Attorneys for Life Settlement Corporations... | RMC |
| 01/16/07 | 29 | IN RE:SUBP., ISSUED TO LIFE SETTLEMENTS CORP., etal.,:Fld Life Settlement Corporation's D/B/A PEACHTREE LIFE SETTLEMENT Memo of Law in Support of Motion to Quash...Wllm. C. Silverman, Esq., | RMC |
| 01/16/07 | 30 | IN RE:SUBP., ISSUED TO LIFE SETTLEMENTS CORP., etal.,:Fld Life Settlement Corporation's... Rule 7.1 Statement. | RMC |

UNITED STATES DISTRICT COURTHOUSE
SOUTHERN DISTRICT OF NEW YORK

MISCELLANEOUS DOCKET
( Ordered by   DOCUMENT No. )

M8-85

| Date | Document # | Proceeding | By |
|------|-----------|-----------|-----|
| 01/22/07 | 31 | IN re DEPOSITION SUBPOENAS...THOMAS FALLON,etal., v LOCKE, LIDDELL & SAPP, LLP:Fld Memorandum OPINION #94165...Ernst & Young LLP ("E&Y) and three of its partners here seek to quash deposition subpoenas served on the partners in an action against a law firm that gave the plaintiffs tax opinions on tax shelter deals promoted by E&Y ...The motions to quash the subpoenas [docket items 570-573] are denied in all respects. SO ORDERED J.KAPLAN Dated:Dec. 5, 2006 | RMC |
| 01/22/07 | 32 | CHARLES A. STANZIALE,JR., CHP 7 Ttee of STUDENT FINANCE CORP.,  v PEPPER HAMILTON LLP, ETAL.,: ORDER Admitting David M. Pelletier, Pro Hac Vice. Dated 1/18/07 J. HAIGHT. | RMC |

UNITED STATES DISTRICT COURTHOUSE
SOUTHERN DISTRICT OF NEW YORK

MISCELLANEOUS DOCKET
( Ordered by  DOCUMENT No. )

M8-85

| Date | Document # | Proceeding | By |
|------|-----------|-----------|-----|
| 02/09/07 | 80 | CHARLES A. STANZIALE, JR... V PEPPER HAMILTON LLP, ETAL: Fld Memorandum Opinion & Order No. 94254... The Motion to Compel is hereby respectfully referred to District Judge Farnan. The Clerk is directed to send the motion file to the Clerk of the USDC for the District of Delaware. Ordered, J. Haight. dtd 2/8/07. EOD: 2/13/07. | RJM |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**DOC #** _____

----------------------------------------------------------------- x

CHARLES A. STANZIALE, JR.,
CHAPTER 7 TRUSTEE OF STUDENT
FINANCE CORPORATION

    :

    :

**07 - 427 -**

             Plaintiff,

    : MISC. NO. M8-85

      -against-

    :

PEPPER HAMILTON LLP, ET AL

    :

             Defendants.

    :

----------------------------------------------------------------- x

## MEMORANDUM OF LAW OF PEPPER HAMILTON LLP
## IN SUPPORT OF MOTION TO COMPEL DISCOVERY FROM
## NONPARTY MANDIANT CORPORATION

Kenneth R. Puhala
Jane H. Kauh
SCHNADER HARRISON SEGAL & LEWIS LLP
140 Broadway, Suite 3100
New York, New York 10005
(212) 973-8000

Of counsel:

Bruce P. Merenstein*
Stephen J. Shapiro*
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000

*Attorneys for Defendants*
*Pepper Hamilton LLP and Roderick Gagné*

*Not admitted in the United States District Court for
the Southern District of New York

## PRELIMINARY STATEMENT/FACTUAL BACKGROUND

Pepper Hamilton LLP ("Pepper") submits this Memorandum of Law in support of its motion pursuant to FRCP 34(c), 37 and 45 to compel nonparty Mandiant Corporation, f/k/a/ Red Cliff Consulting LLC ("Mandiant"), to produce documents responsive to a Subpoena *Duces Tecum* ("Subpoena") on a date and time set by the Court. The facts relevant to a disposition of this motion are set forth in the Declaration of Stephen J. Shapiro dated December 29, 2006, ("Shapiro Decl.") and the exhibits attached thereto. The following is a brief summary of the relevant facts.

On November 17, 2006, Pepper issued a Subpoena to Mandiant in an attempt to obtain documents stored on a computer server relevant to two litigations presently pending in the United States District Court for the District of Delaware – *Stanziale v. Pepper Hamilton LLP, et al.*, No. 04-1551 (D. Del) and *Royal Indemnity Company v. Pepper Hamilton LLP, et al.*, No. 05-165 (D. Del) (collectively, the "Pepper Cases"). Shapiro Decl. ¶ 2. The Pepper Cases were initiated by Charles A. Stanziale, Jr., Chapter 7 Trustee of SFC (the "Trustee"), and Royal Indemnity Company ("Royal"), an insurer that had issued credit risk insurance policies to SFC. The Pepper Cases allege (falsely) that Pepper was "general counsel" to Student Finance Corporation ("SFC"), a former client of the Pepper law firm now in bankruptcy, and that Pepper knew or should have known that SFC was engaged in fraudulent business practices.

On information and belief, as part of the liquidation of SFC's assets, the Trustee sold the computer server (the "Server") on which the documents in questions were stored to Student Loan Servicing LLC ("SLS"), an affiliate of SFC that the Trustee neither represents nor

controls. Shapiro Decl. ¶ 4. On information and belief, SLS subsequently ceased operations. Shapiro Decl. ¶ 10.

In 2004, in connection with discovery in an adversary proceeding that the Trustee had initiated against Royal (and to which Pepper was not a party), Royal, on information and belief, hired Mandiant, a technology consulting firm, to analyze and extract certain documents from the Server. Shapiro Decl. ¶¶ 3-6. Mandiant obtained a copy of the Server for processing, and, on information and belief, retained and still possesses today a copy of the entire Server. Shapiro Decl. ¶ 6.

The Server likely contains documents highly relevant to the Pepper Cases. Because the Trustee claims that he no longer possesses the Server and because SLS is no longer in operation, Pepper took the only option remaining to it to acquire the documents on the Server; namely subpoenaing Mandiant to produce a copy of the Server. Shapiro Decl. ¶10. Mandiant, however, refused to comply with the Subpoena because of out-of-court confidentiality obligations it had undertaken when it was provided with a copy of the Server during the litigation between the Trustee and Royal. Shapiro Decl. ¶¶ 6, 11, Exhibit "B" thereto.[1]

---

[1]    Mandiant's objection to the Subpoena was untimely. Pursuant to Rule 45(c)(2)(B), Mandiant was authorized to serve a written objection to the Subpoena within 14 days after service of the Subpoena. The Subpoena was served on November 21, 2006. Mandiant, therefore, was required to serve a written objection on or before December 5, 2006. Mandiant did not do so until December 11, 2006. Shapiro Decl. ¶ 11. *See Israel v. Carpenter*, 95 Civ. 2703, 2002 U.S. Dist. LEXIS 11792, at *3 (S.D.N.Y. June 28, 2002) (denying non-party's motion to quash a subpoena served upon it where non-party failed to comply with the 14 day time limitation in Rule 45(c)(2)(B)).

- 2 -

## **ARGUMENT**

1.      This Court Should Compel Mandiant To Comply With The Subpoena

        Pursuant to FRCP 34(c), 37 and 45, Mandiant should be compelled to produce

documents responsive to the Subpoena on a date and time set by the Court. FRCP 34(c) ("A

person not a party to the action may be compelled to produce documents and things or submit to

an inspection as provided in Rule 45."); *see also Atlantic Bank of New York v. Homeowners*

*Financial Corp.*, No. 97 Civ. 1274, 1999 U.S. Dist. LEXIS 2982, at \*17 (S.D.N.Y. March 15,

1999) (nonparty witness may be compelled to turn over documents pursuant to FRCP 34(c)). A

party is entitled to discovery "regarding any matter, not privileged, that is relevant to the claim or

defense of any party." FRCP 26. Nothing in the federal rules permits Mandiant to utilize the

out-of-court confidentiality agreement that it entered into with other parties (not Pepper) as an

excuse to avoid complying with the Subpoena.[2]

---

[2]      Although Rule 45(c)(3)(A) permits a party to move to quash or modify a subpoena that
"requires disclosure of privileged or other protected matter [where] no exception or
waiver applies," Mandiant did not avail itself of that procedure within the 14 days
permitted. *See* note 1, *supra*. Nor could it have. First, there is no suggestion that any of
the information on the Server is protected from disclosure by any privilege that belongs
to Mandiant itself. Second, even assuming Mandiant could satisfy its burden of
demonstrating that any documents on the Server are protected from disclosure by a
privilege that belongs to some other party (and Mandiant has made no such showing),
Mandiant would lack standing to invoke that privilege. *See Kuwait Inv. Auth. v. Sarrio
S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) (holding that party opposing production of
documents had no standing to invoke another party's attorney-client privilege).

In addition, the only party that conceivably could assert a privilege – the Trustee – has
waived his right to do so. The 14 day time limit in Rule 45(c)(2)(B) applies with equal
force to objections to document productions that are founded on the assertion of a
privilege. *See DG Creditor Corp. v. Dabah (In re DG Acquisition Corp.)*, 151 F.3d 75,
81 (2d Cir 1998) ("Rule 45 contemplates assertion of all objections to document
production within 14 days, including those based on the act of production privilege.").
The 14 day time limitation applies to parties that seek to quash or modify a subpoena
issued to a non-party. *See Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 412 (S.D.N.Y.
2000) (holding that party to underlying action waived objections to subpoena to a non-

- 3 -

Here, the information sought by Pepper is relevant to its defenses in the Pepper Cases and/or might lead to the discovery of admissible evidence in those matters. For example, the Trustee has alleged that Pepper was SFC's "general counsel" and therefore knew or should have known that SFC was engaging in fraudulent business practices. Discovery in the Pepper Cases, however, has demonstrated that other law firms performed substantial legal work for SFC, and the Server likely contains emails and other documents relating to that legal work. Pepper is clearly entitled to discovery of this information. The Trustee and Royal also falsely allege that Pepper was aware that SFC was engaging in fraudulent business practices. The Server may contain emails and other documents that will prove those allegations to be false.

So as to mitigate the costs that Mandiant may incur in complying with the Subpoena, Pepper will, at its own expense, provide Mandiant with an appropriate storage device onto which Mandiant can copy the data from the Server. Accordingly, Pepper requests that Mandiant be compelled to comply with the Subpoena.

---

party by failing to move to quash or modify the subpoena within 14 days of service of the subpoena). Therefore, the Trustee, who was served with a copy of the Subpoena on November 22, 2006, but who failed to file a motion to quash or modify the Subpoena within 14 days (and who has, to this day, not filed such a motion), has waived any objections to the Subpoena, including privilege objections.

- 4 -

## CONCLUSION

For the reasons set forth above, Pepper respectfully requests that this Court grant

the Motion in its entirety and grant any other relief that it deems just and proper.

Dated:    New York, New York
          December 29, 2006

Respectfully submitted,

SCHNADER HARRISON SEGAL & LEWIS LLP

By:

Kenneth B. Puhala (KP-8104)
Jane H. Kauh (JK-9298)
140 Broadway, Suite 3100
New York, New York 10005-1101
(212) 973-8000

Of counsel:

Bruce P. Merenstein*
Stephen J. Shapiro*
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000

*Attorneys for Defendants Pepper Hamilton
LLP and W. Roderick Gagné*

*Not admitted in the United States District
Court for the Southern District of New York

- 5 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x
CHARLES A. STANZIALE, JR.,                          :
CHAPTER 7 TRUSTEE OF STUDENT
FINANCE CORPORATION                                 :

       Plaintiff,    :   MISC. NO.  M8-85

   -against-       :

PEPPER HAMILTON LLP, ET AL    :  **DOC #** 2

       Defendants.  :
----------------------------------------------------------------------- x

U.S. DISTRICT COURT
FILED
JAN 03 2007
S.D. OF N.Y.
07 - 427

## ORDER TO SHOW CAUSE

Upon the Memorandum of Law of Pepper Hamilton LLP ("Pepper") and the Declaration

of Stephen J. Shapiro, it is hereby:

ORDERED that non party Mandiant Corporation ("Mandiant") show cause before the

undersigned in Courtroom No. _17C_ United States Courthouse, 500 Pearl Street, New York,

New York, at _10:00_ a.m./p.m. on the _16th_ day of January, 2007, why an order should not be

entered, pursuant to F.R.C.P. 34(c), 37(a)(1) and 45: (i) compelling Mandiant to produce

documents pursuant to a Subpoena *Duces Tecum* that was served upon it in connection with

litigation currently pending in the United States District Court for the District of Delaware on a

date and time set by the Court; and (ii) granting such other and further relief as the Court deems

just and proper.

**FURTHER ORDERED**, that service of the Order to Show Cause shall be made

personally on or before January _4_, 2007.

**FURTHER ORDERED**, that Mandiant shall serve its answering papers, if any, to this

Order to Show Cause by January _10_, 2007; and, Pepper shall serve its reply papers, if any, by

January _12_, 2007.

Dated:          New York, New York
                ~~December~~ , 2006
                Jan. 3, 2007

                _____
                UNITED STATES DISTRICT JUDGE

NYDATA 282338_1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x
CHARLES A. STANZIALE, JR.,                            :
CHAPTER 7 TRUSTEE OF STUDENT
FINANCE CORPORATION                                  :

                              Plaintiff,       :   MISC. NO.   M8-85

        -against-                                    :

PEPPER HAMILTON LLP, ET AL                           :

                              Defendants.            :
----------------------------------------------------------------------- x

## DECLARATION OF STEPHEN J. SHAPIRO IN SUPPORT
## OF MOTION TO COMPEL DISCOVERY

Stephen J. Shapiro, an attorney admitted to practice before the Courts of the

Commonwealth of Pennsylvania and the State of New Jersey, declares the following under the

penalties of perjury pursuant to 28 U.S.C. § 1746:

1.    I am an associate at Schnader Harrison Segal & Lewis LLP ("Schnader"), and

counsel to Defendants Pepper Hamilton LLP ("Pepper") and W. Roderick Gagné. I submit this

declaration in support of Pepper's motion to compel nonparty Mandiant Corporation, f/k/a Red

Cliff Consulting, LLC ("Mandiant"), to produce documents responsive to a Subpoena *Duces*

*Tecum* ("Subpoena") on a date and time set by the Court.

2.    The Subpoena was issued to Mandiant in an effort to obtain discovery from it

relevant to litigation currently pending in the United States District Court for the District of

Delaware – *Stanziale v. Pepper Hamilton LLP, et al.*, No. 04-1551 (D. Del) and *Royal Indemnity*

*Company v. Pepper Hamilton LLP, et al.*, No. 05-165 (D. Del). Mandiant was served with the

Subpoena on November 21, 2006. Attached hereto as Exhibit "A" is a copy of the Subpoena and

Proof of Service. To date, Mandiant has refused to comply with the Subpoena.

3.      Student Finance Corporation ("SFC"), a former client of the Pepper law firm, was a Pennsylvania corporation in the business of originating or acquiring and then securitizing student loans from truck driving schools. Bankruptcy proceedings against SFC were initiated in the United States Bankruptcy Court for the District of Delaware in 2002 and Charles A. Stanziale, Jr., was appointed to serve as bankruptcy trustee for SFC (the "Trustee").

4.      Prior to the bankruptcy, SFC owned several computer servers, one of which served as a repository for, among other data, emails to and from employees of SFC (the "Server"). Presumably as part of the Trustee's efforts to liquidate SFC's assets, the Server was sold at auction to an entity called Student Loan Servicing LLC ("SLS"), which was an affiliate of SFC not under the control of the Trustee. The data on the Server, including SFC's emails, was not removed from the Server before SLS took possession of it.

5.      In 2002, the Trustee filed an adversary action against Royal Indemnity Company ("Royal") alleging that Royal, which had issued credit risk insurance policies to SFC, had discovered that SFC was engaging in fraudulent business practices but had concealed that information and had attempted to prop-up SFC to avoid facing claims on its insurance policies. *See Stanziale v. Royal Indemnity Company*, Adv. No. 02-6803 (Bankr. D. Del.) (the "Royal Litigation"). The emails and other data on the Server presumably were potentially relevant to the issues in the Royal Litigation. However, the Trustee apparently took the position that some of the emails on the Server – such as emails between SFC and its attorneys (including Pepper) – theoretically might be protected from disclosure by the attorney-client privilege. The Trustee apparently was not willing to review all of the emails on the Server to determine which emails, if any, were in fact protected from disclosure by the attorney-client privilege. Accordingly, the Trustee and Royal reached a compromise whereby the Trustee, Royal and SLS agreed to have an

2                                                PHDATA 1413806_2

independent third party extract only the emails from the Server that were not sent to or by SFC's lawyers.

6.     Royal retained Mandiant, a technology consulting firm, to extract the emails from the Server. Pursuant to a written agreement between Royal, the Trustee and SLS, Mandiant was to program its extraction software in a fashion that would filter out all emails that were sent to or received from any email address that belonged to any of SFC's lawyers. *See* October 13, 2004 letter annexed to Exhibit "A." As part of this process, Mandiant agreed that it would not "disclose the contents of any files or other data located on the Servers to any person or entity other than Royal [through its lawyers], SFC [through its lawyers] and SLS [through its lawyers], or a judicial officer, unless required by law to do so." *Id.* at 2. After the agreement was put into place, Mandiant obtained a copy of the Server for processing, performed the extraction, and produced to Royal, the Trustee and SLS the thousands of emails that made it through the filtering software Mandiant applied. Mandiant also, on information and belief, retained and still possesses today a copy of the entire Server – not just the emails that made it through the filter. The Trustee and Royal subsequently settled the Royal Litigation.

7.     In November 2004, the Trustee sued Pepper for, among other things, professional malpractice and breach of fiduciary duty arising out of Pepper's representation of SFC. *See Stanziale v. Pepper Hamilton LLP, et al.*, No. 04-1551 (D. Del). In March 2005, Royal sued Pepper for, among other things, negligent and fraudulent misrepresentation in connection with the SFC transactions that Royal insured. *See Royal Indemnity Company v. Pepper Hamilton LLP, et al.*, No. 05-165 (D. Del). Both cases against Pepper (the "Pepper Cases") allege (falsely) that Pepper was SFC's "general counsel" and knew or should have known that SFC was engaging in fraudulent business practices.

8. During discovery in the Pepper Cases, Royal produced the emails that Mandiant extracted from the Server. The Server, however, likely contains emails between SFC and its lawyers (including Pepper lawyers) that were not extracted because they were blocked by Mandiant's filtering software and, therefore, have never been produced in either the Royal Litigation or the Pepper Cases.

9. These emails may be highly relevant to Pepper's defenses in the Pepper Cases and/or are likely to lead to the discovery of admissible evidence. For instance, the Trustee has alleged that Pepper was SFC's "general counsel" and therefore knew or should have known that SFC was engaging in fraudulent business practices. Discovery in the Pepper Cases has demonstrated, however, that other law firms performed substantial legal work for SFC and documents related to those other representations may be stored on the Server. Pepper is clearly entitled to discovery of those documents. The emails may also support Pepper's defense that it was unaware of SFC's fraudulent business practices. Therefore, Pepper asked the Trustee to produce any emails on the Server that were not previously produced. The Trustee responded that he did not possess the Server and, therefore, could not produce the missing emails.

10. Because the Trustee claimed that he was not able to produce the emails in question and because SLS apparently is no longer in business, Pepper's only remaining option was to acquire the emails directly from Mandiant. Accordingly, on November 21, 2006, Pepper served a subpoena on Mandiant (a copy of the subpoena was also sent to counsel for Royal and the Trustee on November 22, 2006). The Subpoena directed Mandiant to produce the emails on the Server that were not produced during the Royal Litigation or, in the alternative, to produce the entire Server in the event that Mandiant did not maintain the withheld emails in a segregated file. *See* Exhibit "A" hereto.

11.     On December 11, 2006, the date on which the Subpoena commanded Mandiant to produce the documents in question, Mandiant wrote to counsel for Pepper and explained that it would not produce the data requested lest it be deemed in breach of the confidentiality agreement into which it had entered. *See* Mandiant Letter attached hereto as Exhibit "B." In response, counsel for Pepper pointed out that Mandiant's out-of-court agreement with Royal, the Trustee and SLS (to which Pepper was not a party) permitted Mandiant to produce the documents requested if "required by law to do so" and that Pepper's Subpoena was just such a legal requirement. Pepper's counsel also explained that the out-of-court confidentiality agreement did not excuse Mandiant from its obligation to comply with the Subpoena and requested that Mandiant comply with it by December 20, 2006. *See* Pepper Letter attached hereto as Exhibit "C." To date, Mandiant has not produced the requested data.[1]

12.     As a result of its failure to comply with the Subpoena, Mandiant should be compelled to respond to the Subpoena on a date and time set by the Court. If Mandiant fails to produce documents on the date and time set by the Court, appropriate sanctions should also be imposed, including a daily fine, until it produces such documents.

13.     No prior application for this or similar relief has been requested.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 29, 2006, in Philadelphia Pennsylvania.

STEPHEN J. SHAPIRO

---

[1]     Pepper will, at its own expense, provide Mandiant with an appropriate storage device onto which Mandiant can copy the data from the Server, so cost should not be an issue.

FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



(a)

EXPOSURE / DEVELOPMENT



(b)

ETCHING / STRIPPING



(c)

FIG. 6



FIG. 7



FIG. 8



PATTERN DENSITY (AREA%)

TAPER ANGLE (degree)

FIG. 9



FIG. 10



FIG. 11



FIG. 12



(a)



(b)

**1**

# ARRAY SUBSTRATE FOR DISPLAY, METHOD OF MANUFACTURING ARRAY SUBSTRATE FOR DISPLAY AND DISPLAY DEVICE USING THE ARRAY SUBSTRATE

## BACKGROUND OF THE INVENTION

The present invention relates to an array substrate for display, a method of manufacturing the array substrate for display and a display device using the array substrate for display.

A display device using a thin film transistor (TFT) array has been frequently used owing to low power consumption and capability of downsizing the display device. The thin film transistor array is manufactured by forming thin film transistors, each being composed of electrodes such as a gate electrode, a source electrode and a drain electrode, wirings such as scan lines and signal lines connected with the above-mentioned electrodes, and pixel electrodes on an insulating substrate.

In recent years, a higher operating speed, a higher resolution and a larger size have been required for the display device described above in many cases. A high speed and a high density have been required for each constituent component of the array for display, which forms a display device. Particularly, in order to operate the thin film transistor array at a high speed, it is preferable to use low-resistance aluminum (Al) for the wirings such as the scan lines and the signal lines since delay in gate pulses can be reduced and a writing speed to the thin film transistor can be increased.

Incidentally, aluminum tends to be easily oxidized in spite of its low resistance. Therefore, in many cases, wiring using aluminum is constituted as a two-layer structure, in which aluminum is used as a lower conductive material, and a material harder to be oxidized than aluminum such as chromium, tantalum, titanium or molybdenum is used as an upper conductive material. FIG. 11 is a view schematically showing a state where wiring 2 is deposited on an insulating substrate 1. A lower conductive material film 2a is deposited on an insulating substrate 1 made of such as glass, and an upper conductive material film 2b is deposited on the lower conductive material film 2a. Each of these films 2a and 2b is patterned by, for example, a proper etching process so as to have tapered ends.

In order to form a tapered shape shown in FIG. 11, an etching rate for the upper conductive material is required to be increased. In order to form the tapered shape shown in FIG. 11, various methods have been proposed up to now. For example, in the gazette of Japanese Patent Laid-Open No. Hei 10 (1998)-90706, a method has been proposed, in which dummy connection pads are provided on sides opposite to scan line connection pads and signal line connection pads, respectively. According to this method, over etching due to an etchant that will be relatively increased by lowering wiring density at ends of the substrate is prevented. Thus, undercut of a lower conductive material 3 is prevented, and an interlayer short circuit is prevented by imparting a proper tapered shape to the wiring 2.

However, though this method enables evenness of etching at the ends of the thin film transistor array substrate to be improved, the method cannot effectively prevent the undercut of the signal lines in a region where the wiring density is apt to be lowered from ends of the pixel electrodes to the connection pads, for example, in a portion where drawing wiring is formed.

**2**

Moreover, in the gazette of Japanese Patent Laid-Open No. Hei 10 (1998)-240150, disclosed is a method of forming a tapered shape at an angle ranging from 20 degrees to 70 degrees on wiring constituted of two layers, in which a pad formed of aluminum and metal such as molybdenum formed on the aluminum is subjected to wet etching. According to this method, a specified tapered shape can be imparted to the wiring formed of a conductive film of a two-layer structure by the wet etching. However, the method never discloses a method of evenly etching a substrate region while maintaining a selection ratio thereof even in the substrate region where the wiring density is lowered.

FIGS. 12A and 12B are enlarged schematic views for explaining a patterning process using a conventionally used wet process in order to impart the above-described tapered shape to the wiring. As shown in FIG. 12A, the lower conductive material 3 and an upper conductive material 4 are deposited on the insulating substrate 1 by a method such as physical vapor deposition. FIG. 12A shows that a photoresist film 5 is coated on a film of the upper conductive material 4 and is patterned in a desired shape. The respective films are etched by an etchant such as a solution of phosphoric acid, nitric acid, acetic acid or mixtures thereof, and desired tapered shapes are formed thereon.

FIG. 12B is a view for explaining an electrochemical process generated as each film is being etched when the wiring constituted of the upper conductive material 4 and the lower conductive material 3 is subjected to wet etching. In FIG. 12B, an internal layer portion of the upper conductive material 4 coated with the photoresist film 5 is not dissolved. However, at the end of the photoresist film 5, the upper conductive material 4 is dissolved by the etchant. When the wiring is formed by the wet etching, the upper conductive material 4 protected by the photoresist film 5 is further dissolved in a lateral direction from the end of the photoresist film 5 to turn into positive ions, and electrons emitted as a result are supplied to the lower conductive material 3. Thus, the upper conductive material 4 serves as an anode. In this connection, the lower conductive material 3 comes to serve as a cathode. Accordingly, an electrochemical cell is formed. Here, when the etching rate for the upper conductive material 4 is increased to form a required tapered shape, the density of the electrons generated by dissolving the upper conductive material 4 and flowing to the lower conductive material 3 is increased accompanied with an increase of a dissolution rate of the upper conductive material 4. FIG. 12B schematically shows currents I flowing from the upper conductive material 4 to the lower conductive material 3.

As the etching rate is increased, the density of the current flowing to an area of the upper conductive material 4, which is exposed to the etchant, exceeds a current density causing passivity of the upper conductive material 4. In such a case, the upper conductive material 4 is passivated not to be dissolved by the etchant, and only the lower conductive material 3 is dissolved accompanied with the progress of the etching, resulting in the occurrence of the undercut. When such undercut occurs, the wiring, for example, the gate wiring cannot be sufficiently coated with an insulating film in some cases, thus causing inconvenience such as an interlayer short circuit, resulting in lowering a yield of the display device.

## SUMMARY OF THE INVENTION

The present invention was made with the foregoing problems in mind. An object of the present invention is to

3

provide an array substrate for display, a method of manufacturing an array substrate for display and a display device using the array substrate for display, which are capable of being etched at a sufficiently high etching rate and a sufficient selection ratio, eliminating undercut, and providing a large-sized and high-resolution display device.

The foregoing object of the present invention is achieved by providing the array substrate for display, the method of manufacturing an array substrate for display and the display device using the array substrate for display of the present invention.

Specifically, according to the present invention, provided is an array substrate for display, comprising: a thin film transistor array formed on an insulating substrate; a plurality of wirings arranged on the insulating substrate; connection pads arranged on unilateral ends of the wirings and respectively connected with the wirings; pixel electrodes, and dummy conductive patterns arranged between the ends of the connection pads and ends of the pixel electrodes. The dummy conductive patterns can occupy 30 area % or more. In the present invention, the dummy conductive patterns can be formed as any of land patterns and line-and-space patterns. In the present invention, the wirings are constituted of a lower conductive material and an upper conductive material, and the lower conductive material can be any one of aluminum and an aluminum alloy. In the present invention, the upper conductive material has a passivating potential. The upper conductive material can be any one of molybdenum and a molybdenum alloy.

According to the present invention, provided is a method of manufacturing an array substrate for display, the method comprising the steps of: forming a thin film transistor array including: a plurality of wirings arranged on an insulating substrate; and connection pads arranged on unilateral ends of the wirings and respectively connected with the wirings; forming pixel electrodes; and forming dummy conductive patterns between ends of the connection pads and ends of the pixel electrodes. In the present invention, it is preferable that the dummy conductive patterns be formed so as to occupy 30 area % or more. In the present invention, the dummy conductive patterns can be formed as any of land patterns and line-and-space patterns. In the present invention, the wirings are constituted of a lower conductive material and an upper conductive material, the lower conductive material can be any one of aluminum and an aluminum alloy, and the upper conductive material can be any one of molybdenum and a molybdenum alloy. In the present invention, the wirings are formed by wet etching.

Moreover, in the present invention, provided is a display device, comprising the array substrate for display mentioned above.

In the present invention, the display device used as a liquid crystal display device or an electroluminescence display device can be provided.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and the advantages thereof, reference is now made to the following description taken in conjunction with the accompanying drawings.

FIG. 1 is a view showing an embodiment of a liquid crystal display device using an array substrate for display of the present invention.

FIG. 2 is a top plan view of the array substrate for display of the present invention.

FIG. 3 is an enlarged view showing a dummy conductive pattern in the present invention.

4

FIG. 4 is an enlarged view showing another dummy conductive pattern in the present invention.

FIGS. 5A to 5C are views illustrating a method of manufacturing the array substrate for display of the present invention.

FIG. 6 is an electron microscope photograph showing a pattern shape of wiring in the case of using the dummy conductive pattern shown in FIG. 3.

FIG. 7 is an electron microscope photograph showing a pattern shape of wiring in the case of using the dummy conductive pattern shown in FIG. 4.

FIG. 8 is a graph showing a relation between a taper angle of the wiring and a pattern density of the wiring.

FIG. 9 is an electron microscope photograph showing a wiring shape in the case of performing etching without using the dummy conductive pattern.

FIG. 10 is an electron microscope photograph showing a sectional shape of the wiring shape shown in FIG. 9.

FIG. 11 is a schematic view showing a tapered shape of the wiring.

FIGS. 12A and 12B are views showing currents formed by a cell formed during an etching process.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Hereinbelow, description will be made in detail for the present invention with reference to embodiments shown in the accompanying drawings. However, the present invention is not limited to the embodiments shown in the drawings.

FIG. 1 is a partially cutaway perspective view showing an embodiment of a display device using an array substrate for display of the present invention. As shown in FIG. 1, the display device of the present invention is constituted by sequentially laminating a liquid crystal layer 11, a transparent electrode 12 and a glass substrate 13 on an array substrate 10 for display, which is formed on an insulating substrate. Wiring 14 formed on the insulating substrate 10 is extended to an end (not shown) of the array substrate for display, and is connected with a driving system (not shown) through a connection pad (not shown).

FIG. 2 is a top plan view of the display device using the array substrate 10 for display of the present invention, which is shown in FIG. 1. In the array substrate 10 for display of the present invention, a plurality of thin film transistors 21 constitute an array. A pixel electrode 22 is connected with each thin film transistor 21 that controls a potential of the pixel electrode. In the array substrate 10 for display shown in FIG. 2, what is further shown is that a scan line 23 and a signal line 24 are connected with each thin film transistor 21.

The respective scan lines 23 are connected with a driver 26 through scan line connection pads 25, and the respective signal lines 24 are connected with a driver 28 through signal line connection pads 27. These scan lines 23 and the signal lines 24 are formed so as to have the same constitution. As shown in FIG. 11, each of these lines is constituted of the lower conductive material 3 and the upper conductive material 4.

In the present invention, aluminum can be used for the lower conductive material 3 usable as wiring from a viewpoint of lowering resistance thereof. Moreover, it is preferable to use molybdenum (Mo) for the upper conductive material 4 usable in the present invention from a viewpoint of protecting the aluminum. However in the present invention, besides the aluminum, an aluminum alloy can be used for the lower conductive material 3. Moreover, for the

**5**

upper conductive material **4**, alloys of chromium, tantalum, titanium and molybdenum can be used. Film thickness of the lower conductive material **3** is not particularly limited, but film thickness of the upper conductive material **4** is preferably thick since a current tends to be concentrated thereto as the film thickness becomes thinner. However, a problem regarding stress occurs as the thickness becomes thicker. Therefore, in the present invention, it is preferable to set the film thickness of the upper conductive material **4** in a range of 30 to 100 nm.

The present invention makes it possible to prevent undercut of the lower conductive material **3**, which occurs due to passivity of the upper conductive material **4**. In the present invention, the term "passivity" is referred to as a phenomenon that metal such as molybdenum or a metal alloy such as a molybdenum alloy becomes insoluble in an acid or alkaline etchant. For example, the term "passivity" is referred to as a phenomenon that metal serving as an anode becomes insoluble in such etchant. In the present invention, specifically as for such passivated metal or a metal alloy, metal or a metal alloy with a passivating potential, that is, a Flade potential can be mentioned. Note that, in the present invention, the Flade potential is referred to as a potential which causes a current density for passivating metal, which is described in the Encyclopedia Chimica (miniature edition 32nd printing, issued by Kyoritsu Shuppan Co., Ltd., edited by editorial committee of the Encyclopedia Chimica), vol. 7, p. 911.

Furthermore, in the embodiment shown in FIG. 2, dummy conductive patterns **29** are disposed between the pixel electrodes **22** and each scan line connection pad **25** and between the pixel electrodes **22** and each signal line connection pad **27**. Thus, the wiring density is increased. Therefore, it is made possible to form good wiring over the entire surface of the array substrate for display without causing defects such as undercut and a mouse hole of the lower conductive material **3** during etching for the scan lines **23** and the signal lines **24**. Each of these dummy conductive patterns **29** can be formed as a two-layers structure with the same materials as those of the scan lines **23** and the signal lines **24** at the same time when the patterning is performed therefor.

FIG. 3 is an enlarged view showing a portion where the dummy conductive pattern **29** is formed in the embodiment of the array substrate **10** for display of the present invention shown in FIG. 2. FIG. 3 shows the dummy conductive pattern **29** formed as a line-and-space pattern between the connection pad **25** and an end **30** of the pixel electrode. In the present invention, the dummy conductive pattern **29** can be formed as the line-and-space pattern shown in FIG. 3. Alternatively, the dummy conductive pattern **29** can be formed as a land pattern completely coating a region where the dummy conductive pattern **29** is formed.

In any case of the patterns, in the present invention, it is preferable that the wiring density of the dummy conductive patterns **29** themselves be 30% or more on an area of a specified surface from a viewpoint of forming a properly tapered shape on the lower conductive material **3** without forming the undercut thereto while dissolving the upper conductive material **4** at a required rate.

Moreover, when the dummy conductive patterns **29** are arranged in the present invention, it is more preferable that the dummy conductive patterns **29** be formed between the end **30** of the pixel electrode **22** and each connection pads **25** and **27** so that the wiring density including the dummy conductive patterns **29** can be 30% or more on the area of a

**6**

specified surface. In the present invention, the term "wiring density" refers to an area ratio of an area of portions where the signal lines, the scan lines, the drawing lines, and the dummy conductive patterns are formed on an area of a specified region where the dummy conductive patterns are formed.

FIG. 4 is a view showing another embodiment of the dummy conductive pattern **29** of the present invention. In the embodiment shown in FIG. 4, the dummy conductive pattern **29** is disposed so that the wiring density thereof, which is specified at 30% or more, is further increased, thus reducing concentration of electric current to exposed portions of the upper conductive material to the etchant during the etching. As shown in FIG. 4, the dummy conductive pattern **29** may have any shapes and any patterns. Moreover, any combination of a plural type of the dummy conductive patterns **29** can be used.

FIGS. 5A, 5B and 5C are views showing an embodiment of a method of manufacturing the array substrate **10** for display of the present invention. With reference to FIG. 5, description will be made for the method of manufacturing the array substrate **10** for display of the present invention, exemplifying a case where the thin film transistor **21** of a reverse stagger type is formed. First, as shown in FIG. 5A, the lower conductive material **3** using aluminum and the upper conductive material **4** using molybdenum are deposited on the transparent or untransparent insulating substrate **1**, thus forming a film.

Next, as shown in FIG. 5B, photoresist **31** is coated on the film. The photoresist is exposed and developed by use of a photo mask **32** provided with patterns for forming the dummy conductive patterns **29** in portions where the wiring density is lowered between the pixel electrodes and the connection pads, which are not particularly shown.

Subsequently, etching is performed by use of an etchant such as a solution of phosphoric acid, nitric acid, acetic acid and mixtures thereof, thus forming the wiring **2** and the dummy conductive patterns **29**. The dummy conductive patterns **29** are arranged in the portions where the wiring density is low. Thus, it is made possible to form wirings having good tapered shape as shown in FIG. 5C even in regions where the conductive material such as molybdenum tends to be passivated. A taper angle can be set in a range of 20 degrees to 70 degrees by adjusting a composition of the etchant and etching conditions. It is more preferable to set the taper angle in a range of about 20 degrees to about 60 degrees.

Thereafter, in the present invention, gate insulating films, the gate electrodes, the source electrodes, the drain electrodes, the pixel electrodes and the like are formed, thus the array substrate **10** for display of the present invention is manufactured. In the present invention, the dummy conductive patterns **29** may be removed if necessary. Alternatively, the dummy conductive patterns **29** may be left as they are without being eliminated.

FIG. 6 is an electron microscope photograph showing a shape of the wiring **33** shown in FIG. 3, which was obtained when the dummy conductive pattern **29** shown in FIG. 3 was provided and the etching was performed. In this case, molybdenum was used for the upper conductive material **4**, and aluminum was used for the lower conductive material **3**. The film thickness of molybdenum is about 50 nm, and wet etching is performed by use of an etchant of a mixed solution of phosphoric acid, nitric acid and acetic acid. As shown in FIG. 6, a good tapered shape is formed even in a wiring portion where the undercut is formerly apt to occur by forming the dummy conductive pattern **29**.

7

FIG. 7 is a photograph showing a shape of the wiring 34 shown in FIG. 4, which was obtained when the dummy conductive pattern 29 shown in FIG. 4 was formed and the etching was performed under the same conditions as those in FIG. 6. As shown in FIG. 7, even when the density of the dummy conductive pattern 29 is increased, a good tapered shape is obtained.

FIG. 8 is a graph plotting values of the taper angle of the formed wiring relative to values of the pattern density (area %) of the wiring including the portions of the dummy conductive patterns 29 on the substrate when the dummy conductive patterns 29 are arranged. As shown in FIG. 8, the taper angle of the wiring obtained by the etching is reduced as the pattern density of the wiring is increased, and a more gentle taper is formed. Therefore, it is understood that the upper conductive material 4 can impart a sufficient selective ratio to the etching of the lower conductive material 3 by arranging the dummy conductive patterns 29.

FIG. 9 is an electron microscope photograph showing, for comparison, a shape of wiring obtained when etching is performed by use of the array substrate 10 for display, which has the same pattern as those in FIGS. 3 and 4, but without forming the dummy conductive patterns 29 at all. As shown in FIG. 9, large undercut occurs in the wiring since the molybdenum used for the upper conductive material 4 is passivated, and only the etching for the aluminum as the lower conductive material 3 progresses.

FIG. 10 is an electron microscope photograph showing a cross section taken along a cutting plane line A—A of the wiring shown in FIG. 9. As shown in FIG. 10, the etching for the aluminum used for the lower conductive material 3 progresses more than that for the molybdenum used for the upper conductive material 4, resulting in the occurrence of the great undercut.

The present invention can be applied not only to the thin film transistor of a reverse stagger type as described above but also to a thin film transistor of a top gate type including wiring formed of aluminum and any metal other than the aluminum, of which passivating current density is known.

Moreover, although the array device for display of the present invention can be applied to a liquid crystal display device using a transparent insulating substrate made of such as glass, the array device for display of the present invention can be also used as an organic or inorganic electroluminescence device, wherein an untransparent insulating substrate is used and an array for display is formed on the insulating substrate.

As described above, according to the present invention, it is made possible to provide an array substrate for display, a method of manufacturing an array substrate for display and a display device using the array substrate for display, which are capable of being etched at a sufficiently high etching rate and a sufficient selection ratio, and eliminating the under cut and the lowering of a yield in manufacturing due to the inconvenience such as an interlayer short circuit. Moreover, according to the present invention, it is made possible to provide an array substrate for display, a method of manufacturing an array substrate for display and a display device using the array substrate for display, which are capable of providing a large-sized and high-resolution display device.

Although the preferred embodiments of the present invention have been described in detail, it should be understood that various changes, substitutions and alternations can be made therein without departing from spirit and scope of the inventions as defined by the appended claims.

8

What is claimed is:

1. An array substrate for display, comprising:
    a layer of an insulating substrate, having an area;
    a thin film transistor array formed on the insulating substrate;
    a plurality of wiring arranged on the insulating substrate, each wiring having a first end, the wiring in communication with at least one of the transistors in the thin film array;
    connections pads, each connection pad contacting the first end of at most one of the plurality of wirings;
    pixel electrodes, and
    dummy conductive patterns, the dummy patterns comprising at least about 30% of the area of the insulating substrate, the dummy conductive patterns situated between the connection pads and the pixel electrodes such that the dummy patters are not in contact with any of the wiring.

2. The array substrate for display according to claim 1 wherein at least one of the wirings comprises at least an upper layer and a lower layer of conductive materials.

3. The array substrate for display according to claim 2 wherein the lower layer wiring material is selected from the group consisting of aluminum and aluminum alloys.

4. The array substrate for display according to claim 2 wherein the upper layer wiring material is selected from the group consisting of molybdenum, chromium, tantalum, titanium and alloys thereof.

5. The array substrate for display according to claim 3 wherein the upper layer wiring material is selected from the group consisting of molybdenum, chromium, tantalum, titanium and alloys thereof.

6. The array substrate for display according to claim 5 wherein the upper wiring material is selected from the group consisting of molybdenum and alloys thereof.

7. The array substrate for display according to claim 4 wherein the upper layer wiring material is selected such that the upper layer wiring material does not become insoluble in an acid or alkaline etchant.

8. The array substrate for display according to claim 5 wherein the upper layer wiring material is selected such that the upper layer wiring material does not become insoluble in an acid or alkaline etchant.

9. A meted for forming an array substrate for display, comprising:
    forming a layer of an insulating substrate, having an area;
    forming a thin film transistor array formed on the insulating substrate, each wiring having a first end, the wiring in communication with at least on of the transistors in the thin film array;
    forming connections pads, each connection pad contacting the first end of at most one of the plurality of wirings;
    forming pixel electrodes, and
    forming dummy conductive patterns, the dummy conductive patterns comprising at least about 30% of the area of the insulating substrate, the dummy patterns situated between the connection pads and the pixel electrodes such that the dummy patters are not in contact with any of the wiring.

10. The method for forming an array substrate for display according to claim 9 wherein at least one of the wirings comprises at least an upper layer and a lower layer of conductive materials.

US 6,689,629 B2

**9**

11. The method for forming an array substrate for display according to claim **10** wherein the lower layer wiring materials is selected from the group consisting of aluminum and aluminum alloys.

12. The method for forming an array substrate for display according to claim **10** wherein the upper layer wiring material is selected from the group consisting of molybdenum, chromium, tantalum, titanium and alloys thereof.

13. The method for forming an array substrate for display according to claim **11** wherein the upper layer wiring material is selected from the group consisting of molybdenum, chromium, tantalum, titanium and alloys thereof.

**10**

14. The method for forming an array substrate for display according to claim **13** wherein the upper wiring material is selected from the group consisting of molybdenum and alloys thereof.

15. The method for forming an array substrate for display according to claim **12** wherein the upper layer wiring material is selected such that the upper layer wiring material does not become insoluble in an acid or alkaline etchant.

16. The method for forming an array substrate for display according to claim **13** wherein the upper layer wiring material is selected such that the upper layer wiring material does not become insoluble in an acid or alkaline etchant.

\* \* \* \* \*

Case 1:07-cv-00427-JJF    Document 20-5    Filed 07/09/2007    Page 1 of 3

US006976781B2

(12) **United States Patent**　　　(10) **Patent No.:**　**US 6,976,781 B2**
Chu et al.　　　　　　　　　　　(45) **Date of Patent:**　**Dec. 20, 2005**

(54) **FRAME AND BEZEL STRUCTURE FOR BACKLIGHT UNIT**

(75) Inventors: **Chi-Chih Chu**, Yung Ho (TW); **Wen-Yuan Cheng**, Taoyuan Hsien (TW); **Hui-Kai Chou**, Taipei (TW)

(73) Assignee: **AU Optronics Corp.**, Hsinchu (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 31 days.

(21) Appl. No.: **10/446,103**

(22) Filed: **May 28, 2003**

(65) **Prior Publication Data**

US 2004/0080952 A1　　Apr. 29, 2004

(30) **Foreign Application Priority Data**

Oct. 25, 2002　(TW) .............................. 91125324 A

(51) **Int. Cl.**$^7$ ................................................. **F21V 7/04**
(52) **U.S. Cl.** .......................... **362/633**; 349/58; 40/209; 40/781
(58) **Field of Search** ............................. 362/23, 26, 28, 362/31, 551, 559, 560, 561, 362, 367, 368, 362/374, 382, 396, 433, 444, 600, 632, 633, 362/634; 349/58, 60, 56; 385/129; 40/204, 40/209, 124.02, 661.02, 541, 549, 700, 714, 40/781

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,570,267 A | * | 10/1996 | Ma ............................. 361/681 |
| 6,170,956 B1 | * | 1/2001 | Rumsey et al. ............. 359/839 |
| 6,386,722 B2 | * | 5/2002 | Okumura ...................... 362/31 |
| 6,502,945 B2 | * | 1/2003 | Kim et al. .................... 362/27 |
| 6,507,377 B1 | * | 1/2003 | Jung ............................ 349/60 |
| 6,507,484 B2 | * | 1/2003 | Fukuyoshi .................. 361/681 |
| 6,762,806 B1 | * | 7/2004 | Matsuo et al. ................ 349/58 |

* cited by examiner

*Primary Examiner*—Thomas M. Sember
*Assistant Examiner*—Ismael Negron
(74) *Attorney, Agent, or Firm*—Troxell Law Office, PLLC

(57) **ABSTRACT**

A frame including a first edge and a second edge, wherein on outer surfaces of the first edge, first hooks are formed to protrude outwardly, and on outer surfaces of the second edge, first holes are formed. A bezel has a first sidewall and a second sidewall, wherein on the first sidewall, second holes are formed, and on outer surfaces of the second sidewall, second hooks are formed to protrude outwardly. When the frame is mounted onto the bezel, the first edge is disposed onto inside surfaces of the first sidewall, and the first hooks are inserted and engaged in the second holes for fastening the frame and bezel, simultaneously the second edge is disposed onto the outside surfaces of the second sidewall, and the second hooks are inserted and engaged in the first holes for fastening the frame and the bezel.

**13 Claims, 5 Drawing Sheets**





Figure 1
(Prior Art)



Figure 2
( Prior Art )



Figure 3
(Prior Art)



Figure 4



Figure 5

**1**

# FRAME AND BEZEL STRUCTURE FOR BACKLIGHT UNIT

## FIELD OF THE INVENTION

The present invention relates to a backlight unit of a liquid crystal display, and more specifically, to a new assembling manner for mounting a frame onto a bezel to provide the assembling structure the reinforced supporting strength and to provide the convenience of disassembling the frame from the bezel.

## BACKGROUND OF THE INVENTION

With the advance of techniques for manufacturing thin-film transistors, the liquid crystal displays (LCD) are widely applied in electrical products, such as PDAs, laptops, digital cameras, cell phones, high resolution television sets, etc. due to advantages as portability, non-radiation and saving electricity. Especially when the manufactures devote themselves to further research and improve the materials, processes and equipments for producing LCD devices, the qualities of the LCDs are promoted and prime costs are reduced substantially. It is required to introduce backlight units into the LCDs for illumination because the liquid crystal molecules are non-illumination materials. Therefore the backlight unit is the most importance element for manufacturing the LCD devices, and the performance thereof is closely related to the displaying effect of the LCD.

Refer to FIG. 1, the typical backlight unit 10 applied to the LCDs comprises a lightguide plate 100, optical films 102, a reflector sheet 104, a tubular lamp 106, a frame 108 and a backbezel 110. The frame 108 and the bezel 110 are assembled together to contain and fabricate above components. When the backlight unit 10 is assembled, the reflector sheet 104 is disposed on the bezel 110, and then the lightguide plate 100 and the optical films 102 are disposed in sequence on the reflector sheet 104. Next, the frame 108 is mounted and fastened onto the bezel 110. And the tubular lamp 106 is inserted into the backlight unit 10 through an opening at the corner of the frame 108. The tubular lamp 106 is inserted into the slot between the lightguide plate 100 and one edge of bezel 110.

It is noted that for the purpose of fastening the frame 108 onto the bezel 110 as shown in FIG. 1, some hooks 110a are formed to protrude outwardly from the outside of the sidewalls of the bezel 110, and correspondingly on the sidewalls of the frame 108 some holes 108a are formed. Thus, when the frame 108 is mounted on the bezel 110, the hooks 110a of the bezel 110 are inserted and engaged in the holes 108a of the frame 108 for fastening the frame 108 and the bezel 110. Please refer to FIG. 2, the assembling structure of the frame 108 and the bezel 110 is illustrated.

Except the aforementioned assembling manner, in some backlight unit, as shown in FIG. 3, on the sidewalls of the bezel 111 are formed some holes 111b, and correspondingly on edges of the frame 109 some hooks 109b are fabricated. Therefore, when the frame 109 is disposed onto the bezel 111, the outside surfaces of the edges of the frame 109 are enclosed and attached by the inside surfaces of the sidewalls of the bezel 111, and the hooks 109b of the frame 109 are inserted and engaged in the respective holes 111b of the bezel 111 for fastening the frame 108 and the bezel 111.

In general, when the assembling manner shown in FIG. 2 is introduced, the edges of the frame 108 are mounted on the outside of the sidewalls of the bezel 110. It is noted that because the frame 108 made of resin material is flexible and

**2**

elastic, the operator can disassemble the frame 108 from the bezel 110 easily just by pressing back slightly the hooks 110a of the bezel 110 and simultaneously pulling the edges of the frame 108. Even though such assembling manner has the advantage of easy disassembling, however, the structure strength of the backlight unit is worse due to the resin frame 108 is pliable.

Besides, when the assembling manner shown in FIG. 3 is used, the edges of the frame 109 are enclosed and attached by the inside surfaces of the sidewalls of the bezel 111. Because the edge of the frame 109 is wedged between the bezel 111 and the lightguide plate 100, the structure strength of such backlight unit is reinforced. However, due to the bezel 111 made of metal material is too hard, it is difficult to disassemble the frame 109 from the bezel 111. The operators have to exert themselves to reject the hooks back and extract the frame 109 from the bezel 111. Apparently, such assembling design will increase the degree of difficulty in reassembling procedures. Under these conditions, the manufacturers usually have to trade off between structure strength and disassembling convenience. And apparently there is a requirement to figure out a new mounting manner for obtaining above two advantages both.

## SUMMARY OF THE INVENTION

The prime objective of the present invention is to provide a new assembling manner of the backlight unit for obtaining the both advantages of disassembling convenience and increasing structure strength.

The present invention discloses an assembling structure of a backlight module. The assembling structure comprises following components. A rectangular frame has a long edge and a short edge, wherein first hooks are formed and protruding outwardly on outside surfaces of said long edge, and first holes are formed on said short edge. A rectangular bezel has a long sidewall and a short sidewall, wherein second holes are formed on said long sidewall and second hooks are formed and protruding outwardly on outside surfaces of said short sidewall. When said rectangular frame is mounted onto said rectangular bezel, said long edge is attached to inside surfaces of said long sidewall and said first hooks are inserted and engaged in said second holes for fastening said rectangular frame and said rectangular bezel, and simultaneously said short edge is attached to said outside surfaces of said short sidewall and said second hooks are inserted and engaged in said first holes for fastening said rectangular frame and said rectangular bezel.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing aspects and many of the attendant advantages of this invention will become more readily appreciated as the same becomes better understood by reference to the following detailed description, when taken in conjunction with the accompanying drawings, wherein:

FIG. 1 illustrates the assembling manner of the components of the backlight unit;

FIGS. 2 & 3 illustrates the conventional assembling manner of the backlight unit;

FIG. 4 illustrates the frame and the bezel fabricated according to the present invention; and

FIG. 5 illustrates the mounting manner of the frame and the bezel according to the present invention.

**3**

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

As aforementioned, the assembling structure **20** is introduced to contain and fabricate various components of the backlight unit, such as a lightguide plate **302**, optical films **300**, a reflector sheet **304**, a tubular lamp **306** and etc. The assembling structure **20** comprises a frame **200** and a bezel **210**. The frame **200** has a rectangular shape composed of two long edges **202** and two short edges **204**. On each long edge **202** a plurality of holes **206** are formed. And on outer surfaces of each short edge **204** a plurality of hooks **208** are fabricated.

Correspondingly, the bezel **210** also has a rectangular shape. As shown in the FIGURE, the bezel **210** has a rectangular board **212**, two long sidewalls **214** and two short sidewalls **216** which are erect from the edges of the rectangular board **212** respectively. On outer surfaces of each long sidewall **214** a plurality of hooks **218** are formed and protruding outwardly. And on each short sidewall **216** a plurality of holes **220** are formed.

As aforementioned, when the components of the backlight unit are assembled, the reflector sheet **304**, the lightguide plate **302** and optical films **300** are disposed in sequence onto the rectangular board **212** of the bezel **210**. As shown in FIG. **4**, the reflector sheet **304** is disposed on the rectangular board **212** of the bezel **210**, the lightguide plate **302** is disposed on the reflector sheet **304**, and the optical films **300** are disposed on the lightguide plate **302**. Then, the frame **200** is mounted onto the bezel **210** to contain those components. The long edges **202** of the frame **200** are disposed and attached onto the outside surfaces of the long sidewalls **214** of the bezel **210**. Namely, the long sidewall **214** is covered by the edge **202**. And the hooks **218** on the outer surfaces of the long sidewall **214** are inserted and engaged in the holes **206** of the long edge **202** to fasten the frame **200** onto the bezel **210**. In the mean time, the short edge **204** is disposed and attached onto the inside surfaces of the short sidewall **216** of the bezel **210**, and the hooks **208** on the outside surfaces of the short edge **204** are inserted and engaged in the holes **220** of the short sidewall **216** to fasten the frame **200** and the bezel **210**, as shown in FIG. **5**.

It is noted that in most applications of the backlight module the frame **200** is made of flexible materials such as resin, and the bezel **210** is made of metal materials such as aluminum. Therefore, the short sidewalls **216** of the bezel **210** covering the outside of the short edge **200** of the short sidewall **216** can reinforce the structure strength of the backlight unit. AT the same time, because the long edges **202** of the frame **200** are attached to the outside of the long sidewalls **214** of the bezel **210**, the frame **200** can be disassembled from the bezel **210** very easily by pressing slightly the hooks **218** of the bezel **210** and pulling the long edges **202** of the frame **200**.

it is noted that in the above embodiment, the long edges **202** of the frame **200** are formed with the holes **206**, and the short edges **204** are formed with hooks **218**. However, in another embodiment, other mounting manners can be chosen according to the requirements of designing backlight units. For example, the short edges of the frame can be defined with holes, and the long edges of the frame can be fabricated with protruding hooks. Correspondingly, the short sidewalls of the bezel are fabricated with hooks and the long sidewalls thereof are drilled to have holes thereon. Thus, the assembling structure with the frame mounted onto the bezel can have both the advantages of enhancing structure strength and easy disassembling.

**4**

Besides, in a further embodiment, only one edge of the rectangular frame is fabricated with holes and the others (the three edges) are fabricated with protruding hooks. Certainly, in this design, only one sidewall of the bezel is fabricated with hooks, and the others are fabricated with holes for fastening the frame and the bezel.

It is noted that in most backlight units the tubular lamp of the backlight unit is disposed on the inside of one long sidewall of the bezel. So in a preferred embodiment the long edges of the frame are disposed to attach the outside surfaces of the long sidewalls of the bezel. Therefore, the long sidewall of the bezel is more closely to the tubular lamp and can have efficient heat dissipations due to the metal material of the bezel. And that can prevent the overheat issues of the tubular lamp in the prior art. In other words, the long sidewall adjacent to the tubular lamp is fabricated with hooks that are protruding outwardly from the outside surfaces of the long sidewall. And on the corresponding long edges of the frame the holes are formed for receiving and wedging the hooks of the bezel, in order to fasten the frame and the bezel and to let the sidewall of the metal bezel more closely to the tubular lamp.

Except the design of assembling the frame and the bezel as illustrated in the above embodiment, the fastening manner can also be applied to the assembling structure of two frames. For example, some first hooks are fabricated on the outside of the first edge of an upper frame, and on the second edges of the upper frame some first holes are formed. In the mean time, on the third edges of a lower frame some second holes are formed to receive and wedge the first hooks, and outside the fourth edges of the lower frame some second hooks are fabricated to insert and engage the first holes for fastening the upper and lower frames.

The assembling structures provided in the present invention have many advantages. Because the two long edges of the frame are disposed to mount and cover the two long sidewalls of the bezel, and the two short edges of the frame are disposed inside the two short sidewalls of the bezel. So the assembling structures can obtain both the reinforced structure strengths and the disassembling convenience.

As is understood by a person skilled in the art, the foregoing preferred embodiment of the present invention is illustrated of the present invention rather than limiting of the present invention. It is intended to cover various modifications and similar arrangements included within the spirit and scope of the appended claims, the scope of which should be accorded the broadest interpretation so as to encompass all such modifications and similar design.

What is claimed is:

1. An assembling structure of a backlight module for containing and fabricating components of said backlight module, said assembling structure comprising:

   a frame, having a first edge and a second edge, wherein on outer surfaces of said first edge a plurality of first hooks are formed to protrude outwardly, and on outer surfaces of said second edge a plurality of first holes are formed;

   a bezel, made of metal material, having a first sidewall and a second sidewall, wherein on said first sidewall a plurality of second holes are formed, and on outer surfaces of said second sidewall a plurality of second hooks are formed to protrude outwardly;

   wherein said first edge is disposed onto inside surfaces of said first sidewall, said first hooks are inserted and engaged in said second holes, said second edge is disposed onto outside surfaces of said second sidewall, and said second hooks are inserted and engaged in said first holes as said frame is mounted onto said bezel.

5

**2.** The assembling structure of claim **1**, wherein said frame is made of resin material.

**3.** The assembling structure of claim **1**, wherein a tubular lamp of said backlight module is disposed inside and adjacent to said second sidewall of said bezel.

**4.** The assembling structure of claim **1**, wherein said frame has a rectangular shape, and said first edge of said frame is a short edge, and said second edge of said frame is a long edge.

**5.** The assembling structure of claim **1**, wherein said bezel has a rectangular board, and said first sidewall and said second sidewall are erect from edges of said rectangular board, said first sidewall is a short sidewall of said bezel and said second sidewall is a long sidewall thereof.

**6.** An assembling structure of a backlight module for containing and assembling components of said backlight module, said assembling structure comprising:

an upper frame, made of resin material, having a first edge and a second edge, wherein on outside surfaces of said first edge first hooks are formed to protrude outwardly, and on said second edge first holes are formed; and

a lower frame, made of metal material, having a third edge and a fourth edge, wherein on said third edge second holes are formed, and on outside surfaces of said forth edge second hooks are formed to protrude outwardly;

wherein said first edge is disposed inside said third edge and said first hooks are inserted and engaged in said second holes, said second edge is attached to the outside surfaces of said fourth edge, and said second hooks are inserted and engaged in said first holes as the upper frame is mounted onto the lower frame.

**7.** The assembling structure of claim **6**, wherein a tubular lamp of said backlight module is disposed inside said fourth edge of said lower frame.

**8.** A backlight unit comprising:

a bezel made of metal material, having a first sidewall and a second sidewall, wherein on said first sidewall a plurality of first holes are formed, and on outer surfaces

6

of said second sidewall a plurality of first hooks are formed to protrude outwardly;

a lightguide plate, disposed above said bezel;

a frame, disposed above said lightguide plate and mounted onto said bezel, having a first edge and a second edge, wherein on outer surfaces of said first edge a plurality of second hooks are formed to protrude outwardly, and on outer surfaces of said second edge a plurality of second holes are formed, wherein said first edge is disposed onto inside surfaces of said first sidewall, and said second hooks are inserted and engaged in said first holes for fastening said frame and said bezel, simultaneously said second edge is disposed onto outside surfaces of said second sidewall, and said first hooks are inserted and engaged in said second holes for fastening said frame and said bezel; and

a tubular lamp, disposed on said bezel, beside said lightguide plate, and adjacent to inside surfaces of said second sidewall of said bezel.

**9.** The backlight unit of claim **8**, wherein said frame is made of resin material.

**10.** The backlight unit of claim **8**, further comprising a reflector sheet, disposed on said bezel and beneath said lightguide plate.

**11.** The backlight unit of claim **8**, further comprising optical films, disposed on said lightguide plate and under said frame.

**12.** The backlight unit of claim **8**, wherein said frame has a rectangular shape, and said first edge of said frame is a short edge, and said second edge of said frame is a long edge.

**13.** The backlight unit of claim **12**, wherein said bezel has a rectangular board, and said first sidewall and said second sidewall are erect from edges of said rectangular board, said first sidewall is a short sidewall of said bezel and said second sidewall is a long sidewall thereof.

\* \* \* \* \*

(12) **United States Patent**
Kubota et al.

(10) **Patent No.:    US 6,778,160 B2**
(45) **Date of Patent:      Aug. 17, 2004**

(54) **LIQUID-CRYSTAL DISPLAY, LIQUID-CRYSTAL CONTROL CIRCUIT, FLICKER INHIBITION METHOD, AND LIQUID-CRYSTAL DRIVING METHOD**

(75) Inventors: **Tetsu Kubota**, Fujisawa (JP); **Akihiro Funakoshi**, Kamakura (JP); **Takuya Ishikawa**, Hino (JP)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice:     Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 218 days.

(21) Appl. No.: **09/760,131**

(22) Filed:     **Jan. 12, 2001**

(65)           **Prior Publication Data**

US 2001/0024181 A1 Sep. 27, 2001

(30)     **Foreign Application Priority Data**

Jan. 17, 2000   (JP) ....................................... 2000-007816

(51) Int. Cl.[7] ................................................. G09G 3/36
(52) U.S. Cl. ............................. **345/89**; 345/98; 345/77; 345/88; 345/690
(58) Field of Search ............................. 345/88, 63, 89, 345/77, 90, 87, 611, 690, 147, 148, 211, 102, 212

(56)             **References Cited**

U.S. PATENT DOCUMENTS

5,347,294 A   *  9/1994  Usui et al. .................... 345/89

| | | | | |
|---|---|---|---|---|
| 5,483,634 A | * | 1/1996 | Hasegawa | 359/162 |
| 5,956,014 A | * | 9/1999 | Kuriyama et al. | 345/147 |
| 6,064,359 A | * | 5/2000 | Lin et al. | 345/89 |
| 6,075,514 A | * | 6/2000 | Ryan | 345/601 |
| 6,326,938 B1 | * | 12/2001 | Ishida et al. | 345/63 |
| 6,333,727 B2 | * | 12/2001 | Mizumaki | 345/89 |

FOREIGN PATENT DOCUMENTS

| JP | 4-365094 | 12/1992 |
|---|---|---|
| JP | 06-062355 | 3/1994 |
| JP | 07-056532 | 3/1995 |
| JP | 8-8671 | 1/1996 |

* cited by examiner

*Primary Examiner*—Regina Liang
*Assistant Examiner*—Jennifer T. Nguyen
(74) *Attorney, Agent, or Firm*—Derek S. Jennings; David Aker

(57)             **ABSTRACT**

A liquid crystal display comprises an input for inputting a video signal from a host and a storage medium for storing the previous brightness level of the video signal input through the input. A determinator is provided for determining an output brightness level based on the previous brightness level stored in the storage medium and the next brightness level of the next video signal input to the input, so as to make the time integration quantity of a brightness change substantially equal to an ideal quantity of light in a stationary state with respect to the next brightness level. Further included are drivers for driving an image displaying liquid crystal cell based on the output brightness level determined by the determinator.

**14 Claims, 11 Drawing Sheets**



[Figure 1]



[Figure 2]



[Figure 4]



[Figure 5]



(a)



(b)

[Figure 6]



[Figure 7]

26 (Graph base table)

| Previous brightness \ Next brightness | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 28 | 48 | 63 | 74 | 83 | 88 | 93 | 96 | 98 | 100 |
| 10 | 0 | 10 | 30 | 45 | 56 | 65 | 70 | 75 | 80 | 90 | 100 |
| 20 | 0 | 10 | 20 | 35 | 46 | 55 | 60 | 70 | 80 | 90 | 100 |
| 30 | 0 | 10 | 20 | 30 | 41 | 50 | 60 | 70 | 80 | 90 | 100 |
| 40 | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| 50 | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| 60 | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| 70 | 0 | 10 | 20 | 30 | 40 | 50 | 59 | 70 | 80 | 90 | 100 |
| 80 | 0 | 10 | 20 | 30 | 40 | 45 | 54 | 65 | 80 | 90 | 100 |
| 90 | 0 | 10 | 20 | 25 | 30 | 35 | 44 | 55 | 70 | 90 | 100 |
| 100 | 0 | 2 | 4 | 7 | 12 | 17 | 26 | 38 | 52 | 72 | 100 |

[Figure 8]



[Figure 9]    PRIOR ART



**U.S. Patent**    Aug. 17, 2004    Sheet 10 of 11    US 6,778,160 B2

[Figure 10]                    PRIOR ART



[Figure 11]    PRIOR ART



US 6,778,160 B2

1

## LIQUID-CRYSTAL DISPLAY, LIQUID-CRYSTAL CONTROL CIRCUIT, FLICKER INHIBITION METHOD, AND LIQUID-CRYSTAL DRIVING METHOD

### FIELD OF THE INVENTION

The present invention relates to a method for compensating poor response time, and in particular, to a method and an apparatus for inhibiting flicker resulting from the poor response time of a liquid crystal display.

### BACKGROUND OF THE INVENTION

In recent years, besides cathode ray tubes (CRTs), liquid crystal displays (LCDs) have come into widespread use as display devices for various types of image displays and monitors for units such as personal computers (PCs) and television sets. The LCDs can be made significantly smaller and lighter than CRTs. In addition, many improvements in the display performance of LCDs, including low geometric distortion as well as considerably high picture quality, have been achieved. For these reasons, the LCDs have gained the spotlight as a mainstream display device used in video equipment of the future.

However, because of the poor response characteristic of the liquid crystal itself, the LCDs has the potential problem of poor response time. That is, in a typical display device used in the industry, the display is refreshed at a frame rate of 60 frames per minute, or every (1÷60≈) 16.7 ms. On the other hand, the response time of liquid crystals used in many current LCDs required to change from black to white is 10 to 50 ms, typically 20 to 30 ms. This means that one frame time in the display is shorter than the response time of most liquid crystals. As a result, problems, such as the visual persistence of moving images and inability to keep up with fast-moving images, caused by the response delay of the LCDs have become obvious.

The term "response time" used in the industry refers to the sum of (1) time required to reverse color by applying a voltage to a liquid crystal cell and (2) time required to restore the original color by the removal of the applied voltage. The term "frame" used in the industry represents the scanning of all the images (picture elements) that should form one complete picture on the display.

Some solutions to these poor response time problems with the LCD are disclosed in, for example, Published Unexamined Japanese Patent Applications Nos. 2-153687, 4-365094, 6-62355, and 7-56532.

In Published Unexamined Japanese Patent Application No. 2-153687, a LCD is provided which is configured to discriminate between a static image area having less motion and a fast-moving area and apply a signal process only to the moving area to emphasize time-based changes in an image, thereby improving response time in the image area where better response time is required to reduce visual persistence and noise.

In Published Unexamined Japanese Patent Application No. 4-365094, a LCD is provided which is configured to be driven by reading pre-stored optimum image data according to the direction and degree of a change when the image data changes, thereby allowing the LCD to rapidly follow the fast-changing image.

In Published Unexamined Japanese Patent Application No. 6-62355, a technology is disclosed which superposes a difference component between fields or frames on a video

2

signal to provide pulse stepping drive when the video signal changes between the fields or frames, thereby improving the response of display elements in an LCD.

In Published Unexamined Japanese Patent Application No. 7-56532, a technology is disclosed which provides table memory containing a table of image increase/decrease values and drive a liquid crystal panel (liquid crystal cell) by performing an addition/subtraction in order to improve response changes due to changes in the gray scale in the liquid crystal panel. However, the amount to be added or subtracted is expressed only by the word "optimum" and no specific amount is disclosed.

One problem associated with picture quality in LCDs which does not arise in a CRT display is flicker. When, for example, a wire-frame model in a CAD application is displayed on the LCD and the operator (user) moves it continuously at a relatively low speed, about several tens pixels per minute, the entire wire-frame model appears to blink in a cycle of several to several tens Hz. This effect is called flicker. While this effect does not occur in CRT displays, it occurs in most existing types of LCDs and many customers have requested minimization of the flicker urgingly. The flicker herein differs in symptom and cause from that in CRT displays which is caused by infrequent refresh.

In CAD applications, a wire-frame model is typically displayed using many thin lines in white or other colors against a black background. Assuming that the wire-model is white (all of the colors R (read)/G (green)/B (blue) are "ON") as an example, no problem arises when the model stay stationary on the screen because only a few frames are required to achieve an proper brightness. However, if the operator move the model on the screen, the proper brightness cannot completely be achieved. That is, if a pixel is made light up only in one frame, the brightness of the pixel may not reach the predetermined brightness because the response of the LCD itself is slow as mentioned above. This situation will be described below with reference to the drawings.

FIG. 9 shows the movement of lines when a wire-frame model is moved on the screen. FIG. 10 shows on/off states of the pixels on line (i) in each frame at the time point in FIG. 9. FIG. 11 shows a change in the brightness of pixel (j).

Herein, as shown in FIG. 9, in the case where attention is paid to a particular pixel, assuming that a line of the wire frame 200 moves through frames (n−1) 201 to (n) 202 to (n+1) 203 in sequence. That is, the pixel lights up in a time period equivalent to the frames in which the line passes over the pixel and goes off immediately after that.

Focusing attention on line (i) 205 represented by a dashed line, in particular, on the particular pixel, each frame is driven from OFF to ON by the movement of pixel (j) 206, then one frame after goes back from ON to OFF, as shown in FIG. 10. However, because the response time of commonly-used liquid crystals is longer than 16.7 ms, pixel (j) 206 changes back to black before completely returning from black to white. That is, as shown in FIG. 11, pixel (j) 206 is OFF in frame (n−1) 201, goes ON in frame (n) 202, then goes OFF in frame (n+1) 203. However, the target brightness of pixel (j) 206 is not reached even though it is turned on in order to achieve 100% brightness in frame (n) 202. As a result, the brightness of the line drawing during movement will be low. The inventors have found that when a wire-frame model is continuously moved in a CAD application, the wire-frame model in fact repeatedly alternates between moving and stationary states every several frames and blinks due to a difference in display brightness

3

between the moving and stationary states, and this difference causes "flicker."

Many manufacturers have actively sought after a method for improving the response of LCD panels by improving a liquid crystal material itself or narrowing the gap between 5 glass plates in order to reduce flicker of LCDs. Some state-of-the-art products on the market have an improved response time of about 25 ms including rising and falling time. Another LCD technologies for reducing response time to several ms have been disclosed in some academic con- 10 ferences. However, these approaches to improve an LCD panel itself can hardly to provide mass-production products because of their low reliability, and there are many other problems to be solved to put them into practical use.

In view of these technical problems, it is a primal object 15 of the present invention to inhibit the flicker effect as visual perception by the panel driving circuitry which drives an LCD.

It is another object of the present invention to drive the 20 LCD by applying an offset to a moving model without globally determining whether the model is moving or stationary.

## SUMMARY OF THE INVENTION

To achieve above-mentioned objects, a feature of the 25 present invention includes a liquid crystal display comprises an input for inputting a video signal from a host and a storage medium for storing the previous brightness level of the video signal input through the input. A determinator is 30 provided for determining an output brightness level based on the previous brightness level stored in the storage medium and the next brightness level of the next video signal input to the input, so as to make the time integration quantity of a brightness change substantially equal to an ideal quantity 35 of light in a stationary state with respect to the next brightness level. Further included are drivers for driving an image displaying liquid crystal cell based on the output brightness level determined by the determinator.

Another feature of the present invention includes a liquid 40 crystal display characterized by comprising a driver for driving each of the pixels forming an image for each frame to a liquid crystal cell displaying the image, an input for inputting an moving-state video signal which changes from the off state to the on state on transition to a particular frame 45 in the frames and returns to the off state after the particular frame is completed, and elements for setting an offset for making the quantity of light closer to the quantity of light in a stationary state in which the moving-state video signal is continuously turned on for the particular frame. The liquid 50 crystal display further includes a generator for applying the offset set by the setting elements to the moving-state video signal input through the input means to generate an output video signal, and an output for outputting the output video signal generated by the generation means to the drive means. 55 By configuring the apparatus in this way, a difference in brightness between a stationary state and a moving state which can be considered as the principal cause of flicker can be reduced to inhibit visually perceptible flicker.

Yet another feature of the present invention is further 60 characterized by a liquid crystal control circuit having a function for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by liquid crystal cells. The liquid crystal control circuit includes a storage portion for storing an offset in brightness in a 65 moving state in which the wire-frame model having a predetermined gray scale changes from frame to frame with

4

respect to a particular pixel. This is with relation to brightness output in a stationary state in which the wire-frame model having the predetermined gray scale is displayed on the particular pixel across a plurality of frames. Further included is a correction portion for applying the offset stored in the storage portion to the gray scale of the wire-frame model if the input wire-frame model is in a moving state.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram for showing the overall configuration of a liquid crystal display (LCD) apparatus according to one embodiment of the present invention.

FIG. 2 is a graph showing an example of brightness of a wire-frame image in a moving state on the LCD used with the embodiment.

FIG. 3 is a table showing the measurements of response time at the maximum brightness of a liquid crystal used in five LCD models (model A to E).

FIG. 4 shows the response characteristic of an ideal liquid crystal.

FIGS. 5 (a) and (b) are graph showing the response characteristics of models A and B shown in FIG. 3 by brightness versus time when a pixel is turned on for only one frame.

FIG. 6 shows an effect when brightness is set by taking a required offset into consideration.

FIG. 7 shows a relation between brightness L1 and brightness L2 in table form;

FIG. 8 is a graph showing desired brightness versus brightness actually provided when brightness falls.

FIG. 9 shows the movement of a line on the screen when a wire-frame model is moved on the screen.

FIG. 10 shows the ON/OFF states of a pixel on line (i) in each frame.

FIG. 11 shows changes in brightness of pixel (i).

## DETAILED DESCRIPTION OF THE INVENTION

The "ideal quantity of light" herein is, to take an example, the quantity of light based on a response characteristic which provides a target brightness level at a time point at which the frame is turned on and provides a brightness level of zero at the time point at which the frame is turned off on a display device in which each pixel is driven for each frame. The brightness level can be represented as a target brightness value by a gray scale and considered as an indication of the characteristic of human visual sensation to brightness. In addition, a brightness change can be considered as a response characteristic depending on the types of liquid crystal cells (liquid crystal panels). Quantity of light is considered as a time integration quantity of a brightness change and can be expressed as brightness_time, if the brightness is constant. The representation "substantially equal level" refers to a level which is not completely the same but can be accepted as a substantially equivalent level, and includes a level which is closer to an ideal quantity of light than no preventive measures are taken.

The determinator is characterized by comprising a table for storing a brightness level determined by the characteristic of a liquid crystal cell according to a relation between the previous brightness level and the next brightness level, and determining an output brightness level by modifying the next brightness level based on the brightness level read from the table. With this configuration, flicker due to changes in

US 6,778,160 B2

5

the quantity of light during the movement of the model can be inhibited without globally determining whether a model is in a moving or stationary states. In addition, a correction for a "halftone" can be made, thereby allowing a decrease in brightness level, which is remarkable in halftones, to be addressed properly.

The video signal input through the input consists of a plurality of color signals and the table in the determinator is provided for each of the color signals so that a brightness level correction for each color can be made with respect to flicker perception of the human eye to reduce a difference in brightness, thereby an easy-on-the-eye liquid crystal display can be provided to the user. While the color signals may be R (read), G (green), B (blue) signals used in displays, other display systems can also be used.

The offset set by the setting elements can be determined based on a time integration quantity, which is a change in brightness in the moving-state vide signal integrated with respect to time, and the quantity of light in stationary state, thus a difference in brightness can be preferably reduced in consideration of the human visual perception characteristic to inhibit flicker appropriately.

The moving-state video signal passed through the input consists of a plurality of color signals, the offset set by the setting elements is determined for each of the color signals, and the generator generates the output video signal for each color signal based on the offset determined for each color signal. Thus a difference in brightness between moving and stationary states can be corrected for each color signal to inhibit flicker on a color image display.

The apparatus further comprises a frame buffer for storing the brightness information of the input wire-frame model as the previous brightness, and characterized by that the storage portion stores the offset as table information based on a relation between the previous brightness stored in the frame buffer and the brightness of the next input wire-frame model, thus, flicker in a moving state can be advantageously inhibited without providing separate determining units for moving and stationary states.

Because the wire-frame model in the present invention is a model consisting of a large number of thin lines in white or other colors in a CAD application, for example, in which flicker is especially troublesome, the flicker inhibition by correcting gray scale of such a wire-frame model in a moving state is highly effective.

The liquid crystal control circuit may be implemented as an interface board provided in a liquid crystal display monitor. The liquid crystal display monitor may be one used with a desktop personal computer or a CAD computer as well as one integrated with a host, like a notebook computer.

In another category, the present invention is a flicker inhibition method for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by a liquid crystal cell. The method is characterized by storing a relation between brightness in a stationary state in which a wire-frame model having a predetermined gray scale is displayed on a particular pixel across a plurality of frames and brightness in a moving state in which the wire-frame model having the predetermined gray scale changes from frame with respect to the particular pixel, applying an offset based on the stored relation to the gray scale of the wire-frame model if the input wire-frame model is in a moving state, and driving the liquid crystal cell based on the gray scale to which the offset is applied to display the wire-frame model.

The moving state brightness used for storing the relation is the brightness when the particular pixel changes back to

6

the off state one frame after it is driven from the off state to the on state during the passage of the wire-frame model over the particular pixel.

Furthermore, the brightness in the moving state which is used when the relation is stored is the quantity of light equal to the brightness change integrated with respect to time.

With this configuration, a difference in the brightness of the wire-frame model between its moving state and stationary state can be reduced to inhibit flicker which would otherwise noticeably occur.

Viewing the present invention as a liquid crystal driving method, the liquid crystal driving method of the present invention is characterized by the steps of storing first brightness information for an input pixel in a frame buffer, and applying, based on second brightness information for the next input pixel and the first brightness information stored in the frame buffer, an offset for making the time integration quantity of a brightness change substantially equal to an ideal light quantity which is brightness in a stationary state to the second brightness information. The steps further include the outputting of the second brightness information to which the offset is applied to a driving circuit for driving an liquid crystal cell, and storing the second brightness information for the input pixel in a frame buffer. This liquid crystal driving method allows the inhibition of flicker by using a simple apparatus without globally determining whether a model is moving or stationary.

The present invention is still further characterized in that the input pixel consists of a plurality of color signals and includes the step of storing the first brightness information in the frame buffer stores the first brightness information for each of the color signals, and the step of applying the offset applies the offset to each of the color signals, thus the brightness of each color of a color image consisting of a plurality of color signals can be corrected individually, allowing more adequate flicker inhibition.

The offset applying step is characterized by the step of reading a pre-stored offset based on the relation between the first and second brightness information and applying the read offset to the second brightness information.

The brightness information at a moving time that is used in a storage operation based on the relation is the quantity of light equal to a brightness change for each color signal integrated with respect to time, therefore correction according to the human visual perception characteristics can be made to address the problems resulting from human visual perception of flicker more properly.

The present invention will be described below with respect to the embodiments shown in the accompanying drawings.

FIG. 1 is a drawing for showing the overall configuration of a liquid crystal display according to an embodiment of the present invention. Reference number 10 denotes a liquid crystal display monitor (LCD monitor) as a liquid crystal display panel, which comprises, for example, a liquid crystal module 30 having a thin-film transistor (TFT) structure and an interface (I/F) board 20 connected to a digital or analog interface to a personal computer (PC) or a workstation (WS) system for supplying a video signal to the liquid crystal module 30. If a notebook PC is used, a system unit (not shown) is integrated with the liquid crystal display monitor 10. If a monitor having a display device separated from its system unit is configured, a system unit (not shown) is attached to the LCD monitor 10 to form a liquid crystal display.

The I/F board 20 comprises a input unit 27 for inputting video data from a host such as a PC/WS system, a com-

US 6,778,160 B2

7

parison logic 24 for comparing the previous brightness with the next brightness for an input video signal, and an Application-Specific Integrate Circuit (ASIC) 21 including a logic having units such as a supplementary correction portion 25 for performing a supplementary correction. The I/F board 20 also comprises a frame buffer 22 for temporarily storing the input video signal and read-only memory (ROM) 23 containing information needed for the operation of the ASIC 21. The frame buffer 22 stores input video signal value input previously and provides it to the ASIC 21. The ROM 23 includes a graph base table 26 which is required for the supplementary correction in the ASIC 21 and is set for each of R/G/B input color signals. The graph base table 26 contains a brightness level to be output based on a relation between the previous brightness and the next brightness in a table form which will be described later.

The liquid crystal module 30 consists of three main blocks a liquid cell control circuit 31, liquid crystal cell 32, and a backlight 33. The liquid cell control circuit 31 consists of panel drivers such as an LCD controller LSI 34, a source driver (X driver) 35, and a gate driver (Y driver) 36. The LCD controller LSI 34 processes signals received from the I/F board 20 via a video interface and outputs appropriate signals to each ICs of the source driver 35 and gate driver 36 with an appropriate timing. The liquid crystal cell 32 outputs an image using a TFT array arranged in a matrix through the application of a voltage from the source driver 35 and the gate driver 36. The backlight 33 has a fluorescent tube (not shown) located on the back or side of the LC cell 32 for illuminating the cells from the back.

FIG. 2 is a graph showing an example of the brightness of a wire-frame model moving on the LCD panel used in this embodiment. The horizontal scale indicates brightness (%) desired to be provided and the vertical scale indicates brightness (%) actually provided in the Figure. The dashed line 51 indicates the relationship between the desired brightness and actual brightness of the model in a stationary state. The solid line 50 indicates the relationship between the desired brightness and actual brightness of the model in a moving state for an R (red) signal. The alternate long and short two dashes line indicates a G (green) signal in the moving state and the alternate long and short one dash line indicates a B (blue) signal in the moving state. The characteristics in the moving state vary from LCD panel to LCD panel.

Consider the case where a wire-frame model of a halftone, which is 50% brightness, is displayed on the LCD having the characteristics shown in FIG. 2. In the stationary state 51, there is no problem because the 50% brightness of a pixel can be achieved with some frames by driving the liquid crystal with a voltage providing the 50% brightness. On the other hand, in the moving state, as apparent from the line 50 indicating the brightness for the R signal in moving state, actually only 21% brightness can be obtained on the display even by driving the liquid crystal with a voltage equivalent to 50% brightness. To achieve an actual brightness of 50%, the LC must be driven with an voltage equivalent to 83% brightness. That is, an offset of 33% is required to be applied to the input voltage equivalent to 50% brightness. For the B signal, more offset is required. Though the brightness for G signal is somewhat closer to that in the stationary state 51, an offset is still required to be applied.

The relationship between the response characteristic of liquid crystal and flicker will be further discussed below.

FIG. 3 is a table showing the measurements of the response time of liquid crystal at the maximum brightness in

8

five LCD models (models A to E). In a model 61 shown in the first column, the symbol in parentheses indicates the magnitude of flicker at the maximum brightness. Symbol "○" indicates that almost no flicker is visually perceived, symbol "Δ" indicates that flicker level is quite acceptable, and symbol "X" indicates that intensive flicker is perceived. Response rising time 62 is shown in the second column and response falling time 63 is shown in the third column. The light quantity ratio 64 in the forth column represents the ratio of the light quantity of each model to that of an ideal LC. The ratio of the brightness of the drawing in a moving state to that in a stationary state 65 is indicated in the fifth column. The brightness ratio of the drawing in the moving state to that in stationary state 65 represents to what degree the brightness of the wire-frame model in the moving state is darkened compared to the brightness of that in the stationary state. It can be seen that while there is almost no reduction in brightness in model A (1.0:1), brightness is reduced in models B (0.8:1), D (0.7:1), and E (0.3:1), on which flicker is perceived.

In terms of whether the response at the maximum brightness is adequately fast, both of the response rising time 62 and the falling time 63 of model A is poor compared to model B. However, when a wire-frame model in an actual CAD application is displayed and moved on these LCD models, flicker in model A is less than in model B. The reason can be explained by considering the characteristics of human visual perception. It is known that the human visual perception is subject to a time integration effect ("Handbook of information technology for television image", 1st edition, pp.39–40, Institute of Television Engineers of Japan, 1990). Brightness of a pixel to the human eye cannot be considered in terms of time required to reach a specified brightness, instead, it should be considered in terms of the quantity of light, that is, a brightness change integrated with respect to time.

FIG. 4 shows the response characteristic of an ideal liquid crystal and indicates the state in which a particular pixel is kept lit up at a brightness of L1, that is in a stationary state. Here, the quantity of light (S) emitted in one frame time (T) is equal to L1×T (i.e. brightness×time) as shown in the shaded area in FIG. 4.

FIGS. 5A and 5B show the response characteristic represented by brightness versus time when a pixel stays lit up for one frame time (On→Off) in models A, B shown in FIG. 3. Both of the rising and falling of the response of model A shown in FIG. 5A are gradually. As a result, the quantity of light ($S_A'$) which is almost the same as that in the ideal LC shown in FIG. 4 can be obtained ($S_A' \approx S$). On the other hand, even though the response rising of model B is rapid, the falling is also rapid and steep as shown in FIG. 5B. Accordingly, quantity of light $S_B'$ is only 81% of that of the ideal LC as shown the column "Light quantity ratio" 64 in FIG. 3. Therefore, even though the response time of model B is better than that shown in FIG. 5A, there is a difference in brightness (the brightness in model B is less than model A) due to the difference in light quantity ($S_B' < S_A'$) in stationary/moving states, causing flicker when the wire-frame model is moved on model B. As can be seen from the results for models C, D, E in FIG. 3, displays providing a smaller light quantity ratio 64 provide a smaller brightness ratio 65 of a drawing in a moving state to that in a stationary state, resulting in more flicker.

Although the ultimate solution to these problems is to develop an LC device having an ideal response characteristic as shown in FIG. 4, it will be some time before such a device comes into use. Thus, another solution is required for inhibiting flicker even in LC devices having moderate response time.

**9**

One of the effective solutions may be a method that uses the measurement of a brightness difference between the stationary state 51 and moving state 50 as shown in FIG. 2. That is, a wire-frame model is drawn with an adequate gray scale by taking account of a required offset, which can be read from the graph shown in FIG. 2, during the movement of the wire-frame model.

FIG. 6 shows an effect when brightness is set by taking a required offset into account. If the liquid crystal is driven trying to achieve desired brightness L1 as target, only the quantity of light (S') indicated by reference number 71 can be obtained due to the response time of the liquid crystal described above. The quantity of light (S') 71 is much smaller than the quantity of light (S) provided by the ideal response characteristic shown in FIG. 4. On the other hand, if the liquid crystal is driven with the aim of achieving brightness L2 which is larger than the desired brightness of L1, the quantity of light (S'') indicated by reference number 72 can be obtained. By overdriving the LC to brightness L2, the LC reaches L1 in a short response time and the quantity of light (S'') 72 can be obtained which is approximately the same as the quantity of light (S), which would be provided with the ideal response characteristic (S''≈S). Here, optimum brightness L2 with respect to L1 can be obtained from the data shown in FIG. 2.

FIG. 7 is a table showing a relation between brightness L1 and L2 and represents the content of the graph base table 26 stored in the ROM 23 shown in FIG. 1. The content of the graph base table 26 shown in FIG. 7 represents a relation between the previous brightness and the next brightness for the LC cell 32 having the characteristic shown in FIG. 2, by taking the effect shown in FIG. 6 into consideration. The previous brightness can be obtained from a video signal input through the ASIC21 shown in FIG. 1 and stored in the frame buffer 22. The next brightness can be obtained from the next video signal input to the ASIC 21. The graph base table 26 is constructed for each of the R, G, B color signals and the values in the table vary depending on the characteristic of the LC cell 32.

The first row of the graph base table 26 shown in FIG. 7 indicates brightness output for the next brightness when the previous brightness is 0 and match the readings of the R signal in the moving state line 50 in the graph shown in FIG. 2. For example, if the next brightness is "10", find a value of 10% on the vertical scale and follow the horizontal line from that point to the point at which the line intersects the moving state line 50, and a value 28%, which is the desired brightness, can be read. When brightness rises from a certain halftone to another halftone, the offset difference is added to the previous brightness. For example, if the previous brightness is 10 and the next brightness is 20, then (48−28)+10= 30. If the next brightness is 30, then (63−28)+10 =45. Similarly, if the previous brightness is 20 and the next brightness is 30, then (63−48)+20=35. If the previous brightness is 30 and the next brightness is 40, then (74−63)+30= 41. In this embodiment, if a difference between the previous brightness and the next brightness is greater than an offset, the next brightness is output without change. For example, if the previous brightness is 10 and the next brightness is 80, then the offset is (96−28)=68. If the previous brightness value, 10, is added to this offset, the result would be 78. In this case, the brightness of 80 is output in order to ensure the next brightness.

On the other hand, when brightness falls from a certain halftone to another halftone, the offset is subtracted from the previous brightness. The example in FIG. 7 shows a case where the characteristic of the LC cell 32 when brightness

**10**

rises (the cell is turned on) is the same as that when the brightness falls (the cell is turned off). In this example, if the previous brightness is 100 and the next brightness is 10, the output value will be 100−98=2. The value "98" is equal to the value when the previous brightness is 0 and the next brightness is 90 in FIG. 7. Similarly, if the previous brightness is 100 and the next brightness is 20, then 100−96=4. If the previous brightness is 90 and the next brightness is 30, then 100−75=25. The value "75" is equal to the value when the previous brightness is 10 and the next brightness is 70 in FIG. 7. Similarly, if the previous brightness is 90 and the next brightness is 40, then 100−70=30. The value "70" is equal to the value when the previous brightness is 10 and the next brightness is 60 in FIG. 7.

While in the table in FIG. 7 the values of previous and next brightness are indicated in increments of 10 for clarity, the table in practice is constructed to store all the combinations which can be read from measurements as shown in FIG. 2. For example, brightness values in increments of 1 may be stored, and any other degree of precision may be chosen according to a given device. While brightness is expressed in percent figures in FIG. 7, the expression of addresses and value stored in the table is not limited to percentage, instead, any appropriate quantized values manageable in a given circuit may be used.

FIG. 8 is a graph showing brightness desired to be provided versus brightness provided actually when brightness falls. The liquid crystal in the example in FIG. 8 has brightness which falls with exhibiting a characteristic similar to the rising characteristic shown in FIG. 2. Accordingly, the line 80 indicating a moving state shown in FIG. 8 is the vertically-flipped curve of the line 50 in a moving state shown in FIG. 2. Tick mark labels on the horizontal scale are also inverted. As can be seen from the graph, when the brightness actually provided is 50%, the brightness desired to be provided is 17%. This matches the value when the previous brightness is 100 and the next brightness is 50 in the table in FIG. 7. That is, the moving state line 80 in FIG. 8 exactly indicates the fall of the previous brightness from 100% in FIG. 7.

While the embodiment has been described with respect to the example which exhibits the same rising (from OFF to ON) and falling (from ON to Off) characteristics, these characteristics may vary depending on the types of liquid crystals. Therefore, the embodiment is configured to accommodate the variation of characteristics by modifying the values in FIG. 7 according to the characteristics of a given liquid crystal.

As described above, the embodiment is configured to store offsets in table form based on the relation between a brightness level in a stationary state and that in a moving state in order to obtain an ideal quantity of light. Thus, even during the movement of a display image on the LCD screen, the image can be displayed virtually the same brightness to the eye as in its stationary state, thereby inhibiting flicker on the screen.

In addition, the embodiment is configured to store the previous brightness level (gray scale value) in the frame buffer 22 and a supplementary correction is made by the ASIC 21 using the data in the graph base table 26 based on the relation between the brightness level of the next video data and the previous brightness level. Thus, whether a wire-frame model is moving or stationary is not required to be determined. Instead, the movement of the model can be determined from a difference between the determined brightness and the previous brightness. As a result, flicker can be inhibited by a simple circuit configuration.

**11**

Furthermore, the embodiment addresses the flicker problem resulting from the response time of the LC panel in recognition of the importance of the quantity of light (brightness×time) to visual perception. As a result, slow response of any types of liquid crystals (such as TN, IPS, and MVA) can be compensated by constructing a look-up table adapted to the characteristics of each liquid crystal. Thus, a flexible liquid crystal control circuit and liquid crystal display which can be widely used can be provided.

As described above, according to the invention, flicker of LCDs which poses a considerable problem in applications such as the display of wire-frame model can be made unperceivable to the user's eye by a simple configuration.

While this invention has been described in terms of certain embodiment thereof, it is not intended that it be limited to the above description, but rather only to the extent set forth in the following claims. The embodiments of the invention in which an exclusive property or privilege is claimed are defined in the appended claims.

We claim:

1. A liquid crystal display, comprising:

an input logic for inputting a video signal from a host;

a storage for storing the previous brightness level of the video signal input through said input logic;

a determinator for determining an output brightness level based on the previous brightness level stored in said storage and the next brightness level of the next video signal input to said input logic so as to make a time integration quantity of a brightness change substantially equal to an ideal quantity of light in a stationary state with respect to the next brightness level; and

a driver for driving an image displaying liquid crystal cell based on said output brightness level determined by said determination logic.

2. The liquid crystal display according to claim 1, wherein said determinator comprising a table for storing a brightness level determined by the characteristic of a liquid crystal cell according to a relation between the previous brightness level and the next brightness level, and determining the output brightness level by modifying said next brightness level based on the brightness level read from said table.

3. The liquid crystal display according to claim 2, wherein:

said video signal input through said input logic comprises a plurality of color signals; and

said table in said determinator is provided for each of said color signals.

4. A liquid crystal display, comprising:

a driver for driving each of the pixels forming an image for each frame to a liquid crystal cell displaying said image;

an input logic for inputting a moving-state video signal which changes from the on state to the off state on transition to a particular frame in said frames and returns to the off state after said particular frame is completed;

a setting logic for setting an offset for making the quantity of light closer to the quantity of light in a stationary state in which said moving-state video signal is continuously turned on for said particular frame;

a generator for applying said offset set by said setting logic to said moving-state video signal input through said input logic to generate an output video signal; and

an output logic for outputting said output video signal generated by said generator to said driver.

**12**

5. The liquid crystal display according to claim 4, wherein said offset set by said setting logic can be determined based on a time integration quantity and the quantity of light in said stationary state, said time integration quantity being a change in brightness in said moving-state vide signal integrated with respect to time.

6. The liquid crystal display according to claim 4, wherein:

said moving-state video signal input through said input logic comprises a plurality of color signals;

said offset set by said setting logic is determined for each of said color signals; and

said generator generates the output video signal for each color signal based on said offset determined for each color signal.

7. A liquid crystal control circuit, having a function for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by liquid crystal cells, comprising:

a storage portion for storing an offset in brightness in a moving state in which said wire-frame model having a predetermined gray scale changes from frame to frame with respect to a particular pixel, with relation to brightness output in a stationary state in which the wire-frame model having the predetermined gray scale is displayed on the particular pixel across a plurality of frames; and

a correction portion for applying said offset stored in said storage portion to the gray scale of the wire-frame model if said input wire-frame model is in a moving state.

8. The liquid crystal control circuit according to claim 7, further comprising a frame buffer for storing the brightness information of said input wire-frame model as the previous brightness,

wherein said storage portion stores said offset as table information based on a relation between said previous brightness stored in said frame buffer and the brightness of the next input wire-frame model.

9. A flicker inhibition method for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by a liquid crystal cell, comprising the steps of:

storing a relation between brightness in a stationary state in which a wire-frame model having a predetermined gray scale is displayed on a particular pixel and a plurality of frames and brightness in a moving state in which the wire-frame model having the predetermined gray scale changes frame to frame with respect to the particular pixel;

applying an offset based on said stored relation to the gray scale of said wire-frame model if said input wire-frame model is in a moving state; and

driving said liquid crystal cell based on said gray scale to which said offset is applied to display said wire-frame model.

10. The flicker inhibition method according to claim 9, wherein said storing step said moving state brightness used for storing said relation is the brightness when said particular pixel changes back to the off state one frame after said particular pixel is driven from the off state to the on state during the passage of the wire-model frame over the particular pixel.

11. The flicker inhibition method according to claim 9, wherein said storing step said brightness in the moving state which is used when said relation is stored is the quantity of light equal to a brightness change integrated with respect to time.

US 6,778,160 B2

13

**12**. A liquid crystal driving method, comprising the steps of:

storing first brightness information for an input pixel in a frame buffer;

applying based on second brightness information for the next input pixel and said first brightness information stored in said frame buffer an offset for making the time integration quantity of a brightness change substantially equal to an ideal light quantity which is the brightness in a stationary state to said second brightness information;

outputting said second brightness information to which said offset is applied to a driving circuit for driving an liquid crystal cell; and

storing said second brightness information for the input pixel in a frame buffer.

14

**13**. The liquid crystal driving method according to claim 12, wherein:

said step of storing said first brightness information in the frame buffer stores said first brightness information for each of said color signals and said input pixel comprises a plurality of color signals; and

said step of applying the offset applies said offset to each of said color signals.

**14**. The liquid crystal driving method according to claim 12, wherein said offset applying step comprises the steps of reading a pre-stored offset based on a relation between said first and second brightness information and applying said read offset to said second brightness information.

*   *   *   *   *

[Figure 3]

| Model (Magnitude of flicker) 61 | Response rising time 62 | Response falling time 63 | Light quantity ratio (to ideal LC) 64 | Brightness ratio of drawing in moving state to that in stationary state 65 |
|---|---|---|---|---|
| Model A  (○) | 20. 3ms | 21. 6ms | 1. 02 : 1 | 1. 0 : 1 |
| Model B  (×) | 18. 5ms | 10. 0ms | 0. 81 : 1 | 0. 8 : 1 |
| Model C  (△) | 10. 0ms | 4. 5ms | 0. 85 : 1 | 0. 9 : 1 |
| Model D  (×) | 19. 9ms | 7. 9ms | 0. 73 : 1 | 0. 7 : 1 |
| Model E  (×) | 43. 2ms | 34. 3ms | 0. 53 : 1 | 0. 3 : 1 |

MEMO ENDORSED

# McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
### ATTORNEYS AT LAW

THREE GATEWAY CENTER
100 MULBERRY STREET
NEWARK, NEW JERSEY 07102-4079
(973) 622-7711
FACSIMILE (973) 622-5314

DOC # /2

ELIZABETH A. KENNY
Direct dial: (973) 565-2036
ekenny@mdmc-law.com

; 07 - 427 -

January 9, 2007

**VIA FACSIMILE**

MEMO ENDORSED

Honorable Charles S. Haight
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1940
New York, NY 10007

U.S. DISTRICT COURT
FILED
JAN - 9 2007
S.D. OF N.Y.

> RE: **Charles A. Stanziale Jr. Chapter 7 Trustee of Student Finance Corporation v. Pepper Hamilton LLP, et al.**
> **Misc. No. M8-85**

Dear Judge Haight:

With the permission of your secretary Ceceilia Rudden, I submit this letter on behalf of Charles A. Stanziale Jr., the Chapter 7 Trustee of Student Finance Corporation, requesting a brief adjournment of the return day of an Order to Show Cause in the above matter which is presently on your motion calendar for January 16, 2007. Counsel for Pepper Hamilton LLP, the moving party, and counsel for Mandiant Corporation and Royal Insurance have consented to a brief adjournment.

The Order to Show Cause asks why Mandiant Corporation should not be compelled to produce documents pursuant to a subpoena that was served in regard to litigation currently pending in the U.S. District Court for the District of Delaware.

I respectfully request that the return day of the Order to Show Cause be postponed to Thursday, January 18, 2007, at 2 p.m., a date and time suggested by your secretary. Please advise if my request for a brief adjournment is granted.

Respectfully submitted,

Elizabeth A. Kenny

01/09/2007
So Ordered

cc:   Stephen J. Shapiro, Esquire (via electronic mail)
      Kenneth J. Pfaehler, Esquire (via electronic mail)

( PART I )

NEW YORK, NEW YORK      DENVER, COLORADO      RIDGEWOOD, NEW JERSEY      MORRISTOWN, NEW JERSEY      PHILADELPHIA, PENNSYLVANIA

MICROFILM   -9:12 AM   JAN 1 0 2007

# ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

DOC # _13_

CHARLES A. STANZIALE, JR.,                )
CHAPTER 7 TRUSTEE OF                       )          07 - 4 2 7
STUDENT FINANCE CORPORATION,              )
                                           )          Misc. No. M8-85
            Plaintiff,                     )
                                           )
    vs.                                    )
                                           )
PEPPER HAMILTON LLP, et. al.,             )
                                           )
            Defendant.                     )
_____)

## RESPONSE OF MANDIANT CORPORATION AND
## ROYAL INDEMNITY COMPANY TO ORDER TO SHOW CAUSE

Mandiant Corporation, successor in interest to Red Cliff Consulting LLC ("Mandiant"),

and Royal Indemnity Company ("Royal"), through their undersigned counsel Sonnenschein Nath

& Rosenthal LLP, hereby show cause why Mandiant should not be compelled to produce

documents pursuant to the *subpoena duces tecum* served by Pepper Hamilton LLP ("Pepper")

under the terms of the subpoena as currently stated. As grounds therefore, Mandiant and Royal

state as follows:

1.    On or after November 21, 2006, Mandiant was served with a *subpoena duces*

*tecum* by Pepper, a defendant in the captioned case. Mandiant is not a party to the case. The

subpoena purports to require Mandiant to produce e-mails from servers formerly maintained by

Student Loan Servicing, LLC ("SLS"), or a complete copy of the servers. SLS is an affiliate of

Student Finance Corporation ("SFC"), which is in a chapter 7 bankruptcy proceeding in the

United States District Court for the District of Delaware. Mandiant and Royal understand that

SLS acquired the servers from SFC.

25192771\V-2

2.      The trustee has brought an adversary proceeding against, among others, Pepper.

Royal has sued Pepper in another case also proceeding in the District of Delaware. The cases are

jointly supervised for discovery purposes by the Honorable Judge Joseph J. Farnan, Jr. In those

cases, the trustee and Royal have alleged that Pepper functioned as outside general counsel to

SFC, and that a Pepper partner and his family invested more than $34 million in SFC and related

companies. The trustee alleges that Pepper committed professional malpractice and breached its

fiduciary duties to SFC. Royal also has sued Pepper, alleging among other things that Pepper

aided and abetted SFC's fraud.[1]

3.      The SLS servers came into Mandiant's possession in 2004 pursuant to an

agreement among the parties to the SFC bankruptcy. SLS was not and is not a party to the SFC

bankruptcy or the bankruptcy adversary proceedings. Royal, however, sought access to the

computer servers maintained by SLS as a potential source of discoverable information. *(See*

exhibit A attached hereto). The trustee and SLS demurred because, among other things, the

servers contained confidential and privileged communications with counsel. (Exhibit B).

4.      To assuage the trustee's and SLS's concerns, on June 17, July 8 and July 29,

2004, Royal sent letters proposing that a forensic consultant could duplicate the data on the

servers, and release to Royal only data created or modified before September 29, 2003 (the date

of the trustee's appointment) and screened for privileged communications. Protection of the

privilege, and confidentiality, thus would be assured. Copies of these letters are attached as

exhibits C, D and E.

5.      Counsel for Royal, the trustee and SLS held a telephonic conference on August

11, 2004, and agreed that SLS would produce the servers on the terms outlined in Royal's letters.

---

[1]      Oddly, counsel for Pepper declares that these allegations are false. Declaration of Stephen J.
Shapiro in Support of Motion to Compel Discovery, dated December 29, 2006, at paragraph 7. We doubt
that Mr. Shapiro bases this statement on any actual knowledge on his part.

25192771\V-2

On August 16, 2004, counsel for SLS wrote to counsel for Royal to confirm SLS's agreement. A copy of the letter from SLS's counsel is attached as exhibit F.

6.    On October 13, 2004, Mandiant was engaged by Royal's counsel to perform the August 16, 2004 agreement among counsel. A copy of the Engagement Protocols and Statement of Work for the engagement is attached as exhibit G.

7.    Mandiant performed the work and produced to Royal documents from the SLS servers, subject to the limitations in the August, 2004 agreement. As Pepper concedes (Shapiro decl. ¶ 8), Royal has produced all such documents to Pepper. The only documents on the servers relevant to the Pepper cases that have not been produced should be privileged communications, which as Pepper concedes (Shapiro decl. ¶ 8) have never been produced in the litigations relating to SFC. Mandiant still has custody of a copy of the server(s).

8.    Mandiant and Royal would not have a principled objection to Mandiant's responding to the subpoena as propounded if the August, 2004 agreement did not exist. However, the SLS servers were provided to Royal, and Royal provided them to Mandiant, on the condition that Royal -- and others -- not have access to SLS's privileged communications. For this reason, Mandiant and Royal share a concern that to respond to the Pepper subpoena could subject Mandiant or Royal to a claim from SLS for violating the August, 2004 agreement. For this reason too, counsel discussed the matter and a potential resolution with counsel for Pepper. On December 11, 2006, Mandiant sent a letter to Pepper indicating that it would not comply with the subpoena while counsel attempted to resolve the dilemma. A copy of this letter is attached as exhibit H.

9.    In addition, because the servers were formerly owned and operated by SFC, the SFC bankruptcy trustee has expressed concerns that the servers may contain emails or documents that are privileged communications between SFC, or the SFC trustee, and counsel.

- 3 -

Accordingly, the SFC trustee objected to the unfiltered production of the SLS servers, and has directed Mandiant not to produce the servers. A copy of the trustee's letter is attached as exhibit I. The SFC trustee is unwilling to allow the SLS servers to be produced unless they are first filtered to protect SFC's privilege. Applying such a filter can be an expensive proposition; Mandiant estimates the cost here at $30,000 - $50,000.

10.    If filters are to be applied to protect the trustee, the cost should be borne by Pepper. *See, e.g., R.J. Reynolds Tobacco v. Philip Morris, Inc.*, No. 00-4226, 29 Fed. Appx. 880, 883, 2002 WL 334111, **2 (3d Cir. Feb. 28, 2002) ("Significant expenses must be borne by the party seeking discovery") (attached as exhibit J); *see also, cf., Chimie v. PPG Indus., Inc.*, 218 F.R.D. 416, 422 fn. 7 (D. Del. 2003); *Zubulake v. USB Warburg LLC*, 216 F.R.D. 280, 284 (S.D.N.Y. 2003). For its part, we note that Mandiant cannot be compelled to produce the information in a filtered fashion, but has the option of producing them as they are maintained by Mandiant, unfiltered. Fed. R. Civ. P. 45(d)(1)(A).

11.    SLS is not a party to the bankruptcy adversary proceeding or Royal's case against Pepper, and Royal and Mandiant do not know whether SLS actually received a copy of Pepper's subpoena to Mandiant. To ensure that SLS had a chance to protect its privilege, on December 14, 2006, Mandiant wrote to SLS's registered agent and sent the letter by Federal Express overnight delivery service to afford SLS an opportunity to protect its privilege. A copy of this letter is attached as exhibit K. SLS has not responded to this letter in any way.

12.    Although Pepper's counsel is aware of the August, 2004 agreement with SLS, Pepper's response has been to ignore the issue of how Mandiant came to be an possession of SLS's privileged communications and to simply demand that Mandiant comply forthwith. For the reasons set forth above, the relief sought by Pepper should be denied.

- 4 -

2519277\V-2

WHEREFORE, Mandiant and Royal respectfully request the Court to determine:

(i) whether the communications on the SLS servers may be produced to Pepper

pursuant to the subpoena notwithstanding the August, 2004 agreement with SLS,

(ii) to determine appropriate safeguards for such a production, if any, and to

require Pepper to bear the cost for Mandiant to comply with the safeguards; and

(iii)(a) to require Pepper to bear the cost of applying any filters that are required

to protect the trustee's privilege, or

(b) to determine that the allocation of cost for applying the filters sought by the

trustee is not a matter to be determined on this order to show cause, but rather a

matter for resolution by the United States District Court for the District of

Delaware.

Dated: January 10, 2007                 Respectfully submitted,

                                        SONNENSCHEIN NATH & ROSENTHAL LLP

                                        Michael H. Barr        (MB-3171)
                                        Kenneth J. Pfaehler
                                        1221 Avenue of the Americas
                                        New York, New York 10020-1089
                                        (212) 768-6700
                                        (212) 768-6800 (Fax)

                                        *Attorneys for Respondents Mandiant Corporation
                                        and Royal Indemnity Company*

- 5 -

25192771\V-2



Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

**Marc J. Zwillinger**
202.408.9171
mzwillinger@sonnenschein.com

June 14, 2004

<u>VIA FACSIMILE AND FEDERAL EXPRESS</u>

Sheryl L. Auerbach
Member
Dilworth Paxson LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103-7595

Dear Ms. Auerbach:

As we discussed, this firm ("Sonnenschein") will engage FTI Consulting, Inc. ("FTI") on behalf of our client, Royal Indemnity Company ("Royal"). This engagement will consist of the data restoration, data preservation, and potentially data analysis and preparation services set forth in the Statement of Work provided by FTI (the "Services"). The Services will be performed in connection with those servers identified in the Statement of Work which have been used by SFC to transmit and store data (the "Servers"). SFC shall provide FTI with reasonable cooperation to allow it to conduct the Services, and shall use reasonable efforts to assist Royal to obtain permission from Student Loan Servicing, LLC ("SLS") to the extent necessary to perform the Services.

Attached hereto as Exhibit A is a list of prior counsel for SFC that will be used by FTI to identify electronic records that Royal and SFC have agreed shall be treated as privileged (the "Privileged Materials"). All correspondence sent by or directed to individuals listed on Exhibit A (as a main addressee and not a "cc") shall be excluded from the material provided to Royal and Sonnenschein. SFC will cooperate with Royal and FTI to help locate and identify email addresses for these individuals to assist FTI in locating and excluding such materials. SFC and Royal agree that any inadvertent production of privileged material by FTI shall not be deemed a waiver of any work product or attorney-client privileges pertaining to such material. SFC and Royal also agree that by this agreement, Royal is not waiving and is expressly reserving its right to challenge any privilege asserted by SFC with regard to such documents, but shall not use this letter agreement or any inadvertent production pursuant hereto to demonstrate waiver.

Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Sheryl L. Auerbach
June 14, 2004
Page 2


Royal shall bear the entire cost of the Services and shall furnish SFC with access to all records extracted from the Servers and provided to Royal by FTI in the same manner and format as the material is made available to Royal. SFC will not commission any additional work or changes to work by FTI or otherwise incur any fees or costs payable by Royal, unless approved in advance by Sonnenschein. SFC shall be entitled to have access to any Privileged Materials excluded from the data made available to Sonnenschein and Royal, but any such expenses incurred in searching through or duplicating such data shall be borne entirely by SFC.

Please sign below and return a copy to me to indicate your agreement to the terms of this letter. Feel free to contact me if you have any questions.

Sincerely,

*Marc J. Zwillinger /sm*

Marc J. Zwillinger


Acknowledged and Agreed by:



_____    _____
Sheryl L. Auerbach                  Date
DILWORTH PAXSON LLP
for CHARLES A. STANZIALE, JR., Chapter 7 Trustee of SFC

Read and Accepted by:



_____    *Marc J. Zwillinger /sm* 6/14/04
Neal B. Lawson          Date        Marc Zwillinger, Esq.        Date
FTI CONSULTING, INC.                SONNENSCHEIN NATH & ROSENTHAL LLP
                                    for ROYAL INDEMNITY COMPANY


cc:    Alan S. Gilbert, Esq.
       Daniel D. Barnowski, Esq.
       Peter D. Wolfson, Esq.
       Shane M. McGee, Esq.



# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

## Facsimile Transmittal Sheet

*DATE•*    June 14, 2004

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

| | |
|---|---|
| *NAME•* | Sheryl L. Auerbauch |
| *FIRM•* | Dilworth Paxson |
| *PHONE•* | 215-575-7000 |
| *FAX•* | 215-575-7200 |
| *CLIENT / MATTER•* | |
| *FROM•* | Marc J. Zwillinger |

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*    3

*MESSAGE •*

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

*SN&R FACSIMILE DEPARTMENT USE ONLY:*

*TRANSMISSION COMPLETED AT:*          *DOCUMENT TRANSMITTED BY:*

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO              0351
CONNECTION TEL              912155757200
SUBADDRESS
CONNECTION ID
ST. TIME           06/14 11:39
USAGE T            00'47
PGS. SENT             3
RESULT             OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

**Facsimile Transmittal Sheet**

*DATE•*  June 14, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

*NAME•*          Sheryl L. Auerbauch

*FIRM•*          Dilworth Paxson

*PHONE•*         215-575-7000

*FAX•*           215-575-7200

*CLIENT / MATTER•*

*FROM•*          Marc J. Zwillinger

TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:      3

*MESSAGE •*

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, NJ
St. Louis
Washington, D.C.
West Palm Beach


**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

# Facsimile Transmittal Sheet

*DATE•*   June 14, 2004

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

| NAME | FIRM | PHONE | FAX |
|------|------|-------|-----|
| Alan S. Gilbert | SNR-CH | 312-876-7410 | 312-876-7934 |
| Peter D. Wolfson | SNR-NY | 212-768-6840 | 212-768-6800 |

*CLIENT / MATTER•*   Royal & Sun Alliance/SFC 20010580-0087

*FROM•*   Marc J. Zwillinger

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*   3

*MESSAGE •*

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

*SN&R FACSIMILE DEPARTMENT USE ONLY:*

*TRANSMISSION COMPLETED AT:*          *DOCUMENT TRANSMITTED BY:*

```
**********************
***    TX REPORT    ***
**********************


TRANSMISSION OK

TX/RX NO              0354
CONNECTION TEL             912127686800
SUBADDRESS
CONNECTION ID
ST. TIME             06/14 11:43
USAGE T              01'26
PGS. SENT               3
RESULT               OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

## Facsimile Transmittal Sheet

*DATE•* June 14, 2004

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

| NAME | FIRM | PHONE | FAX |
|------|------|-------|-----|
| Alan S. Gilbert | SNR-CH | 312-876-7410 | 312-876-7934 |
| Peter D. Wolfson | SNR-NY | 212-768-6840 | 212-768-6800 |

*CLIENT / MATTER•*   Royal & Sun Alliance/SFC 20010580-0087

*FROM•*          Marc J. Zwillinger

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*      3

*MESSAGE •*

From:    Origin ID:    (202)408-9171
Marc Zwillinger
Sonnenschein Nath and Rosenthal
1301 K Street, NW
5th Floor
Washington, DC 20005



FedEx
Express

E

CL603240t

Ship Date: 14JUN04
Actual Wgt: 1 LB
System#: 3987387/INET1850
Account#: S ********

REF: 20010580-0087 (MJZ)

Delivery Address Bar Code

SHIP TO:    (202)408-9171        BILL SENDER

**Sheryl Auerbach**
**Dilworth Paxson LLP**
**3200 Mellon Bank Center**
**1735 Market Street**
**Philadelphia, PA 191037595**



## STANDARD OVERNIGHT

TRK#   **7906 6840 7040**    FORM 0201

**19103**    -PA-US

**TUE**
Deliver By:
15JUN04

**PHL**    A1

## Z9 PSQA



---

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

## SCHWARTZ, TOBIA, STANZIALE, SEDITA & CAMPISANO.

Kip's Castle
22 Crestmont Road
Montclair, NJ 07042
Telephone # (973) 746-6000
**Telecopier #1 (973) 655-0699**

---

### FACSIMILE TRANSMITTAL COVERSHEET

---

8660-03

DATE:    June 15, 2004

TO:    Marc J. Zwillinger, Esquire    (202) 408-6399
       Neal B. Lawson, FTI Consulting    (202) 312-9101
       Sheryl L. Auerbach, Esquire    (215) 575-7200
       Daniel K. Astin, Esquire    (302) 658-6395

FROM:    Charles A. Stanziale, Esq.

Re:    *Student Finance Corporation*
       *Engagement by Sonnenschein Firm of FTI Consulting, Inc.*

TOTAL PAGES:    4

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND
CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY
NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE
HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPY OF THIS COMMUNICATION
IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE
IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE
ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

N:\docs1\008660\03\A0072175.WPD

LAW OFFICES

## SCHWARTZ, TOBIA, STANZIALE, SEDITA & CAMPISANO

A PROFESSIONAL ASSOCIATION

KIP'S CASTLE

22 CRESTMONT ROAD

### MONTCLAIR, NEW JERSEY 07042

———

(973) 746-6000

FAX

(973) 746-5849

(973) 746-8250

(973) 655-0699 Direct Fax

THEODORE A. SCHWARTZ
CHARLES A. STANZIALE, JR. '''''
RONALD L. TOBIA'''
DAMON R. SEDITA''
JOSEPH M. CAMPISANO
WARREN R. KASOAN
FRANK R. CAMPISANO
DONALD J. CRECCA
SANDRA T. AYRES
WILLIAM A. BAKER'
JILL TOBIA SORGER '''
RICHARD J. SCHWARTZ''
WANDA CHIN MONAHAN '!!'
JEFFREY T. TESTA
KIM M. DIDDIO'''

OF COUNSEL:
ROGER C. WARD

COUNSEL:
KENT A. P. WEISERT

TRENTON OFFICE
172 W. STATE STREET
P.O. BOX 2041
TRENTON, NJ 08607
(609) 393-0041
FAX
(609) 393-1980
———
ALSO CA BAR''
ALSO D.C. BAR''
ALSO FL BAR'''
ALSO NY BAR''''
ALSO MD BAR'
ALSO PA BAR''

June 15, 2004

<u>VIA FACSIMILE – 202-408-6399 and FIRST CLASS MAIL</u>

Marc J. Zwillinger, Esquire
Sonnenschein Nath & Rosenthal LLP
1301 K Street N.W.
Suite 600, East Tower
Washington, DC  20005

Re:    **Student Finance Corporation ("SFC") - Engagement
by Sonenschein Firm of FTI Consulting, Inc.**

Dear Mr. Zwillinger:

Sheryl L. Auerbach forwarded to me a copy of the June 14, 2004 letter concerning Sonnenschein's engagement of FTI Consulting, Inc. and its affiliates and subcontractors (collectively "FTI") on behalf of Royal Indemnity Company ("Royal") which she received from you without the referenced exhibit. (Agreement will need to be reached regarding the exhibit.) Because your letter does not recite our entire agreement concerning the data preservation and restoration, I am circulating this supplement to more fully reflect the parties' understanding regarding FTI's services.

First, as Ms. Auerbach and I previously advised, the Estate does not own several of the pieces of equipment on which FTI will be working. Accordingly, you will need to obtain appropriate consents from Student Loan Services ("SLS") to copying and/or restoring its equipment. Of course, because SFC is a user of SLS systems, the time period for any shutdown of the systems which SFC currently uses must be agreed to by SFC as well.

Second, no data on the hard drives or other equipment or disks (including back-up tapes) created after the date of my appointment as Trustee, September 29, 2003, shall be provided by FTI to Royal or its counsel. See legend at the bottom of the privilege list which was sent by Ms. Auerbach to you last week and which reflected Royal's June 1, 2004 agreement on that point. As counsel have discussed several times, due to e-mailing between counsel for the Trustee and representatives at SFC working with counsel, there is considerable work product contained within the data created after the date of my appointment.

N:\docs\1\008660\03\A0072169.DOC

Marc J. Zwillinger, Esquire
June 15, 2004
Page 2

With respect to privilege, it is our agreement that all e-mails and other communications sent by or directed to individuals identified on Exhibit A including all attachments thereto are deemed as protected by the work product doctrine or attorney-client privilege. The privileged protection designation will **not** be subject to subsequent challenge by Royal. While we may determine to provide Royal with any non-privileged communications which we detect in the course of our review, it is expressly understood that the Trustee has no obligation to review the material withheld as presumptively protected and is not required to furnish any privilege list or log.

Further, all charges by FTI for providing access to the Trustee of the records extracted from the servers and other items copied and provided to Royal and its counsel in the same manner and format as is made available to Royal, shall be paid for by Royal. Additionally, FTI will provide, at Royal's expense, to SFC only in the same format as the previous items a copy of the privileged materials excluded from the data produced to Royal and its counsel.

Lastly, this agreement is subject to your appending and my reviewing the subject Statement of Work, which is deemed modified as necessary by our agreement. Consistent with our discussion with you, we request that both you and FTI acknowledge your understanding of the above by signing and returning to us a copy of this letter supplement.

Sincerely,

Charles A. Stanziale, Jr.

CAS/ja
Cc:    Neal B. Lawson, FTI Consulting, Inc. (via Facsimile – 202-312-9101)
       Sheryl L. Auerbach, Esquire (via Facsimile)
       Daniel K. Astin, Esquire (via Facsimile)

Read and Accepted by:

_____          _____
Neal B. Lawson                   Date
FTI Consulting, Inc.

_____          _____
Marc J. Zwillinger, Esquire      Date
On behalf of Royal Indemnity Company

N:\docs1\008660\03\A0072169.DOC



SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

**Marc J. Zwillinger**
202.408.9171
mzwillinger@sonnenschein.com

June 17, 2004

<u>VIA FACSIMILE AND FEDEX</u>

Charles A. Stanziale, Jr.
Schwartz, Tobia, Stanziale, Sedita & Campisano
Kip's Castle
22 Crestmont Road
Montclair, NJ 07042

     Re:    Engagement of FTI Consulting, Inc.

Dear Mr. Stanziale,

     We received your letter of June 15, 2004, and agree with many of the terms contained therein. Specifically, we agree to obtain the consent of Student Loan Services ("SLS") before starting work, and that we will instruct FTI Consulting, Inc. ("FTI") to produce no data that was created after the date of your appointment as Trustee.

     There are two aspects of your letter with which we do not agree, and have never agreed. First, with regard to claims of privilege, we agreed that whatever agreement we reached with regard to this forensic imaging would not result in any waiver of your claims of privilege and work-product whatsoever. We did not agree, however, that this agreement would bind Royal Indemnity Company ("Royal") to accept all materials excluded from the production as privileged. This result would be absurd, as we have intentionally (and at your request) designed a protocol to exclude documents -- many of which are clearly not privileged -- from being produced to Royal so that you can avoid a lengthy and costly privilege review. Even without the over-inclusiveness issue, we have never agreed that all communications with and among the entities to be included in the Exhibit are privileged. In fact, some of those communications may be within well-recognized exceptions to the privilege, including without limitation the crime-fraud exception. Accordingly, under no circumstances does Royal agree that our willingness to allow you to exclude a broad category of materials for these purposes constitutes a waiver of Royal's right to challenge privilege or otherwise binds Royal.

     The second, less significant point of disagreement concerns your language regarding the documents that will be produced to you at Royal's expense. For purposes of clarity, we agree that you shall be provided with access to all materials provided by FTI to Royal, in the same manner and form as they are provided to Royal. With regard to the excluded materials, however, Royal will pay for you to obtain only a single electronic copy of all materials excluded from the

Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

June 17, 2004
Page 2

production to Royal. We will not pay for any additional searches, printouts, or other analysis of these materials.

We believe that these three letters (our letter of June 14, 2004, your response of June 15, 2004, and this response of June 17, 2004) adequately memorialize the agreement between us. If you disagree, please let me know.

Sincerely,

Marc J. Zwillinger /sm

Marc J. Zwillinger

cc:    Sheryl L. Auerbach, Esq.
       Neal B. Lawson, FTI Consulting, Inc.
       Alan S. Gilbert, Esq.
       Daniel D. Barnowski, Esq.
       Peter D. Wolfson, Esq.
       Shane M. McGee, Esq.

From:   Origin ID:   (202)408-9171
Marc Zwillinger
Sonnenschein Nath and Rosenthal
1301 K Street, NW
5th Floor
Washington, DC 20005



Ship Date: 17JUN04
Actual Wgt: 1 LB
System#: 3987387/INET1850
Account#: S ********

REF: 20010580-0087 (MJZ)



Delivery Address Bar Code

SHIP TO:   (202)408-9171        **BILL SENDER**
**Charles A. Stanziale, Jr.**
**Schwartz, Tobia, Stanziale, Sedita**
**22 Crestmont Road**

**Montclair, NJ 07042**



**STANDARD OVERNIGHT**            **FRI**

Deliver By:
TRK#   **7920  2472  3475**   FORM   **18JUN04**
                              0201
                                          **EWR**   A1

**07042**   -NJ-US

**Z3 SXPA**

---

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

```
**********************
***   TX REPORT   ***
**********************


TRANSMISSION OK

TX/RX NO            0363
CONNECTION TEL          919736550699
SUBADDRESS
CONNECTION ID
ST. TIME           06/17 17:10
USAGE T            00'47
PGS. SENT          3
RESULT             OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, NJ
St. Louis
Washington, D.C.
West Palm Beach

## Facsimile Transmittal Sheet

DATE•   June 17, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME•        Charles A. Stanziale, Jr.

FIRM•        Schwartz, Tobia, Stanziale, Sedita & Campisano

PHONE•

FAX•         (973) 655-0699

CLIENT / MATTER•

FROM•        Marc J. Zwillinger

TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:      3

MESSAGE •

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

## Facsimile Transmittal Sheet

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

*DATE*   June 17, 2004

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

*NAME*   Charles A. Stanziale, Jr.

*FIRM*   Schwartz, Tobia, Stanziale, Sedita & Campisano

*PHONE*

*FAX*   (973) 655-0699

*CLIENT / MATTER*

*FROM*   Marc J. Zwillinger

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*   3

*MESSAGE*

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

*SN&R FACSIMILE DEPARTMENT USE ONLY:*

*TRANSMISSION COMPLETED AT:*          *DOCUMENT TRANSMITTED BY:*

```
**********************
***   TX REPORT   ***
**********************


TRANSMISSION OK

TX/RX NO            0364
CONNECTION TEL          912155757200
SUBADDRESS
CONNECTION ID
ST. TIME           06/17 17:11
USAGE T            00'43
PGS. SENT             3
RESULT             OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, NJ
St. Louis
Washington, D.C.
West Palm Beach

## Facsimile Transmittal Sheet

DATE•   June 17, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME•              Sheryl L. Auerbauch

FIRM•              Dilworth Paxson

PHONE•             215-575-7000

FAX•               215-575-7200

CLIENT / MATTER•

FROM•              Marc J. Zwillinger

TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:        3

MESSAGE •

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

## Facsimile Transmittal Sheet

*DATE•*    June 17, 2004

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

| | |
|---|---|
| *NAME•* | Sheryl L. Auerbauch |
| *FIRM•* | Dilworth Paxson |
| *PHONE•* | 215-575-7000 |
| *FAX•* | 215-575-7200 |
| *CLIENT / MATTER•* | |
| *FROM•* | Marc J. Zwillinger |

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*    3

*MESSAGE •*

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

*SN&R FACSIMILE DEPARTMENT USE ONLY:*

*TRANSMISSION COMPLETED AT:*    *DOCUMENT TRANSMITTED BY:*

```
***********************
***   TX REPORT   ***
***********************


TRANSMISSION OK

TX/RX NO              0365
CONNECTION TEL                93129101
SUBADDRESS
CONNECTION ID
ST. TIME             06/17 17:13
USAGE T              00'42
PGS. SENT            3
RESULT               OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, NJ
St. Louis
Washington, D.C.
West Palm Beach

## Facsimile Transmittal Sheet

DATE•    June 17, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME•    Neal B. Lawson

FIRM•    FTI Consulting, Inc.

PHONE•

FAX•     (202) 312-9101

CLIENT / MATTER•

FROM•    Marc J. Zwillinger

TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:    3

MESSAGE •


# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, NJ
St. Louis
Washington, D.C.
West Palm Beach

## Facsimile Transmittal Sheet

DATE•   June 17, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME•              Neal B. Lawson

FIRM•              FTI Consulting, Inc.

PHONE•

FAX•               (202) 312-9101

CLIENT / MATTER•

FROM•              Marc J. Zwillinger

TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:        3

MESSAGE •

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

SN&R FACSIMILE DEPARTMENT USE ONLY:

TRANSMISSION COMPLETED AT:              DOCUMENT TRANSMITTED BY:

06/17/2004 17:17 FAX 202 408 6399     SNR LLP WDC

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO            0367
CONNECTION TEL            912127686800
SUBADDRESS
CONNECTION ID
ST. TIME            06/17 17:16
USAGE T            01'25
PGS. SENT            3
RESULT            OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

## Facsimile Transmittal Sheet

*DATE•*  June 17, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

| NAME | FIRM | PHONE | FAX |
|------|------|-------|-----|
| Alan S. Gilbert | SNR-CH | 312-876-7410 | 312-876-7934 |
| Peter D. Wolfson | SNR-NY | 212-768-6840 | 212-768-6800 |

*CLIENT / MATTER•*  Royal & Sun Alliance/SFC 20010580-0087

*FROM•*  Marc J. Zwillinger

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*  3

*MESSAGE •*



# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, NJ
St. Louis
Washington, D.C.
West Palm Beach

## Facsimile Transmittal Sheet

*DATE•*    June 17, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

| NAME | FIRM | PHONE | FAX |
|------|------|-------|-----|
| Alan S. Gilbert | SNR-CH | 312-876-7410 | 312-876-7934 |
| Peter D. Wolfson | SNR-NY | 212-768-6840 | 212-768-6800 |

*CLIENT / MATTER•*    Royal & Sun Alliance/SFC 20010580-0087

*FROM•*    Marc J. Zwillinger

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*    3

*MESSAGE •*

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

*SN&R FACSIMILE DEPARTMENT USE ONLY:*

*TRANSMISSION COMPLETED AT:*    *DOCUMENT TRANSMITTED BY:*

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

**Marc J. Zwillinger**
202.408.9171
mzwillinger@sonnenschein.com

July 8, 2004

<u>VIA FACSIMILE AND FEDERAL EXPRESS</u>

Linda Richenderfer, Esq.
Saul Ewing LLP
222 Delaware Avenue
Suite 1200
Wilmington, DE 19899

   Re: Letter Agreement

Dear Linda:

   Thank you for your cooperation in connection with Royal Indemnity Company's ("Royal") acquisition of the Student Finance Company ("SFC") data located on servers owned or controlled by Student Loan Servicing, LLC ("SLS"). As we discussed, SFC, through its Chapter 7 Trustee, owns data located on a file server and a Microsoft Exchange e-mail server (the "Servers"), both which are controlled by SLS. The Chapter 7 Trustee, as the title-holder of the data formerly belonging to SFC (the "SFC Data"), is allowing Royal to access the SFC Data. Royal is in the process of engaging FTI Consulting, Inc. ("FTI") to acquire and preserve the SFC Data on Royal's behalf.

   In order to access the SFC Data, FTI must obtain physical access to the Servers. In exchange for SLS' cooperation in this regard, FTI will access the Servers outside of SLS' normal business hours and observe any other reasonable requests made by SLS with respect to FTI's onsite activities. Royal anticipates that the acquisition process will last no longer than one or two evenings, and will have little or no impact on SLS' business environment.

   Royal is sensitive to SLS' concerns about the confidential nature of its information. Specifically, Royal understands that some of the data created after SLS acquired the Servers (the "Purchase Date") is unrelated to SFC. Accordingly, Royal will keep confidential any and all data found on the Servers that was created after the Purchase Date to the extent that such data pertains to SLS clients other than SFC (collectively, the "SLS Data"). For purposes of this Letter Agreement, "keep confidential" shall mean that Royal will neither use nor distribute the SLS Data for any purpose, and will ensure that FTI is bound by the same or more rigorous obligations of confidentiality. Finally, to the extent that SLS sufficiently identifies certain SLS Data prior to the acquisition process, Royal will instruct FTI to forego providing such identified data to Royal.



Linda Richenderfer, Esq.
July 8, 2004
Page 2


        We hope this letter agreement addresses all of your concerns.  Please contact me once you have had a chance to review this letter so that we can arrange to begin the acquisition process.  Feel free to contact me if you have any questions.

                                Sincerely,

                                Marc J. Zwillinger


cc:     Chad J. Toms, Esq.
        Alan S. Gilbert, Esq.
        Daniel D. Barnowski, Esq.
        Peter D. Wolfson, Esq.
        Shane M. McGee, Esq.

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO          0962
CONNECTION TEL            913024215880
SUBADDRESS
CONNECTION ID
ST. TIME          07/08 14:34
USAGE T           01'02
PGS. SENT           3
RESULT            OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

## Facsimile Transmittal Sheet

*DATE•* July 8, 2004

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

| | |
|---|---|
| *NAME•* | Linda Richenderfer |
| *FIRM•* | Saul Ewing LLP |
| *PHONE•* | 302-421-6804 |
| *FAX•* | 302-421-5880 |
| *FROM•* | Marc J. Zwillinger |

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*    **3**

*MESSAGE•*


SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, NJ
St. Louis
Washington, D.C.
West Palm Beach

## Facsimile Transmittal Sheet

DATE•   July 8, 2004

PLEASE DELIVER THE FOLLOWING PAGES TO:

NAME•       Linda Richenderfer

FIRM•       Saul Ewing LLP

PHONE•      302-421-6804

FAX•        302-421-5880

FROM•       Marc J. Zwillinger

TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:       3

MESSAGE•

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

*SN&R FACSIMILE DEPARTMENT USE ONLY:*

*TRANSMISSION COMPLETED AT:*              *DOCUMENT TRANSMITTED BY:*

From: Origin ID: (202)408-6400
Marc J. Zwillinger
Sonnenschein Nath & Rosenthal
1301 K Street, N.W.
Suite 600, East Tower
Washington, DC 20005



Ship Date: 08JUL04
Actual Wgt: 1 LB
System#: 3452043/INET1850
Account#: S ********

REF: 20010580-0087-MJZ

Delivery Address Bar Code

SHIP TO:  (302)421-6804    **BILL SENDER**
**Linda Richenderfer**
**Saul Ewing LLP**
**222 Delaware Avenue**
**Suite 1200**
**Wilmington, DE 19899**



**PRIORITY OVERNIGHT**

TRK#  **7926 8033 5820**    FORM 0201

**FRI**
Deliver By:
09JUL04

**PHL**    A2

19899    -DE-US

**Z9 ZWIA**



Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

**Marc J. Zwillinger**
202.408.9171
mzwillinger@sonnenschein.com

July 29, 2004

VIA FACSIMILE AND FEDERAL EXPRESS

Linda Richenderfer, Esq.
Chad J. Toms, Esq.
Saul Ewing LLP
222 Delaware Avenue
Suite 1200
Wilmington, DE 19899

Re:    Clarification of Letter Agreement

Dear Linda and Chad:

Thank you for your July 19, 2004 letter requesting clarification on some of the issues in connection with Royal Indemnity Company's ("Royal") acquisition of the Student Finance Company ("SFC") data located on servers owned or controlled by Student Loan Servicing, LLC ("SLS"). According to your letter, there are three issues to be resolved: (1) clarification of the process that will be used to access and copy the data; (2) the scope of the definition of "SFC Data"; and (3) the status of certain confidentiality obligations.

With respect to the first issue, FTI plans to use standard forensic imaging software and procedures to duplicate the data on the servers discussed in our last letter (the "Servers"). That information will then be forensically examined, most likely with an application called Encase. This process will enable FTI to identify and exclude certain data from its production to Royal based on keywords, date of creation, and other criteria. To the extent that SLS is able to identify non-SFC Data, Royal will instruct FTI to exclude that data from any production to Royal.

You are correct that our definition of "SFC Data" includes information about SFC that might otherwise be SLS data. Our goal is to identify and examine all data relating to SFC. Because some of the information found on the server will be in fragments (e.g., deleted files and/or slack space), there will be no way to determine who created that data and when it was created. Moreover, we expect to find information created by people that were, at some point, employed by both SFC and SLS, making that information relevant to both companies. In both of these scenarios, we believe that Royal has a right to view the SFC-related data.

We have attached the latest draft of the agreement between Royal and FTI per your request. However, we fail to see how that agreement -- still in the process of being formalized --

Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Linda Richenderfer, Esq.
July 29, 2004
Page 2

will be helpful to this discussion. As you will see, SFC agreed that the agreement for FTI's
services would be solely between FTI and Royal. Any agreements or understandings between
Royal and SFC, and/or between Royal and SLS, are being handled separately, and not within that
agreement. FTI is obligated to act in accordance with Royal's instructions, and Royal will
instruct FTI to perform its services consistent with Royal's obligations as set forth in this and
other agreements.

If necessary, Royal will enter into an agreement governing Royal's and FTI's use and
disclosure of SLS information. We propose that the following language -- included in our July 8,
2004 letter -- be used as the framework for that agreement:

Royal is sensitive to SLS' concerns about the confidential nature of its
information. Specifically, Royal understands that some of the data created after
SLS acquired the Servers (the "Purchase Date") is unrelated to SFC.
Accordingly, Royal will keep confidential any and all data found on the Servers
that was created after the Purchase Date to the extent that such data pertains to
SLS clients other than SFC (collectively, the "SLS Data"). For purposes of this
Letter Agreement, "keep confidential" shall mean that Royal will neither use nor
distribute the SLS Data for any purpose, and will ensure that FTI is bound by the
same or more rigorous obligations of confidentiality. Finally, to the extent that
SLS sufficiently identifies certain SLS Data prior to the acquisition process,
Royal will instruct FTI to forego providing such identified data to Royal.

To the extent you have other suggestions or prefer specific language, please let us know.

We hope we have addressed all of your concerns. Please contact me once you have had a
chance to review this letter so that we can arrange to begin the acquisition process. Feel free to
contact me if you have any questions.

Sincerely,

Marc J. Zwillinger

Attachment

cc:     Alan S. Gilbert, Esq.
        Daniel D. Barnowski, Esq.
        Peter D. Wolfson, Esq.
        Shane M. McGee, Esq.

# ATTACHMENT 1

1201 Eye Street, N.W.
Suite 400
Washington, DC 20005
202.312.9100 telephone
202.312.9101 facsimile
www.fticonsulting.com

[logo] F T I

June 11, 2004

Marc J. Zwillinger, Esq.
Sonnenschein Nath & Rosenthal LLP
1301 K Street, NW
Washington, DC 20005

*Re:    Letter of Engagement: Royal Indemnity Company and Student Finance Company*

Dear Mr. Zwillinger:

This letter confirms that FTI Consulting, Inc. ("FTI") has been retained by **Royal Indemnity Company** ("Royal") through **Sonnenschein Nath & Rosenthal LLP ("Sonnenschein")**, to provide the **data restoration, data preservation, and potentially data analysis and preparation** services set forth in the attached Statement of Work (the "Services"). This Letter of Engagement, the Statement of Work, and the attached Terms and Conditions constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

Sonnenschein will provide direction to FTI on behalf of Royal, and Royal is solely responsible for making payment to FTI for the Services rendered hereunder. FTI is authorized to proceed with Phase I of the Statement of Work, but shall not proceed with Phases II or III unless authorized by Sonnenschein in writing.

Prior to Phase III, if authorized, Sonnenschein will deliver to FTI a set of criteria agreed to by Royal and Charles A. Stanziale, Jr., Chapter 7 Trustee of Student Finance Company ("SFC"), which FTI will use to identify information Royal and SFC have agreed to treat as privileged (the "Privileged Materials"). FTI shall exclude the Privileged Materials from any data provided, or made available, to Sonnenschein or Royal.

Please acknowledge your acceptance of the terms set forth in this Letter of Engagement and the attached Terms and Conditions by signing below and on page five (5) of the Terms and Conditions, and returning a copy of each to me at the above address.

We very much appreciate this opportunity to work with you on this assignment. If you have any questions, please do not hesitate to contact me at (202) 312.9183.

[PLEASE SEE NEXT PAGE]

Agreed and Accepted by,

| | | | |
|---|---|---|---|
| Neal B. Lawson | Date | Marc Zwillinger, Esq. | Date |
| FTI CONSULTING, INC. | | SONNENSCHEIN NATH & ROSENTHAL LLP | |
| | | for ROYAL INDEMNITY COMPANY | |

# ATTACHMENT 2

## FTI CONSULTING, INC.

## STANDARD TERMS AND CONDITIONS

The following are the Terms and Conditions on which we will provide the Services to you set forth within the attached Statement of Work. The Letter of Engagement, the Terms and Conditions and the Statement of Work ("Contract") together comprise the entire Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Contract are included to make it easier to read but do not form part of the Contract.

1.    **Scope of Services**

   1.1    FTI is engaged by *Royal Indemnity Company ("Royal")* through *Sonnenschein Nath and Rosenthal LLP ("Sonnenschein")* to provide the **data restoration, data preservation, and potentially data analysis and preparation services** set forth in the attached Statement of Work (the "Services").

   1.2    The Services may be performed by FTI or by any subsidiary of FTI, as FTI shall determine. FTI may also provide Services through agents or independent contractors where approved in advance by Royal. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees. The Services are subject to change as mutually agreed between FTI and Royal.

   1.3    Accordingly, while we may from time to time suggest options which may be available to you, and further give our professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with Royal. FTI and its employees will not make any management decisions for Royal and will not communicate information concerning Royal to any third party.

   1.4    FTI agrees that it will perform no Phase II or Phase III work (as set forth in the Statement of Work) unless Sonnenschein authorizes such work in writing.

2.    **Fees**

   2.1    Fees in connection with this engagement will be based upon the time necessary spent in providing the Services, multiplied by our standard hourly rates, summarized as follows:

|                                          | Per Hour   |
|------------------------------------------|------------|
| i. Senior Managing Directors             | $450-595   |
| ii. Directors / Managing Directors       | $350-475   |
| iii. Managers                            | $310-365   |
| iv. Consultants / Sr. Consultants        | $175-305   |
| v. Administrative / Paraprofessionals    | $50-150    |

   Based on our discussions, FTI does not foresee the need for significant time spent at the Senior Managing Director level.

2.2     Hourly rates are revised periodically. We will notify you of any such changes to our rates, at least thirty (30) days prior to those rates becoming effective. You agree that payment of our fees is not contingent upon the outcome of this mater.

2.3     Our invoices shall become due thirty (30) days after receipt; provided, however, in the event that Royal disputes any charge or expense on such invoice, such disputed amount shall not become due, and Royal shall be obligated to pay only such undisputed amounts. With regard to any disputed amounts for which Royal has withheld payment, Royal shall immediately provide notification to FTI of Royal's challenge to such disputed amount, and the parties shall attempt to resolve such disputed amounts within ten (10) days following the original due date of the invoice reflecting the amount in dispute.

2.4     We reserve the right to suspend further services until any such disputed amount is resolved or undisputed past-due amount is received. Our Federal Tax Identification number is 52-1261113. Please use this number in filings concerning the reporting of fees paid to our firm.

2.5     It is FTI's policy to collect a retainer for payment in relation to the professional services to be rendered and disbursements to be incurred by FTI. The retainer, if required, will serve as security for Royal's agreement to pay FTI for all fees and disbursements authorized by Royal and incurred by FTI in its representation hereunder. The advance is not intended to be an estimate for the total cost of the work to be performed. The retainer will be applied to the final invoice rendered for this matter and any amount not used by FTI pursuant to the terms of this agreement will be returned to Royal.

## 3.     Reports and Advice

3.1     **Use and purpose of advice and reports.** Other than as set forth herein, any advice given or report issued by us is provided solely for your use and benefit. Unless required by law, you shall not provide any advice given or reports issued by us to any third party, or refer to us or the Services, without our prior written consent, except that such advice and reports may be used and disclosed in connection with litigation to which Royal or Student Finance Company ("SFC") are a party, including in the bankruptcy proceedings for Student Finance Company. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available. This provision does not apply to data extracted by FTI and provided to Royal.

## 4.     Information and Assistance

4.1     **Provision of information and assistance.** Performance of the Services is dependent upon your providing us with such information and assistance as we may reasonably require from time to time.

4.2     **Punctual and accurate information.** You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. You shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

-2-

5.    **Additional Services**

5.1    .**Your responsibility for other parties**. You shall be solely responsible for the work and fees of any other party engaged by you to provide services in connection with this Contract regardless of whether such party was introduced to you by us. Except as provided in the Letter of Engagement or Statement of Work, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters. Further, we acknowledge that we are not authorized under our Contract to engage any third party to provide services or advice to you without your written authorization.

6.    **Confidentiality**

6.1    **Restrictions on confidential information.**    Confidential information means any electronically stored information contained on the servers or other items made available to FTI or its representatives (a) which is protected by the attorney-client privilege or work product doctrine or (b) which is disclosed by a party that the receiving party knows or should know is confidential. The parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other Contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's consent. Confidential information shall not include information that: i) is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 6.1; ii) is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or iii) is or was independently developed by the recipient. Advice and Reports shall not be confidential information to the extent they fall within the exception in Section 3.1.

6.2    **Disclosing confidential information.** Notwithstanding Clause 6.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 15 business days' notice in writing is first given to the other party.

6.3    **Citation of engagement.** Without prejudice to Clause 6.1 and Clause 6.2 above, we may cite generally the performance of the Services to our clients and prospective clients as an indication of our experience, unless we both specifically agree otherwise in writing.

6.4    **Internal quality reviews.** Notwithstanding the above, we may disclose any information referred to in this Clause 6 to any FTI subsidiary or use it for internal quality reviews.

6.5    **Maintenance of work papers.** Notwithstanding the above, we may keep one archival set of our working papers from the engagement, at no cost to Royal, including working papers containing or reflecting confidential information, in accordance with our professional standards and internal document retention policies.

7.    **Termination**

7.1    **Termination of Contract with notice.** Royal may terminate the Contract for whatever reason upon written notice to FTI; provided, however, that Royal will be solely responsible for any fees and expenses accrued prior to such termination to the extent such work was authorized as set forth herein. FTI may terminate the Contract a) upon thirty (30) days written notice for non-payment of fees, unless Royal remedies such non-

- 3 -

payment within the thirty (30) day notice period; or b) upon written notice if the requested Services would violate state or federal law or other applicable regulations.

7.2   **Continuation of terms.** Clauses 3.1, 6, 8 and 9 of the Standard Terms and Conditions, shall survive the termination or expiration of the Contract and shall continue to bind both parties.

8.   **Indemnification and Liability Limitation; Waiver of Jury Trial**

8.1   **Indemnification.** Royal agrees to indemnify and hold harmless FTI and its subsidiaries and affiliates and each of its and their officers, directors, principals, shareholders, agents, independent contractors and employees ("Indemnified Persons") against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of FTI's performance of Services requested by Royal, except to the extent that any such claim, liability, obligation, damage, cost or expense results from FTI's negligence or willful misconduct.

8.2   **Limitation of liability.** Royal agrees that neither FTI nor any Indemnified Person shall have any liability as a result of the retention of FTI, the execution and delivery of this Engagement Contract or the provision of Services requested other than liabilities that result from the negligence or willful misconduct of FTI or the Indemnified Person(s) in respect of whom such liability is asserted. Without limiting the generality of the foregoing, in no event shall any party be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind, or for damages in excess of the amount of fees paid for services rendered, in connection with the Engagement Contract or the provision of Services.

9.   **Governing Law and Jurisdiction.** This Contract shall be governed by and interpreted in accordance with the laws of the State of Delaware, without giving effect to the choice of law provisions thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Agreed and Accepted by,

| | |
|---|---|
| Neal B. Lawson                    Date | Marc Zwillinger, Esq.                    Date |
| FTI CONSULTING, INC. | SONNENSCHEIN NATH & ROSENTHAL LLP |
| | for ROYAL INDEMNITY COMPANY |

```
********************
***   TX REPORT    ***
********************


TRANSMISSION OK

TX/RX NO              1015
CONNECTION TEL              913024215880
SUBADDRESS
CONNECTION ID
ST. TIME             07/29 14:55
USAGE T              01'47
PGS. SENT             12
RESULT               OK
```

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

## Facsimile Transmittal Sheet

**DATE•**  July 29, 2004

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

| | |
|---|---|
| *NAME•* | **Linda Richenderfer** |
| *FIRM•* | **Saul Ewing LLP** |
| *PHONE•* | **302-421-6804** |
| *FAX•* | **302-421-5880** |
| *FROM•* | **Marc J. Zwillinger** |

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*   11

*MESSAGE •*

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

## Facsimile Transmittal Sheet

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, NJ*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

*DATE*    July 29, 2004

*PLEASE DELIVER THE FOLLOWING PAGES TO:*

| | |
|---|---|
| *NAME* | Linda Richenderfer |
| *FIRM* | Saul Ewing LLP |
| *PHONE* | 302-421-6804 |
| *FAX* | 302-421-5880 |
| *FROM* | Marc J. Zwillinger |

*TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS SHEET:*    11

*MESSAGE* •

**Original will NOT be mailed**

**CONFIDENTIALITY NOTE**

*The documents accompanying this facsimile transmission and the Facsimile Transmission Sheet contain information from the law firm of Sonnenschein Nath & Rosenthal LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this facsimiled information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.*

*IF YOU DO NOT RECEIVE ALL OF THE PAGES ABOVE, PLEASE CALL 202.408.6400 AS SOON AS POSSIBLE.*

*SN&R FACSIMILE DEPARTMENT USE ONLY:*

*TRANSMISSION COMPLETED AT:*                    *DOCUMENT TRANSMITTED BY:*



From:  Origin ID:  (202)408-6400
Marc J. Zwillinger
Sonnenschein Nath & Rosenthal
1301 K Street, N.W.
Suite 600, East Tower
Washington, DC 20005

Ship Date: 29JUL04
Actual Wgt: 1 LB
System#: 3452043/INET1850
Account#: S ********

REF: 20010580-0087-MJZ

Delivery Address Bar Code

SHIP TO:  (302)421-6804    **BILL SENDER**
**Linda Richenderfer**
**Saul Ewing LLP**
**222 Delaware Avenue**
**Suite 1200**
**Wilmington, DE 19899**



**PRIORITY OVERNIGHT**                    **FRI**
                                    Deliver By:
TRK#  **7920 5561 1386**   FORM   30JUL04
                          0201
                              **PHL**   A2

**19899**   -DE-US
                    **Z9 ZWIA**

Shipping Label: Your shipment is complete

1.  Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2.  Fold the printed page along the horizontal line.
3.  Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# FACSIMILE COVER SHEET



**SAUL
EWING**
Attorneys at Law
A Delaware LLP

P.O. Box 1266
Wilmington, DE 19899-1266

COURIER ADDRESS
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801-1611

| | |
|---|---|
| **From:** LINDA RICHENDERFER | **Date:** August 16, 2004 |
| **Pages (including cover):** 4 | **Direct Phone:** (302) 421-6804 |
| **Client/Matter #:** 16597/83927 | **Direct Fax:** (302) 421-5880 |
| **User #:** 490 | **Sender's Floor:** 12 |

| **To: Name** | **Fax Number** | **Phone Number** |
|---|---|---|
| Marc J. Zwillinger, Esq. | 202-408-6399 | 202-408-6400 |

| **CC: Name** | **Fax Number** | **Phone Number** |
|---|---|---|
| Sheryl L. Auerbach, Esq. | 973-655-0699 | 973-746-8000 |
| Daniel K. Astin, Esq. | 302-658-6395 | 302-655-5000 |

**Comments:**
**See attached correspondence re: Student Loan Servicing, LLC – Computer Servers**

☐ **The Original will be sent by regular mail.**
☐ **The Original will be sent by overnight delivery.**
☑ **No Original will be sent.**

**IMPORTANT NOTICE**
    This transmission is intended only for the addressees named above and may contain information that is privileged, confidential, or otherwise protected from disclosure to anyone else. Any review, dissemination or use of this transmission or its contents by persons other than the addressees is strictly prohibited. If you have received this facsimile in error, please telephone us immediately at (302) 421-6800 and return the original to us by mail at the address stated above.

LINDA RICHENDERFER

Phone: (302) 421-6804

Fax: (302) 421-5880

lrichenderfer@saul.com

www.saul.com

SAUL
EWING
Attorneys at Law
A Delaware LLP

August 16, 2004

**FACSIMILE (202) 408-6399**

Marc J. Zwillinger, Esquire
Sonnenschein Nath & Rosenthal LLP
1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005

          RE:  Student Loan Servicing, LLC -- Computer Servers

Dear Marc:

          This letter shall confirm the agreement reached between Student Loan Servicing, LLC
("SLS") and Royal Indemnity Company ("Royal") regarding Royal's request for access to the
computer servers (the "Servers") purchased by SLS from the bankruptcy estate of Student
Finance Company ("SFC"). The agreement, which was originally proposed in Royal's letters to
SLS dated July 8, 2004 and July 29, 2004, was discussed during a telephone conference call held
on August 11, 2004. During that conference call the scope of the information sought by Royal
was quantified. The terms of the agreement reached between the parties, as understood by SLS,
are recited below. To the extent the terms below are inconsistent with the agreement originally
outlined in Royal's letters, the terms outlined herein shall control.

- FTI Consulting, Inc. ("FTI") will use their forensic imaging software to duplicate
  the data on the Servers. Access to the Servers will be outside of SLS' normal
  business hours and FTI will observe any other reasonable requests made by SLS
  with respect to FTI's onsite activities.
- FTI will not release to Royal any data from the Servers that was created or
  modified after September 29, 2003.
- Before providing any data to Royal, FTI will screen that data for privilege based
  upon the criteria provided to Royal by SFC and SLS. The screening to be
  performed by FTI on behalf of SLS shall take into consideration all individuals
  listed on Exhibit A attached hereto. However, should a question arise, SLS
  reserves the right to assert a claim of privilege to any information released by FTI
  to Royal.

P.O. Box 1266 • Wilmington, DE 19899-1266 • Phone: (302) 421-6800 • Fax: (302) 421-6813
Courier Address: 222 Delaware Avenue, Suite 1200 • Wilmington, DE 19801-1611

BALTIMORE    CHESTERBROOK    HARRISBURG    PHILADELPHIA    PRINCETON    WASHINGTON    WILMINGTON

505707.1 8/16/04

Marc J. Zwillinger, Esquire
August 16, 2004
Page 2

- The confidentially provisions, contained in paragraph three of Royal's July 8, 2004 letter, are hereby reaffirmed.

Please feel free to call me should you have any questions. You should contact Chad Toms, Esquire to make arrangements for access to the Servers.

Very truly yours,

Linda Richenderfer

cc:     Chad J. Toms, Esquire
        Sheryl L. Auerbach, Esquire (via telecopy)
        Daniel K. Astin, Esquire (via telecopy)

505707.1 8/16/04

EXHIBIT A

## <u>Saul Ewing LLP Attorneys and Staff:</u>

Elizabeth Witmer                    ewitmer@saul.com
Linda Richenderfer                  lrichenderfer@saul.com
Suzanne Laumakis                    slaumakis@saul.com
Chadd Fitzgerald                    cfitzgerald@saul.com
Christine Kovan                     ckovan@saul.com
Chad Toms                           ctoms@saul.com
Nicole Gicker                       ngicker@saul.com
Derrick Lowe                        dlowe@saul.com
Terri Pawelski                      tpawelski@saul.com
David Falcone                       dfalcone@saul.com
Chris Pippett                       cpippett@saul.com
Mary Kay Christodoulou              mchristodoulou@saul.com
Colleen Nihill                      cnihill@saul.com
John Royer                          jroyer@saul.com

## <u>Other Counsel:</u>

William C. Cleveland, III, Esquire   wcleveland@bmsmlaw.com
Richard Hawley, Esquire              rhawley@k-glaw.com
Chad A. Cicconi                      ccicconi@thorpreed.com
Constance R. Ariagno                 cariagno@PattonBoggs.com
Gerald R. Flatten                    RienDF@aol.com
Bruce S. Haines                      bhaines@hangley.com
Kathleen M. Laubenstein             klaubenstein@hangley.com
                                     cariagno@PattonBoggs.com
Rendi Mann-Stadt                     rmann-stadt@mwbavl.com
Heather Goldstein                    hgoldstein@mwbavl.com
Fred Barbour                         fbarbour@mwbavl.com
Russell S. Sayre                     sayre@taftlaw.com
Scott Hickman                        shickman@sherrardroe.com
Stephen Hurd                         shurd@sherrardroe.com
Anthony P. DeMichele                 ademichele@foxrothschild.com
David A. Gradwohl                    dgradwohl@foxrothschild.com
Andrew W. Bonekemper                 abonekemper@foxrothschild.com

# Sⓝnnenschein

SONNENSCHEIN NATH & ROSENTHAL LLP

**Marc J. Zwillinger**
202.408.9171
mzwillinger@sonnenschein.com

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

October 13, 2004

<u>VIA FACSIMILE</u>

Brian Dykstra
Red Cliff Consulting LLC
111 South Fairfax Street
Alexandria, VA 22314

> Re:    Engagement Protocols

Dear Brian:

As you know, Red Cliff's engagement by Royal Indemnity Company ("Royal") will involve the evaluation (phase I), restoration and preservation (phase II), and analysis and preparation (phase III) of three separate servers. Red Cliff will consult with Marc Zwillinger or Shane McGee at Sonnenschein Nath & Rosenthal LLP ("Sonnenschein") prior to beginning each phase, and Red Cliff will not begin a new phase without obtaining Sonnenschein's consent.

As a part of this engagement, Red Cliff will access data owned by Student Finance Company through its Chapter 7 Trustee ("SFC"). This data is located on three servers: an EMC server with a 40-drive RAID array; a file server with a small RAID array; and a small Exchange server (collectively, the "Servers"). The latter two servers are owned or controlled by Student Loan Servicing, LLC ("SLS"). Red Cliff will access the SLS-owned Servers outside of SLS' normal business hours and will observe any other reasonable requests made by SLS with respect to Red Cliff's onsite activities.

Red Cliff's activities in performing the work pursuant to this retention will follow the attached Statement of Work. In addition, at all times Red Cliff will adhere to the following protocol in connection with this engagement:

1.    There are three categories of information that ***must not*** and ***will not*** be provided to Sonnenschein or its client Royal:

A.    Any and all email messages (along with any attachments thereto) in which an address in either or both of the "TO:" and/or "FROM:" fields (but not including the "CC:" field) contain any of the email addresses on the attached Schedule A; and

# S☐nnenschein
**SONNENSCHEIN NATH & ROSENTHAL LLP**

Brian Dykstra
October 13, 2004
Page 2

       B.     Any file or other data that was initially created after September 29, 2003.

2.     Red Cliff shall not, under any circumstances, disclose the contents of any files or other data located on the Servers to any person or entity other than Royal (through Sonnenschein), SFC (through Dilworth Paxson), SLS (through Saul Ewing LLP), or a judicial officer, unless required by law to do so.

3.     After the acquisition phase, Red Cliff will provide to SFC (through the Trustee or his counsel) a single copy of all information acquired from the Servers in the same form and manner as such information was provided to Royal.

4.     Red Cliff will access the SLS-owned Servers outside of SLS' normal business hours and will observe any other reasonable requests made by SLS with respect to Red Cliff's onsite activities.

Please let me know if you have any questions.

Sincerely,

Marc J. Zwillinger



Brian Dykstra
October 13, 2004
Page 3

## SCHEDULE A

### Saul Ewing LLP Attorneys and Staff:

| | |
|---|---|
| Elizabeth Witmer | ewitmer@saul.com |
| Linda Richenderfer | lrischenderfer@saul.com |
| Suzanne Laumakis | slaumakis@saul.com |
| Chad Fitzgerald | cfitzgerald@saul.com |
| Christine Kovan | ckovan@saul.com |
| Chad Toms | ctoms@saul.com |
| Nicole Gicker | ngicker@saul.com |
| Derrick Lowe | dlowe@saul.com |
| Terri Pawelski | tpawelski@saul.com |
| David Falcone | dfalcone@saul.com |
| Chris Pippett | cpippett@saul.com |
| Mary Kay Christodoulou | mchristodoulou@saul.com |
| Colleen Nihill | cnihill@saul.com |
| John Royer | jrover@saul.com |

### Pepper Hamilton LLP Attorneys and Staff:

| | |
|---|---|
| Abbott, Natalie S. | abbottn@pepperlaw.com |
| Abelson, Barry | abelsonb@pepperlaw.com |
| Adler, Matthew | adlerm@pepperlaw.com |
| Agran, Joan | agranj@pepperlaw.com |
| Allen, Eileen | allene@pepperlaw.com |
| Anderson, M. | andersonm@pepperlaw.com |
| Arnold, Joan | arnoldj@pepperlaw.com |
| Barberena, Irene | barbernai@pepperlaw.com |
| Barbour, Aisha | barboura@pepperlaw.com |
| Bassett, Rhonda | bassettr@pepperlaw.com |
| Battista, Julie | battistaj@pepperlaw.com |
| Beard, Glenn A. | beardg@pepperlaw.com |
| Bettinger, William C. | bettingerw@pepperlaw.com |
| Boericke, J. Bradley | boerickej@pepperlaw.com |
| Braun, George | braung@pepperlaw.com |
| Brookman, Andrew | brookmana@pepperlaw.com |
| Butler, Cinque | butlerc@pepperlaw.com |
| Cappaso, Jane | cappasoj@pepperlaw.com |
| Caputo, Jodi Simme | caputojs@pepperlaw.com |
| Cole, Thomas | colet@pepperlaw.com |

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 4

| | |
|---|---|
| Comisky, Hope A. | comiskyh@pepperlaw.com |
| Cook, J. | cookj@pepperlaw.com |
| DeCarlo, Maria E. | decarlome@pepperlaw.com |
| Demirjian, Heather | demirjianh@pepperlaw.com |
| Dery, Janet | deryj@pepperlaw.com |
| Dobrydnia, Beth A. | dobrydniaba@pepperlaw.com |
| Donnely-Evans, Deneen | donnelyevansd@pepperlaw.com |
| Doyal, D. | doyald@pepperlaw.com |
| Dukes, J. Andrea | dukesja@pepperlaw.com |
| Eastridge, Jacqueline | eastridgej@pepperlaw.com |
| Eckman, Richard | eckmanr@pepperlaw.com |
| Epstein, James D. | epsteinj@pepperlaw.com |
| Farrell, Michael V. | farrellmv@pepperlaw.com |
| Fenton, Bruce K. | fentonb@pepperlaw.com |
| Fisher, Linda K. | fisherl@pepperlaw.com |
| Folensbee-Moore, Barbara | folsenbeemooreb@pepperlaw.com |
| Fungaroli, Jane | fungarolij@pepperlaw.com |
| Gagne, W. Roderick | gagner@pepperlaw.com |
| Gayman, Denise | gaymand@pepperlaw.com |
| Gibson, Sheilah | gibsons@pepperlaw.com |
| Goldberg, Howard | goldbergh@pepperlaw.com |
| Gordon, Paul | gordonp@pepperlaw.com |
| Grant, M. Duncan | grantm@pepperlaw.com |
| Grassi, Lila S. | grassils@pepperlaw.com |
| Grassi, Rita | grassir@pepperlaw.com |
| Grossman, Robert | grossmanr@pepperlaw.com |
| Heagle, Khristan A. | heagleka@pepperlaw.com |
| Herrmann, K. | herrmannk@pepperlaw.com |
| Holden, Joseph | holdenj@pepperlaw.com |
| Horowitz, Joel E. | horowitzj@pepperlaw.com |
| Hughes, Maureen | hughesm@pepperlaw.com |
| Inamdar, U. | indamaru@pepperlaw.com |
| Isayev, Gennady | isayevg@pepperlaw.com |
| Jenkins, Julie | jenkinsj@pepperlaw.com |
| Kaplan, David M. | kapland@pepperlaw.com |
| Kennedy, Paul J. | kennedyp@pepperlaw.com |
| Kessell, Edward | kessele@pepperlaw.com |
| Kim, S. | kims@pepperlaw.com |
| Klammer, Steven R. | klammers@pepperlaw.com |
| | klammersr@pepperlaw.com |
| Klein, Sharon | kleins@pepperlaw.com |

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 5

| | |
|---|---|
| Kohn, Debra E. | kohnd@pepperlaw.com |
| | kohnde@pepperlaw.com |
| Kopelman, Rena M. | kopelmanrm@pepperlaw.com |
| | kopelmanr@pepperlaw.com |
| Krepto, Laurie | kreptol@pepperlaw.com |
| Lane, Robert D. | laner@pepperlaw.com |
| Lawlor, James | lawlorj@pepperlaw.com |
| Leadbetter, Amanda | leadbettera@pepperlaw.com |
| Lee, Darcy | leed@pepperlaw.com |
| Lee, Joo Young | leejy@pepperlaw.com |
| Leone, Michael | leonecm@pepperlaw.com |
| Liebman, Daniel S. | liebmand@pepperlaw.com |
| | liebmands@pepperlaw.com |
| Lindenfeldar, R. | lindenfeldarr@pepperlaw.com |
| Lisansky, Mary | lisanskym@pepperlaw.com |
| Lozoff, Gary | lozoffg@pepperlaw.com |
| Manwaring, Albert H. | manwaringa@pepperlaw.com |
| Marino, Carla | marinoc@pepperlaw.com |
| Matlock, Tracy | matlockt@pepperlaw.com |
| McDonald, Barbara | mcdonaldb@pepperlaw.com |
| McGrenrey, Sharon | mcgrenreys@pepperlaw.com |
| Moore, Darlene | moored@pepperlaw.com |
| Morais, Michael M. | moraism@pepperlaw.com |
| | moraismm@pepperlaw.com |
| Naylor, Joseph | naylorj@pepperlaw.com |
| Pace, M. | pacem@pepperlaw.com |
| Pang, Juliana | pangj@pepperlaw.com |
| Perez, Kimberly K. | perezk@pepperlaw.com |
| | perezkk@pepperlaw.com |
| Petkun, Lisa B | petkunl@pepperlaw.com |
| Pigeon, Jennifer M. | pigeonjm@pepperlaw.com |
| | pigeonj@pepperlaw.com |
| Proffitt, Leslie | proffittl@pepperlaw.com |
| Quirk, Marion | quirkm@pepperlaw.com |
| Reed, Michael H. | reedm@pepperlaw.com |
| Richardson, Shari | richardsons@pepperlaw.com |
| Robertson, Monica | robertsonm@pepperlaw.com |
| Rollins, Gene | rollinsg@pepperlaw.com |
| Rudolph, Andrew | rudolpha@pepperlaw.com |
| Ruggiero, Christopher A. | ruggieroca@pepperlaw.com |
| | ruggieroc@pepperlaw.com |

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 6

| | |
|---|---|
| Schless, Adam | schlessa@pepperlaw.com |
| Schneider, Shari | schneiders@pepperlaw.com |
| Schwartz, Mindy E. | schwartzme@pepperlaw.com |
| Serritella, Joseph S. | serritellaj@pepperlaw.com |
| Shea, Kathleen Ballay | sheaballayk@pepperlaw.com |
| Shire, D. | shired@pepperlaw.com |
| Smith, D. | smithdg@pepperlaw.com |
| Smith, N. | smithn@pepperlaw.com |
| Spangler, L. | spanglerl@pepperlaw.com |
| Spitofsky, Amy | spitofszkya@pepperlaw.com |
| Stephenson, Kathleen A. | stephensonk@pepperlaw.com |
| Strauss, Benjamin | straussb@pepperlaw.com |
| Street, R. | streetr@pepperlaw.com |
| Sullivan, Mark | sullivanm@pepperlaw.com |
| Surbeck, David | surbeckd@pepperlaw.com |
| Tanner, Neil B. | tannern@pepperlaw.com |
| Thompson, J. | thompsonj@pepperlaw.com |
| Townsend, J. | townsendj@pepperlaw.com |
| Unterberger, Andrea | unterbergera@pepperlaw.com |
| Vargo, Brian S. | vargob@pepperlaw.com |
| | vargobs@pepperlaw.com |
| Wallen, John | wallenj@pepperlaw.com |
| Warren, Laura D. | warrenl@pepprlaw.com |
| Weisensee, Barbara D. | weisenseeb@pepperlaw.com |
| | weisenseebd@pepperlaw.com |
| Woodward, Matthew A. | woodwardm@pepperlaw.com |
| | woodwardma@pepperlaw.com |

## Dilworth Paxson LLP Attorneys and Staff:

Any email address ending in "dilworthlaw.com"

## Other Counsel:

**Brownstein, Hyatt & Farber, P.C.**

| | |
|---|---|
| Farbes, Hubert A. | hfarbes@bhf-law.com |
| Gill, Terence C. | tgill@bhf-law.com |
| Imhoff, Elizabeth Rae | eimhoff@bhf-law.com |
| Keegan, Teresa A. | tkeegan@bhf-law.com |
| Warnkey, Kathleen A. | kwarnkey@bhf-law.com |

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 7

**Powell, Trachtman, Logan, Carrle, Bowman & Lombardo**
| | |
|---|---|
| Curley, C.V. | ccurley@powelltrachtman.com |
| Curry, Michael J. | mcurry@powelltrachtman.com |
| Halberstadt, E.N. | ehalberstadt@powelltrachtman.com |
| Hall, C.B. | chall@powelltrachtman.com |
| Jacobson, M.B. | mjacobson@powelltrachtman.com |
| Maransky, Michael J. | mmransky@powelltrachtman.com |

**Montgomery, McCracken, Walker & Rhoads, LLP**
| | |
|---|---|
| Bloxom, John M. | jbloxom@mmwr.com |
| Newcomer, J.H. | jnewcomer@mmwr.com |

**Fox Rothschild**
| | |
|---|---|
| Berger, Allison | aberger@foxrothschild.com |
| Bonekemper, Andrew W. | abonekemper@foxrothschild.com |
| Baume, Hal | hbaume@foxrothschild.com |
| Cornell, L. Jason | jcornell@foxrothschild.com |
| DeMichele, Anthony P. | ademichele@foxrothschild.com |
| Dorr, Teresa M. | tdorr@forxrothschild.com |
| Gradwohl, David A. | dgradwohl@foxrothschild.com |
| Hinerman, Philip L. | phinerman@foxrothschild.com |
| Jobes, T.H. | tjobes@foxrothschild.com |
| Kelly, Kimberly L. | kkimberly@foxrothschild.com |
| Maransky, Michael J. | mmaransky@foxrothschild.com |
| Menkowitz, Michael G. | mmenkowitz@foxrothschild.com |
| Pileggi, Francis | fpileggi@foxrothschild.com |
| Rennie, Sheldon | srenni@foxrothschild.com |
| Solomon, Robin I. | rsolomon@foxrothschild.com |
| Wanger, William R. | wwanger@foxrothschild.com |

**The Bayard Firm**
| | |
|---|---|
| Astin, Daniel K. | dastin@bayardfirm.com |
| Davis, Charlene D. | cdavis@bayardfirm.com |
| Matthews, Tiffany | cmatthews@bayardfirm.com |
| Richards, Deirdre | drichards@bayardfirm.com |
| Saccullo, Anthony | asaccullo@bayardfirm.com |

**Gardere & Wynne**
| | |
|---|---|
| Nicewander, Dan L. | dnicewander@gardere.com |

# Sonnenschein
### SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 8

**Dorsey & Whitney**
Reeslund, Michael                          reeslund.mike@dorsey.com

**Schwartz, Tobia, Stanziale, Sedita & Campisano**
Crecca, Donald J.                          creccd@kipslaw.com
Diddio, Kim M.                             kim@kipslaw.com
Stanziale, Jr., Charles A.                 stanzch@kipslaw.com
Testa, Jeffrey T.                          testaj@kipslaw.com
Ward, Roger C.                             wardr@kipslaw.com

## Others

William C. Cleveland, III, Esquire         wcleveland@bmsmlaw.com
Richard Hawley, Esquire                    rhawley@k-glaw.com
Chad A. Cicconi                            ccicconi@thorpreed.com
Constance R. Ariagno                       cariagno@PattonBoggs.com
Gerald R. Flatten                          RienDF@aol.com
Rendi Mann-Stadt                           rmann-stadt@mwbavl.com
Heather Goldstein                          hgoldstein@mwbavl.com
Fred Barbour                               fbarbour@mwbavl.com
Russell S. Sayre                           sayre@taftlaw.com
Scott Hickman                              shickman@sherrardroe.com
Stephen Hurd                               shurd@sherrardroe.com
James (Jim) M. Matour                      jmatour@hangley.com
Perry K. Delay                             pdelay@hangley.com
Bruce S. Haines                            bhaines@hangley.com
Kathleen M. Laubenstein                    klaubenstein@hangley.com
Richard J. Zook                            rzook@cdzc.com

# Electronic Evidence Discovery and Analysis

## Statement of Work

### For:

## Royal Indemnity Company
through
## Sonnenschein Nath & Rosenthal LLP

**October 13, 2004**

**Prepared For:**

**Mr. Marc Zwillinger, Esq.**
**Sonnenschein Nath & Rosenthal LLP**

## Engagement Summary

Royal Indemnity Company ("ROYAL"), through Sonnenschein Nath & Rosenthal LLP ("SONNENSCHEIN") has retained Red Cliff Consulting, Inc. ("Red Cliff") to provide forensic preservation, forensic and data analysis, file recovery and file processing services. As part of this engagement, Red Cliff will preserve and attempt to recover data from the following servers:

1.   EMC Storage Device – 40-36GB RAID drives – 1.5TB total. EMC owned 20 of the 40 drives, removed those 20 drives and disabled the machine for failure to pay rental fees. The machine has been offline for more than one year. Configuration and server model are unknown. Preserve forensically and attempt to rebuild RAID array and recover data.

2.   Microsoft Exchange 5.5 Email Server – Machine is currently in use supporting 8 user mailboxes, but had supported approximately 200 user mailboxes at one time. Size and server model unknown. Preserve forensically and attempt to recover the previous 192 mailboxes.

3.   File Server – 8-18GB RAID drives. Machine is currently in use. Configuration and server model are unknown. Preserve forensically and attempt to recover data.

Once onsite, Red Cliff will assess the functionality of the servers and determine the exact course of action to take for efficient restoration. Due to the unknown model and state of each of the machines, there may be no relevant data that can be recovered from a particular machine. Red Cliff may engage EMC Professional Services to provide technical background and consulting related to the EMC storage device.

### Engagement Tasks

### Phase I – Preservation and Data Restoration of Identified Hardware

Red Cliff's foremost task and goal will be to preserve the data available on each machine's hard drive(s). Because this project involves a large number of drives that must be preserved individually, Red Cliff will establish an onsite data acquisition lab including multiple acquisition workstations with write-protection hardware. This will enable Red Cliff to preserve multiple drives concurrently to shorten the preservation process.

Provided the Exchange server and the File server are in working order, Red Cliff should be able to complete the restoration and assessment in very short order. However, the fact that drives have been removed from the EMC server increases the potential complexity of the restoration process exponentially due to the fact that each drive must be put back in the exact same order as when the server was being used. In order to maximize the opportunity for a successful restoration of the EMC RAID array, Red Cliff may partner with EMC Professional Services to develop a custom EMC approach to determine the viability of the machine and data drives. EMC may require restitution for any outstanding invoices before any support will be provided. If so, Sonnenschein will instruct Red Cliff how to proceed.

Once the data has been preserved, the following tasks will take place for the specific hardware in order to collect the relevant data:

A.    EMC Server – Once preserved, if the RAID array cannot be rebuilt onsite with EMC's support, Red Cliff will bring the preserved drives back to its lab in Fairfax, VA, and use the EnCase forensic software to attempt to reconstruct the order and configuration drives. <u>NOTE: This is a manually intensive process with a possibility of no success.</u>

B.    Exchange Server – Once preserved, Red Cliff will review the preserved data for the Exchange server file (.edb) that may have contained the previous 192 mailboxes. If it exists, Red Cliff will restore the .edb file and attempt to extract any identified mailboxes. If the previous .edb cannot be located or restored, Red Cliff will examine the preserved data forensically to determine if any email fragments can be recovered.

C.    File Server – If a logical preservation can be made of the file server, Red Cliff will allow the server to reconstruct the RAID array and preserve the data directly. If a forensic preservation is required, Red Cliff will preserve each drive individually and then rebuild the RAID array using either the existing hardware or by bringing the data back to Red Cliff's VA lab and reconstructing it using the EnCase forensic software.

Due to the availability of EMC Professional Services, Red Cliff may begin work on the Exchange server and the File Server before beginning work on the EMC server. This will allow EMC to perform the necessary research into the EMC server's specific history, and Red Cliff and EMC to prepare for the onsite assessment.

**Phase II –Analysis and Preparation of Resulting Data**

Once the existing data has been preserved and reconstructed, the data will be verified and reviewed for consistency, and recoverable deleted files will be restored. Due to the processing requirements for email and user files, the data will be broken into two different processing paths at this point.

EMAIL – All recovered mailboxes will be screened for exclusion consistent with the Engagement Protocols at the end of this document, searched, and prepared for review in multiple formats. Because the mailboxes are a structured format, Red Cliff will convert each email message into an HTML representation of the message, establish an automated link between the email and any attachments (only to the extent that the email message containing the attachment was not already excluded pursuant to the Engagement Protocols at the end of this document), and de-duplicate the email messages.

Cost estimates provided for these tasks will be based on the assumption that only 25 PSTs need to be recovered from the Exchange server. Final determination on the approach to take will be made by Sonnenschein once the volume of data is identified.

USER FILES – These are non-email files that are typically found on custodian's computers or on file servers that custodians have access to (this could also include email file stores which will be processed as described above). Red Cliff's standard approach for processing user files is to begin by filtering out known files that are not specific to the custodians including system executable files (e.g., .exe, .dll, .sys, etc.). The remaining files are then filtered to exclude non-

business documents which are typically not relevant to litigation (e.g., .gif, .avi, .mp3, etc.). The remaining business documents will be de-duplicated to remove multiple versions of the same file. The resulting files will be indexed and searched according to Sonnenschein's instructions.

## Engagement Protocols

**Red Cliff will adhere to the following protocol in connection with this engagement:**

1.    There are three categories of information that ***must not*** and ***will not*** be provided to Sonnenschein or its client Royal Indemnity Company ("Royal"):

      A.    Any and all email messages (along with any attachments thereto) in which an address in either or both of the "TO:" and/or "FROM:" fields (but not including the "CC:" field) contain any of the email addresses on the attached Schedule A; and

      B.    Any file or other data that was initially created after September 29, 2003.

2.    Red Cliff shall not, under any circumstances, disclose the contents of any files or other data located on the Servers to any person or entity other than Royal (through Sonnenschein), SFC (through Dilworth Paxson), SLS (through Saul Ewing LLP), or a judicial officer, unless required by law to do so.

3.    After the acquisition phase, Red Cliff will provide to SFC (through the Trustee or his counsel) a single copy of all information acquired from the Servers in the same form and manner as such information was provided to Royal.

4.    Red Cliff will access the SLS-owned Servers outside of SLS' normal business hours and will observe any other reasonable requests made by SLS with respect to Red Cliff's onsite activities.

12/11/2006  18:18    2125544215                    MANDIANT                    PAGE  02


INTELLIGENT INFORMATION SECURITY


Stephen J. Shapiro
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286


        Re: Subpoena

Dear Mr. Shapiro:

        We received your subpoena dated November 17, 2006.  As you know,
Mandiant acquired the data referenced in your subpoena pursuant to a
multi-party agreement.  Releasing the data you requested without the
consent of all parties to that original agreement would be a breach of
our confidentiality obligations.

        We understand that negotiations are underway among counsel to
find a way to make this information available.  We will address your
subpoena once those negotiations conclude.  If you have any questions,
please contact Shane McGee at 202-408-9216.


        Regards,



        Michael Malin
        Executive Vice President & CFO
        Mandiant Corporation


cc: Shane M. McGee, Esq.

# McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
### ATTORNEYS AT LAW

THREE GATEWAY CENTER
100 MULBERRY STREET
NEWARK, NEW JERSEY 07102-4079
(973) 622-7711
FACSIMILE (973) 622-5314

LOIS H. GOODMAN
Direct dial:  (973) 565-2079
lgoodman@mdmc-law.com

December 21, 2006

### VIA OVERNIGHT MAIL AND FACSIMILE

Mr. Michael Malin
Executive Vice President & CFO
Mandiant Corporation
675 North Washington Street, Suite 210
Alexandria, VA 22314

> **Re:  Subpoena to Mandiant Corp. issued in *Charles A. Stanziale Jr., Ch. 7 Trustee of Student Finance Corp. v. Pepper Hamilton LLP, et al.* Civil Action Number: 04-1551(JJF)**

Dear Mr. Malin:

We represent Charles A. Stanziale Jr., Chapter 7 Trustee of Student Finance Corp. (the "Trustee") in the above-referenced case. We are aware that on November 17, 2006 Schnader Harrison Segal & Lewis LLP, counsel for Pepper Hamilton LLP ("Pepper"), issued a third-party subpoena to Mandiant Corporation, formerly known as Red Cliff Consulting LLC ("Mandiant"), seeking to obtain information Mandiant acquired from two Student Loan Servicing, LLC ("SLS") servers in late 2004. Mandiant obtained forensic images of the two SLS servers pursuant to an agreement among SLS, Royal Indemnity Company, and the Trustee. As you have stated in your letter dated December 14, 2006, Mandiant retained copies of the unfiltered forensic images, and is prepared to produce those copies in response to the subpoena.

While the Trustee does not object in concept to the production of e-mail communications between Student Financing Corporation ("SFC") and Pepper and other non-privileged communications, the Trustee does object to the following:

- Communications between the Trustee and his previous counsel, Dilworth Paxson LLP ("Dilworth").
- Communications between Dilworth and SFC or any of its agents.
- Communications between the Trustee, Dilworth and SFC or any of its agents.
- Communications between the Trustee and Schwartz, Tobia, Stanziale, Sedita & Campisano, PA, including but not limited to the e-mail domain @kipslaw.com ("Schwartz").

NEW YORK, NEW YORK    DENVER, COLORADO    RIDGEWOOD, NEW JERSEY    MORRISTOWN, NEW JERSEY    PHILADELPHIA, PENNSYLVANIA

# MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

Mr. Michael Malin
December 21, 2006
Page 2

- Communications between Schwartz and SFC or any of its agents.
- Communications between the Trustee, Schwartz, and SFC or any of its agents.

As the above-listed communications are attorney-client privileged, please refrain from producing those e-mails to Pepper or any other parties. Further, before production of any e-mail communications, please contact me to address the specifics of the exclusions requested. Also, please be advised that any production should be at the cost of the requesting party. Thank you for your assistance in this matter.

Very truly yours,

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

Lois H. Goodman

cc: Stephen J. Shapiro, Esq. (via facsimile and overnight mail)
   Edwin M. Goldsmith, III, Esq. (via facsimile and overnight mail)
   John Bicks, Esq. (via facsimile and overnight mail)
   Lisa A. MacVittie, Esq. (via facsimile and overnight mail)

Westlaw.

29 Fed.Appx. 880
29 Fed.Appx. 880, 2002 WL 334111 (C.A.3 (Pa.))
**(Cite as: 29 Fed.Appx. 880)**

▷

Briefs and Other Related Documents

R.J. Reynolds Tobacco v. Philip Morris, Inc.C.A.3 (Pa.),2002.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
R.J. REYNOLDS TOBACCO,
v.
PHILIP MORRIS, INC., Philip Morris, Incorporated
WaWa, Inc., Appellant.
**No. 00-4226.**

Argued Jan. 17, 2002.
Filed Feb. 28, 2002.

Tobacco manufacturer brought antitrust suit against competitor, challenging competitor's retailer program. The United States District Court for the Eastern District of Pennsylvania, Marvin Katz, J., issued orders enforcing subpoenas served upon nonparty retailer, and requiring each party to bear its own discovery expenses. Retailer appealed. The Court of Appeals, Roth, Circuit Judge, held that: (1) orders were final, for appeals purposes; (2) subpoena requests did not exceed bounds of permissible discovery; (3) retailer failed to establish that subpoened documents were privileged as trade secrets; and (4) expense reimbursement request should not have been denied without consideration whether expenses were extraordinary.

Affirmed in part; reversed and remanded in part.
West Headnotes

**[1] Federal Courts 170B** ☞594

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk585 Particular Judgments, Decrees or Orders, Finality
                    170Bk594 k. Discovery and Production of Documents; Depositions. Most Cited Cases

District court orders, enforcing subpoenas requiring nonparty retailer to provide information to tobacco

manufacturer, suing competitor under antitrust laws, were final as to retailer, allowing for appeal, as retailer would not be able to appeal orders to close of antitrust suit. 28 U.S.C.A. § 1291.

**[2] Witnesses 410** ☞16

410 Witnesses
    410I In General
        410k16 k. Subpoena Duces Tecum. Most Cited Cases

Manufacturer of tobacco products, suing competitor for antitrust violations allegedly arising from competitor's retailer program, did not exceed scope of relevant discovery by issuing subpoena requiring nonparty retailer to provide documents relating to its retail cigarette business and dealings with competitor. Fed.Rules Civ.Proc.Rules 26(b)(1), 45, 28 U.S.C.A.

**[3] Witnesses 410** ☞16

410 Witnesses
    410I In General
        410k16 k. Subpoena Duces Tecum. Most Cited Cases

Nonparty retailer failed to establish that documents subpoened by tobacco products manufacturer, bringing antitrust suit against competitor challenging competitor's retailer program, were privileged as trade secrets; its privilege log was insufficiently detailed, and retailer failed to show it would be harmed by disclosures. Fed.Rules Civ.Proc.Rule 45(c)(3)(B)(i), 28 U.S.C.A.

**[4] Witnesses 410** ☞24

410 Witnesses
    410I In General
        410k23 Compensation
            410k24 k. In General. Most Cited Cases

Trial court could not deny request of nonparty retailer, for fees and costs incurred in connection with response to subpoena served by tobacco manufacturer, bringing antitrust action challenging competitor's retailer program, without considering evidence as to whether expenses in question were significant. Fed.Rules Civ.Proc.Rule 45(c)(2)(B), 28 U.S.C.A.

**\*881** Appeal from the United States District Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Fed.Appx. 880                                                                 Page 2
29 Fed.Appx. 880, 2002 WL 334111 (C.A.3 (Pa.))
**(Cite as: 29 Fed.Appx. 880)**

for the Eastern District of Pennsylvania, (D.C. Civil
Action No. 01-mc-00193), District Judge: Honorable
Marvin Katz.

Nicholas J. Lisi, Jason Miles Levien, (Argued),
Padova & Lisi, Philadelphia, PA, for Appellee.
Robert G. Devine, (Argued), Michael W. Horner,
White & Williams, Westmont, NJ, for Appellant.

Before ALITO and ROTH, Circuit Judges
SCHWARZER ᶠᴺ*, District Judge.

> FN* Honorable William W Schwarzer,
> Senior District Judge for the Northern
> District of California, sitting by designation.

## OPINION

ROTH, Circuit Judge.

**\*\*1** Wawa, a non-party and retail distributor of
defendant Phillip Morris's tobacco products, appeals
two discovery orders issued by the District Court for
the Eastern District of Pennsylvania. The first order,
entered on November 15, 2000, directed Wawa to
produce certain documents requested in plaintiff R.J.
Reynolds' subpoena. The second order, entered on
November 20, 2000, directed Wawa to pay its own
expenses in complying with the subpoena. We will
affirm the first order and reverse the second.

## JURISDICTION AND STANDARD OF REVIEW

[1] As a non-party, Wawa cannot appeal the District
Court's orders at the conclusion of R.J. Reynolds' suit
against Phillip Morris in North Carolina. Thus, these
orders are final orders over which we have appellate
jurisdiction. 28 U.S.C. § 1291; *In re: Mark
Madden*, 151 F.3d 125, 127 (3d Cir.1998). Our
standard of review is whether the District Court
abused its discretion. James Wm. Moore, 9 Moore's
Federal Practice § 45.04[8][b] (3d ed.2001).

## NOVEMBER 15 ORDER

R.J. Reynolds' subpoena requests documents and
information concerning Wawa's **\*882** cigarette
business, especially its dealings with Phillip Morris
and Phillip Morris's Retail Leaders Program. The
documents and information that R.J. Reynolds seeks
under this subpoena are subject to a protective order
entered in the North Carolina action. The protective
order provides that the "information and documents
provided shall be used only for purposes of the

instant litigation and shall not be otherwise
disclosed." Nevertheless, Wawa refused to produce
certain documents requested by R.J. Reynolds on the
ground that they are privileged trade secrets.

[2] Wawa advances two main arguments on appeal.
First, it argues that R.J. Reynolds' subpoena exceeds
the scope of relevant discovery permitted under
Fed.R.Civ.P. 26(b)(1). Although the Federal Rule
governing subpoenas is Rule 45, and not Rule 26, it
is not necessary to resolve this distinction here. R.J.
Reynolds' subpoena meets the requirements of Rule
26 in any event. Rule 26(b)(1) allows discovery
regarding "any matter, not privileged, that is relevant
to the claim or defense of any party." Here, R.J.
Reynolds has requested documents related to Wawa's
retail cigarette business and dealings with Phillip
Morris. This information plainly relates to R.J.
Reynolds' antitrust claims challenging Phillip
Morris's Retail Leaders program.

[3] Second, Wawa argues that its documents are
privileged as trade secrets and, thus, not obtainable
under Fed.R.Civ.P. 45(c)(3)(B)(i). Wawa has the
burden of establishing that its documents are
privileged. See Charles Alan Wright & Arthur R.
Miller, 9A Fed. Prac. & Proc. § 2458 (1995);
Fed.R.Civ.P. 45(d)(2) (when information subject to a
subpoena is withheld under a claim of privilege, it
must be supported by a sufficient description of the
nature of the documents produced). Although Wawa
has assembled a privilege log listing certain
documents as trade secrets, the skeletal descriptions
in its privilege log do not support a trade secret
privilege for many documents. See, e.g. A118
(listing "various daily log entries" as trade secrets);
A119 (listing "interoffice emails" with "various"
authors and "various" addressees as trade secrets);
A121 (listing "various miscell. Wawa
notes/correspondence" as trade secrets).

**\*\*2** Even if Wawa's privilege log did establish that
certain documents were trade secrets, however,
Wawa's argument would still fail. This is because
Wawa cannot meet the additional showing of good
cause for restricting dissemination on the ground that
it would be harmed by its disclosures. Charles Alan
Wright, Arthur R. Miller & Richard L. Marcus, 8
Fed. Prac. & Proc. § 2043 (1994). The disclosure
required by R.J. Reynolds' subpoena would be made
under the limitations of the protective order entered
in North Carolina. That order restricts the use of
information gained from Wawa to the pending
antitrust and unfair trade practices litigation between
R.J. Reynolds, Phillip Morris and other tobacco

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 Fed.Appx. 880                                                    Page 3
29 Fed.Appx. 880, 2002 WL 334111 (C.A.3 (Pa.))
**(Cite as: 29 Fed.Appx. 880)**

producers. In light of this protective order, Wawa has not presented sufficient showing of harm to establish that the District Court abused its discretion in ordering production.

Therefore, we find that the District Court did not abuse its discretion in requiring Wawa to comply with R.J. Reynolds' subpoena.

## NOVEMBER 20 ORDER

[4] The District Court also denied Wawa fees and costs incurred as a result of its compliance with R.J. Reynolds' subpoena. We find that the court abused its discretion when it summarily denied compensation without considering evidence of the expenses Wawa incurred.

Fed.R.Civ.P. 45(c)(2)(B) imposes mandatory fee shifting and directs the court to **\*883** "protect" a nonparty from "significant expense resulting from inspection and copying commanded." Thus, district courts must determine whether the subpoena imposes expenses on a non-party and whether those expenses are significant. *James Wm. Moore,* 9 Moore's Federal Practice § 45.04[2] (3d ed.2001). Significant expenses must be borne by the party seeking discovery. *Id.* The District Court abused its discretion when it denied Wawa compensation without determining the existence and magnitude of Wawa's expenses.

## CONCLUSION

We will affirm the District Court's November 15, 2000, order requiring Wawa to comply with R.J. Reynolds' subpoena. We will reverse the District Court's November 20, 2000, order and remand this case to the District Court to make findings regarding Wawa's expenses and to award any expenses required by Fed.R.Civ.P. 45(c)(2)(B).

C.A.3 (Pa.),2002.
R.J. Reynolds Tobacco v. Philip Morris, Inc.
29 Fed.Appx. 880, 2002 WL 334111 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 2001 WL 34108410 (Appellate Brief) Reply Brief of Appellant (Sep. 26, 2001) Original Image of this Document (PDF)
• 2001 WL 34108411 (Appellate Brief) Brief of Appellee (Sep. 10, 2001) Original Image of this

Document (PDF)

• 2001 WL 34108412 (Appellate Brief) Brief of Appellant (Aug. 13, 2001) Original Image of this Document (PDF)

• 00-4226 (Docket) (Dec. 12, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

December 14, 2006

**VIA REGISTERED MAIL**

Student Loan Servicing, LLC
c/o Andrew N. Yao, Registered Agent
261 Chapman Road, Suite 101
Newark, Delaware 19702

Student Loan Servicing, LLC
c/o Andrew N. Yao, Registered Agent
107 Leighton Drive
Bryn Mawr, Pennsylvania 19010

> Re:   Subpoena to Mandiant Corp. issued in *Charles A. Stanziale Jr., Ch. 7 Trustee of Student Finance Corp. v. Pepper Hamilton LLP, et al.* (D. Del. case no. 04-1551-JJF) and *Royal Indemnity Co. v. Pepper Hamilton LLP, et al.* (D. Del. case no. 05-165-JJF)

Dear Mr. Yao:

On November 17, 2006, Schnader Harrison Segal & Lewis LLP issued the attached subpoena to Mandiant Corporation ("Mandiant") seeking to obtain information Mandiant acquired from two Student Loan Servicing, LLC ("SLS") servers in late 2004. Mandiant, formerly Red Cliff Consulting LLC, acquired forensic images of the two SLS servers pursuant to an agreement among SLS, Royal Indemnity Company, and Student Finance Corporation through its Chapter 7 Trustee. Pursuant to the agreement, Mandiant filtered these forensic images to remove communications between SLS and its attorneys before the remaining data were produced to the parties.

The subpoena, however, seeks all the communications on these servers, which would include the privileged communications filtered out in 2004. As the privilege is SLS's, and we are unsure if you are aware of the subpoena, we wanted to bring the subpoena to SLS's attention.  Please be advised that, consistent with the 2004 agreement, Mandiant retained copies of the unfiltered forensic images, and may be compelled to produce those copies in response to the subpoena unless the subpoena is quashed or modified pursuant to a court order.

Please notify us in writing prior to December 22, 2006 whether you intend to move to quash or otherwise challenge the subpoena.

Sincerely yours,

Michael Malin
Executive Vice President & CFO
Mandiant Corporation

Mr. Andrew N. Yao
December 14, 2006
Page 2

Enclosure

cc:    Stephen Shapiro, Esq.
       Lois Goodman, Esq.
       Shane M. McGee, Esq.

**FedEx** Express

WRG ADDR
27DEC 10:11        RECIPIENT MOVED

Pcs: 2
Emp# 322151
Rt#: 716

1 of 1

Recpt Addr: 1405 FOULK RD STE 102

Pkg Trk#'s: 846191465904
846542959297

e weight limit for the FedEx® Envelope rate?

including the FedEx Envelope. airbill and contents (up to approximately thirty
. If it exceeds the gross weight limit, a higher rate will apply.

elope

e shipped in the FedEx Envelope?

designed for documents. Contents should be compatible with the container and
to help assure safe transportation with ordinary care in handling. Shipments within
blue greater than US$500 should not be shipped in this envelope. International
value in excess of US$100 for carriage or customs should not be shipped in this-
send cash, cash equivalent or other prohibited items. This envelope is for FedEx
s only. Any other use is prohibited.

FedEx limit of liability?

In the U.S., FedEx liability is limited to US$100 for loss, damage, delay.
unless you declare a higher value and pay an extra charge. The maximum
of this envelope is US$500. See the current FedEx Service Guide or

bility.is limited to US$100 for dam____ ____ or loss of
further limited by certain treaties, including the Warsaw
d. See the current FedEx Service Guide or the FedEx®

1.800.463.3339 for U.S. domestic shipments. 1.800.247.4747
FedEx office if you are outside the U.S.

---

Ref: RTRN 846191465890 Date: 12/29/2005
Dwp:                    Wgt: 1.0 LBS

SHIPPING:          0.00
SPECIAL:           0.00
HANDLING:          0.00
TOTAL:             0.00

By:

DV:

Svcs: EXPRESS SAVER PACKAGE
TRCK# 7302 0509 3511
FEDEX (800) 463-3339
2 COMMONS BLVD

ORIGIN ID: ZWIA
ILGRA
NEW CASTLE, DE 19720
UNITED STATES US

Ship Date: 29DEC05
ShipWgt: 1.0 LB MAN
Acctit: 09200/RDFE2328
System:
Account: S ********

TO MIKE MALIN
MANDIANT
675 N WASHINGTON 210

ALEXANDRIA, VA 22314

Dept:

BILL RECIPIENT

**FedEx**
Express

E

Delivery Address
Barcode

THU
Deliver By:
04JAN07

IAD    A1

SA  LVLA

EXPRESS SAVER PACKAGE
Form
0201

TRK# 7302 0509 3511

22314    -VA-US

SA  LVLA

**Urgent**

Name    FOULKSTONE PLZA

Company

Address  1405  FOULK RD    STE 102

City, State, Zip

Telephone

**FedEx Express** USA Airbill

FedEx Tracking Number **8461 9146 5904**

0200

**Recipient's Copy**

Date 12/14/06

Sender's Name MIKE MALIN    Phone 703 683-3141

Company MANDI. MNT

Address 6775 North Washington    210
Dept/Floor/Suite/Room

ALEXANDRIA    State VA    ZIP 22314

Your Internal Billing Reference MANDI. MNT

Recipient's Name ANDREW YAO    Phone

Company STUDENT LOAN SERVICING LLC

Address 261 ___ CORP    101
Dept/Floor/Suite/Room

NEWARK    State DE    ZIP 19702

12/14/06

8461 9146 5904

**4a Express Package Service**    *Packages up to 150 lbs.*
Delivery commitment may be later in some areas.

☑ FedEx Priority Overnight
Next business morning

☐ FedEx Standard Overnight
Next business afternoon

☐ FedEx First Overnight
Earliest next business morning delivery to select locations

☐ FedEx 2Day
Second business day

☐ FedEx Express Saver
Third business day

FedEx Envelope rate not available. Minimum charge: One-pound rate

**4b Express Freight Service**    *Packages over 150 lbs.*
Delivery commitment may be later in some areas.

☐ FedEx 1Day Freight*
Next business day

☐ FedEx 2Day Freight
Second business day

☐ FedEx 3Day Freight
Third business day

*Call for Confirmation

**5 Packaging**    *Declared value limit $500*

☑ FedEx Envelope*    ☐ FedEx Pak*    ☐ Other
Includes FedEx Small Pak, FedEx Large Pak, and FedEx Sturdy Pak

**6 Special Handling**    Include FedEx address in Section 3.

☐ SATURDAY Delivery
Available ONLY for FedEx Priority Overnight, FedEx 2Day, FedEx 1Day Freight, and FedEx 3Day Freight to select ZIP codes.

☐ HOLD Weekday
at FedEx Location
Not available for FedEx First Overnight

☐ HOLD Saturday
at FedEx Location
Available only for FedEx Priority Overnight and FedEx 2Day to select locations

Does this shipment contain dangerous goods?
One box must be checked.

☑ No    ☐ Yes
As per attached Shipper's Declaration

☐ Yes
Shipper's Declaration not required

☐ Dry Ice
Dry Ice, 9, UN 1845 ___ x ___ kg

Dangerous Goods (including Dry Ice) cannot be shipped in FedEx packaging.

☐ Cargo Aircraft Only

**7 Payment** *Bill to:*

☑ Sender
Acct. No. in Section 1 will be billed.

☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Enter FedEx Acct. No. or Credit Card No. below.

☐ Obtain Recip.
Acct. No.

| Total Packages | Total Weight | Total Declared Value† | Total Charges |
|---|---|---|---|
|  |  | $ .00 |  |

†Our liability is limited to $100 unless you declare a higher value. See back for details.

Credit Card Auth.

**8 Release Signature** *Sign to authorize delivery without obtaining signature.*

By signing you authorize us to deliver this shipment without obtaining a signature and agree to indemnify and hold us harmless from any resulting claims.

Questions? Visit our Web site at fedex.com

446



INTELLIGENT INFORMATION SECURITY

Stephen J. Shapiro
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

     Re: Subpoena

Dear Mr. Shapiro:

     We received your subpoena dated November 17, 2006. As you know,
Mandiant acquired the data referenced in your subpoena pursuant to a
multi-party agreement. Releasing the data you requested without the
consent of all parties to that original agreement would be a breach of
our confidentiality obligations.

     We understand that negotiations are underway among counsel to
find a way to make this information available. We will address your
subpoena once those negotiations conclude. If you have any questions,
please contact Shane McGee at 202-408-9216.

     Regards,

     Michael Malin
     Executive Vice President & CFO
     Mandiant Corporation

cc: Shane M. McGee, Esq.

WWW.MANDIANT.COM