UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------- x
CHARLES A. STANZIALE, JR.,                         :
CHAPTER 7 TRUSTEE OF STUDENT                        .
FINANCE CORPORATION                                :

               Plaintiff,                       :       MISC. NO.  M8-85

      -against-                                    :

PEPPER HAMILTON LLP, ET AL                          :       **DOC #** 2

            Defendants.                      :
--------------------------------------------------------------------- x

## ORDER TO SHOW CAUSE

Upon the Memorandum of Law of Pepper Hamilton LLP ("Pepper") and the Declaration

of Stephen J. Shapiro, it is hereby:

ORDERED that non party Mandiant Corporation ("Mandiant") show cause before the

undersigned in Courtroom No. 17C United States Courthouse, 500 Pearl Street, New York,

New York, at 10:00 a.m./p.m. on the 16th day of January, 2007, why an order should not be

entered, pursuant to F.R.C.P. 34(c), 37(a)(1) and 45: (i) compelling Mandiant to produce

documents pursuant to a Subpoena *Duces Tecum* that was served upon it in connection with

litigation currently pending in the United States District Court for the District of Delaware on a

date and time set by the Court; and (ii) granting such other and further relief as the Court deems

just and proper.

**FURTHER ORDERED**, that service of the Order to Show Cause shall be made

personally on or before January 4, 2007.

**FURTHER ORDERED**, that Mandiant shall serve its answering papers, if any, to this

Order to Show Cause by January 10, 2007; and, Pepper shall serve its reply papers, if any, by

January 12, 2007.

Dated:  New York, New York
~~December~~ , 2006
Jan. 3, 2007

_____
UNITED STATES DISTRICT JUDGE

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x
CHARLES A. STANZIALE, JR.,                              :
CHAPTER 7 TRUSTEE OF STUDENT
FINANCE CORPORATION                                     :

                            Plaintiff,      :   MISC. NO.  M 8 - 85

          -against-                                     :

PEPPER HAMILTON LLP, ET AL                              :

                            Defendants.                 :
----------------------------------------------------------------------x

### DECLARATION OF STEPHEN J. SHAPIRO IN SUPPORT
### OF MOTION TO COMPEL DISCOVERY

Stephen J. Shapiro, an attorney admitted to practice before the Courts of the

Commonwealth of Pennsylvania and the State of New Jersey, declares the following under the

penalties of perjury pursuant to 28 U.S.C. § 1746:

1.      I am an associate at Schnader Harrison Segal & Lewis LLP ("Schnader"), and

counsel to Defendants Pepper Hamilton LLP ("Pepper") and W. Roderick Gagné. I submit this

declaration in support of Pepper's motion to compel nonparty Mandiant Corporation, f/k/a Red

Cliff Consulting, LLC ("Mandiant"), to produce documents responsive to a Subpoena *Duces*

*Tecum* ("Subpoena") on a date and time set by the Court.

2.      The Subpoena was issued to Mandiant in an effort to obtain discovery from it

relevant to litigation currently pending in the United States District Court for the District of

Delaware – *Stanziale v. Pepper Hamilton LLP, et al.*, No. 04-1551 (D. Del) and *Royal Indemnity*

*Company v. Pepper Hamilton LLP, et al.*, No. 05-165 (D. Del). Mandiant was served with the

Subpoena on November 21, 2006. Attached hereto as Exhibit "A" is a copy of the Subpoena and

Proof of Service. To date, Mandiant has refused to comply with the Subpoena.

3.    Student Finance Corporation ("SFC"), a former client of the Pepper law firm, was a Pennsylvania corporation in the business of originating or acquiring and then securitizing student loans from truck driving schools. Bankruptcy proceedings against SFC were initiated in the United States Bankruptcy Court for the District of Delaware in 2002 and Charles A. Stanziale, Jr., was appointed to serve as bankruptcy trustee for SFC (the "Trustee").

4.    Prior to the bankruptcy, SFC owned several computer servers, one of which served as a repository for, among other data, emails to and from employees of SFC (the "Server"). Presumably as part of the Trustee's efforts to liquidate SFC's assets, the Server was sold at auction to an entity called Student Loan Servicing LLC ("SLS"), which was an affiliate of SFC not under the control of the Trustee. The data on the Server, including SFC's emails, was not removed from the Server before SLS took possession of it.

5.    In 2002, the Trustee filed an adversary action against Royal Indemnity Company ("Royal") alleging that Royal, which had issued credit risk insurance policies to SFC, had discovered that SFC was engaging in fraudulent business practices but had concealed that information and had attempted to prop-up SFC to avoid facing claims on its insurance policies. *See Stanziale v. Royal Indemnity Company*, Adv. No. 02-6803 (Bankr. D. Del.) (the "Royal Litigation"). The emails and other data on the Server presumably were potentially relevant to the issues in the Royal Litigation. However, the Trustee apparently took the position that some of the emails on the Server – such as emails between SFC and its attorneys (including Pepper) – theoretically might be protected from disclosure by the attorney-client privilege. The Trustee apparently was not willing to review all of the emails on the Server to determine which emails, if any, were in fact protected from disclosure by the attorney-client privilege. Accordingly, the Trustee and Royal reached a compromise whereby the Trustee, Royal and SLS agreed to have an

2                                                              PHDATA 1413806_2

independent third party extract only the emails from the Server that were not sent to or by SFC's lawyers.

6.      Royal retained Mandiant, a technology consulting firm, to extract the emails from the Server. Pursuant to a written agreement between Royal, the Trustee and SLS, Mandiant was to program its extraction software in a fashion that would filter out all emails that were sent to or received from any email address that belonged to any of SFC's lawyers. *See* October 13, 2004 letter annexed to Exhibit "A." As part of this process, Mandiant agreed that it would not "disclose the contents of any files or other data located on the Servers to any person or entity other than Royal [through its lawyers], SFC [through its lawyers] and SLS [through its lawyers], or a judicial officer, unless required by law to do so." *Id.* at 2. After the agreement was put into place, Mandiant obtained a copy of the Server for processing, performed the extraction, and produced to Royal, the Trustee and SLS the thousands of emails that made it through the filtering software Mandiant applied. Mandiant also, on information and belief, retained and still possesses today a copy of the entire Server – not just the emails that made it through the filter. The Trustee and Royal subsequently settled the Royal Litigation.

7.      In November 2004, the Trustee sued Pepper for, among other things, professional malpractice and breach of fiduciary duty arising out of Pepper's representation of SFC. *See Stanziale v. Pepper Hamilton LLP, et al.*, No. 04-1551 (D. Del). In March 2005, Royal sued Pepper for, among other things, negligent and fraudulent misrepresentation in connection with the SFC transactions that Royal insured. *See Royal Indemnity Company v. Pepper Hamilton LLP, et al.*, No. 05-165 (D. Del). Both cases against Pepper (the "Pepper Cases") allege (falsely) that Pepper was SFC's "general counsel" and knew or should have known that SFC was engaging in fraudulent business practices.

8.     During discovery in the Pepper Cases, Royal produced the emails that Mandiant extracted from the Server. The Server, however, likely contains emails between SFC and its lawyers (including Pepper lawyers) that were not extracted because they were blocked by Mandiant's filtering software and, therefore, have never been produced in either the Royal Litigation or the Pepper Cases.

9.     These emails may be highly relevant to Pepper's defenses in the Pepper Cases and/or are likely to lead to the discovery of admissible evidence. For instance, the Trustee has alleged that Pepper was SFC's "general counsel" and therefore knew or should have known that SFC was engaging in fraudulent business practices. Discovery in the Pepper Cases has demonstrated, however, that other law firms performed substantial legal work for SFC and documents related to those other representations may be stored on the Server. Pepper is clearly entitled to discovery of those documents. The emails may also support Pepper's defense that it was unaware of SFC's fraudulent business practices. Therefore, Pepper asked the Trustee to produce any emails on the Server that were not previously produced. The Trustee responded that he did not possess the Server and, therefore, could not produce the missing emails.

10.     Because the Trustee claimed that he was not able to produce the emails in question and because SLS apparently is no longer in business, Pepper's only remaining option was to acquire the emails directly from Mandiant. Accordingly, on November 21, 2006, Pepper served a subpoena on Mandiant (a copy of the subpoena was also sent to counsel for Royal and the Trustee on November 22, 2006). The Subpoena directed Mandiant to produce the emails on the Server that were not produced during the Royal Litigation or, in the alternative, to produce the entire Server in the event that Mandiant did not maintain the withheld emails in a segregated file. *See* Exhibit "A" hereto.

11.    On December 11, 2006, the date on which the Subpoena commanded Mandiant to produce the documents in question, Mandiant wrote to counsel for Pepper and explained that it would not produce the data requested lest it be deemed in breach of the confidentiality agreement into which it had entered. *See* Mandiant Letter attached hereto as Exhibit "B." In response, counsel for Pepper pointed out that Mandiant's out-of-court agreement with Royal, the Trustee and SLS (to which Pepper was not a party) permitted Mandiant to produce the documents requested if "required by law to do so" and that Pepper's Subpoena was just such a legal requirement. Pepper's counsel also explained that the out-of-court confidentiality agreement did not excuse Mandiant from its obligation to comply with the Subpoena and requested that Mandiant comply with it by December 20, 2006. *See* Pepper Letter attached hereto as Exhibit "C." To date, Mandiant has not produced the requested data.[1]

12.    As a result of its failure to comply with the Subpoena, Mandiant should be compelled to respond to the Subpoena on a date and time set by the Court. If Mandiant fails to produce documents on the date and time set by the Court, appropriate sanctions should also be imposed, including a daily fine, until it produces such documents.

13.    No prior application for this or similar relief has been requested.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 29, 2006, in Philadelphia Pennsylvania.

STEPHEN J. SHAPIRO

---

[1]    Pepper will, at its own expense, provide Mandiant with an appropriate storage device onto which Mandiant can copy the data from the Server, so cost should not be an issue.

PHDATA 1413806_2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CHARLES A. STANZIAE, JR.,
CHAPTER 7 TRUSTEE OF STUDENT FINANCE CORPORATION

                              Plaintiff,                CASE NO.
                                                        05-165 AND
            -against-                                   04-1551

PEPPER HAMILTON LLP, ET AL                              AFFIDAVIT OF
                                                        SERVICE
                              Defendants.
-------------------------------------------------------------X

STATE OF NEW YORK, COUNTY OF NEW YORK.  ss:

    **Robert Vick**, being duly sworn, deposes and says that he is not a party to
the above action, is over 18 years of age, and resides in Brooklyn, New York.

    On **November 21, 2006**, at approximately **3:15pm**, deponent served a **SUBPOENA
AND COVER LETTER**, in the above captioned action upon **Mandiant**, at **1285 Avenue of
the Americas, 35th Floor, New York, NY 10019**, by delivering a true and correct
copy of said documents to **Michael Malin/Manager**, who acknowledged that he was
authorized to accept service on behalf of **Michael Malin**.

    **Mr. Malin's** approximate physical description is:

    RACE      :WHITE
    SEX       :MALE
    HAIR      :BROWN
    EYES      :BROWN
    HEIGHT    :6'1"
    WEIGHT    :200 LBS
    AGE       :40-45

                                          _Robert Vick_
                                          Robert Vick

Sworn to Before Me this

27th day of _November_, 2006.

_____
NOTARY PUBLIC

Schnader400

RINA I. RAMOS, Notary Public
State of New York No. 01RA6002465
Qualified in Queens County
Certified in Queens County
Commission Expires Feb. 9, 2010



1800 MARKET STREET  SUITE 3600
PHILADELPHIA, PA  19103-7286
215.751.2000  FAX 215.751.2205  schnader.com

November 17, 2006

Stephen J. Shapiro
Direct Dial 215-751-2259
E-mail: sshapiro@schnader.com

## VIA PERSONAL SERVICE

Mandiant
1285 Avenue of the Americas, 35th Floor
New York, NY 10019

> **RE:** *Royal Indemnity Company v. Pepper Hamilton LLP, et al.,*
> **No. 05-165 (D. Del.)**
> *Stanziale v. Pepper Hamilton LLP, et al.,* **No. 04-1551 (D. Del.)**

Dear Sir or Madam:

This firm represents defendants Pepper Hamilton LLP and W. Roderick Gagné in the above-captioned actions. Information that we have obtained through discovery indicates that Mandiant, which we understand formerly operated under the name Red Cliff Consulting, LLC, may possess information relevant to the case. Therefore, we have enclosed a subpoena directing Mandiant to produce certain information that may be in its possession.

Please do not hesitate to contact me if you have any questions or need any additional information.

Sincerely,

Stephen Shapiro /dej
Stephen J. Shapiro
For SCHNADER HARRISON SEGAL & LEWIS LLP

Enclosure

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

SOUTHERN     DISTRICT OF     NEW YORK

Charles A. Stanziale, Jr.,
Chapter 7 Trustee of Student Finance Corporation    **SUBPOENA IN A CIVIL CASE**

       V.

Pepper Hamilton LLP, et al.

Case Number:[1] 05-165 and 04-1551 (D. Del.)

TO:   Mandiant
1285 Avenue of the Americas, 35th Floor
New York, New York 10019

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attached Schedule

| PLACE   Schnader Harrison Segal & Lewis LLP<br>140 Broadway, Suite 3100, New York, New York 10005-1101 | DATE AND TIME<br>12/11/2006 10:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *(signature)* | 11/17/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Bruce P. Merenstein, Esquire
Schnader Harrison Segal & Lewis LLP, 1600 Market St., Ste 3600, Philadelphia, PA 19103 (215) 751-2249

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|

SERVED

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER _____

ADDRESS OF SERVER _____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## SCHEDULE OF DOCUMENTS

### Definitions

1.    "Red Cliff" means Red Cliff Consulting LLC, as well as its parents, subsidiaries, or affiliate companies, predecessors, successors, including Mandiant, agents, officers, directors, attorneys, employees, or representatives.

2.    "Royal" means Royal Indemnity Company and Royal & Sun Alliance, as well as their parents, subsidiaries, affiliates, officers, directors, employees, agents, attorneys, and representatives.

3.    "Letter" means the October 13, 2004 letter from Marc J. Zwillinger to Brian Dykstra attached hereto.

4.    "Servers" shall have the same meaning as that term is defined in the Letter.

5.    All words and phrases shall be construed in accordance with normal custom and usage in the industries or field of commerce to which they apply.

6.    The connectives "and" and "or" are to be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

7.    The use of the singular form of any word includes the plural and vice versa.

## **Document Request**

All email messages from the Servers that were not provided to Royal pursuant to the instructions set forth in the paragraph numbered "1" in the Letter.

## **Alternative Document Request**

In the event Red Cliff is not able to comply with the request above without performing anew the procedures set forth in the Letter, Red Cliff shall produce a complete copy of the Servers.

PHDATA 1399225_1

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Marc J. Zwillinger
202.408.9171
mzwillinger@sonnenschein.com

1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
202.408.6400
202.408.6399 fax
www.sonnenschein.com

Chicago
Kansas City
Los Angeles
New York
San Francisco
Short Hills, N.J.
St. Louis
Washington, D.C.
West Palm Beach

October 13, 2004

**VIA FACSIMILE**

Brian Dykstra
Red Cliff Consulting LLC
111 South Fairfax Street
Alexandria, VA 22314

Re:     Engagement Protocols

Dear Brian:

As you know, Red Cliff's engagement by Royal Indemnity Company ("Royal") will involve the evaluation (phase I), restoration and preservation (phase II), and analysis and preparation (phase III) of three separate servers. Red Cliff will consult with Marc Zwillinger or Shane McGee at Sonnenschein Nath & Rosenthal LLP ("Sonnenschein") prior to beginning each phase, and Red Cliff will not begin a new phase without obtaining Sonnenschein's consent.

As a part of this engagement, Red Cliff will access data owned by Student Finance Company through its Chapter 7 Trustee ("SFC"). This data is located on three servers: an EMC server with a 40-drive RAID array; a file server with a small RAID array; and a small Exchange server (collectively, the "Servers"). The latter two servers are owned or controlled by Student Loan Servicing, LLC ("SLS"). Red Cliff will access the SLS-owned Servers outside of SLS' normal business hours and will observe any other reasonable requests made by SLS with respect to Red Cliff's onsite activities.

Red Cliff's activities in performing the work pursuant to this retention will follow the attached Statement of Work. In addition, at all times Red Cliff will adhere to the following protocol in connection with this engagement:

1.     There are three categories of information that *must not* and *will not* be provided to Sonnenschein or its client Royal:

A.     Any and all email messages (along with any attachments thereto) in which an address in either or both of the "TO:" and/or "FROM:" fields (but not including the "CC:" field) contain any of the email addresses on the attached Schedule A; and



      B.     Any file or other data that was initially created after September 29, 2003.

2.     Red Cliff shall not, under any circumstances, disclose the contents of any files or other data located on the Servers to any person or entity other than Royal (through Sonnenschein), SFC (through Dilworth Paxson), SLS (through Saul Ewing LLP), or a judicial officer, unless required by law to do so.

3.     After the acquisition phase, Red Cliff will provide to SFC (through the Trustee or his counsel) a single copy of all information acquired from the Servers in the same form and manner as such information was provided to Royal.

4.     Red Cliff will access the SLS-owned Servers outside of SLS' normal business hours and will observe any other reasonable requests made by SLS with respect to Red Cliff's onsite activities.

Please let me know if you have any questions.

Sincerely,

Marc J. Zwillinger


Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 3

## SCHEDULE A

### Saul Ewing LLP Attorneys and Staff:

| | |
|---|---|
| Elizabeth Witmer | ewitmer@saul.com |
| Linda Richenderfer | lrischenderfer@saul.com |
| Suzanne Laumakis | slaumakis@saul.com |
| Chad Fitzgerald | cfitzgerald@saul.com |
| Christine Kovan | ckovan@saul.com |
| Chad Toms | ctoms@saul.com |
| Nicole Gicker | ngicker@saul.com |
| Derrick Lowe | dlowe@saul.com |
| Terri Pawelski | tpawelski@saul.com |
| David Falcone | dfalcone@saul.com |
| Chris Pippett | cpippett@saul.com |
| Mary Kay Christodoulou | mchristodoulou@saul.com |
| Colleen Nihill | cnihill@saul.com |
| John Royer | jroyer@saul.com |

### Pepper Hamilton LLP Attorneys and Staff:

| | |
|---|---|
| Abbott, Natalie S. | abbottn@pepperlaw.com |
| Abelson, Barry | abelsonb@pepperlaw.com |
| Adler, Matthew | adlerm@pepperlaw.com |
| Agran, Joan | agranj@pepperlaw.com |
| Allen, Eileen | allene@pepperlaw.com |
| Anderson, M. | andersonm@pepperlaw.com |
| Arnold, Joan | arnoldj@pepperlaw.com |
| Barberena, Irene | barbernai@pepperlaw.com |
| Barbour, Aisha | barboura@pepperlaw.com |
| Bassett, Rhonda | bassettr@pepperlaw.com |
| Battista, Julie | battistaj@pepperlaw.com |
| Beard, Glenn A. | beardg@pepperlaw.com |
| Bettinger, William C. | bettingerw@pepperlaw.com |
| Boericke, J. Bradley | boerickej@pepperlaw.com |
| Braun, George | braung@pepperlaw.com |
| Brookman, Andrew | brookmana@pepperlaw.com |
| Butler, Cinque | butlerc@pepperlaw.com |
| Cappaso, Jane | cappasoj@pepperlaw.com |
| Caputo, Jodi Simme | caputojs@pepperlaw.com |
| Cole, Thomas | colet@pepperlaw.com |

Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 5

| | |
|---|---|
| Kohn, Debra E. | kohnd@pepperlaw.com |
| | kohnde@pepperlaw.com |
| Kopelman, Rena M. | kopelmanrm@pepperlaw.com |
| | kopelmanr@pepperlaw.com |
| Krepto, Laurie | kreptol@pepperlaw.com |
| Lane, Robert D. | laner@pepperlaw.com |
| Lawlor, James | lawlorj@pepperlaw.com |
| Leadbetter, Amanda | leadbettera@pepperlaw.com |
| Lee, Darcy | leed@pepperlaw.com |
| Lee, Joo Young | leejy@pepperlaw.com |
| Leone, Michael | leonem@pepperlaw.com |
| Liebman, Daniel S. | liebmand@pepperlaw.com |
| | liebmands@pepperlaw.com |
| Lindenfeldar, R. | lindenfeldarr@pepperlaw.com |
| Lisansky, Mary | lisanskym@pepperlaw.com |
| Lozoff, Gary | lozoffg@pepperlaw.com |
| Manwaring, Albert H. | manwaringa@pepperlaw.com |
| Marino, Carla | marinoc@pepperlaw.com |
| Matlock, Tracy | matlockt@pepperlaw.com |
| McDonald, Barbara | mcdonaldb@pepperlaw.com |
| McGrenrey, Sharon | mcgrenreys@pepperlaw.com |
| Moore, Darlene | moored@pepperlaw.com |
| Morais, Michael M. | moraism@pepperlaw.com |
| | moraismm@pepperlaw.com |
| Naylor, Joseph | naylorj@pepperlaw.com |
| Pace, M. | pacem@pepperlaw.com |
| Pang, Juliana | pangj@pepperlaw.com |
| Perez, Kimberly K. | perezk@pepperlaw.com |
| | perezkk@pepperlaw.com |
| Petkun, Lisa B | petkunl@pepperlaw.com |
| Pigeon, Jennifer M. | pigeonjm@pepperlaw.com |
| | pigeonj@pepperlaw.com |
| Proffitt, Leslie | proffittl@pepperlaw.com |
| Quirk, Marion | quirkm@pepperlaw.com |
| Reed, Michael H. | reedm@pepperlaw.com |
| Richardson, Shari | richardsons@pepperlaw.com |
| Robertson, Monica | robertsonm@pepperlaw.com |
| Rollins, Gene | rollinsg@pepperlaw.com |
| Rudolph, Andrew | rudolpha@pepperlaw.com |
| Ruggiero, Christopher A. | ruggieroca@pepperlaw.com |
| | ruggieroc@pepperlaw.com |

Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 6


| | |
|---|---|
| Schless, Adam | schlessa@pepperlaw.com |
| Schneider, Shari | schneiders@pepperlaw.com |
| Schwartz, Mindy E. | schwartzme@pepperlaw.com |
| Serritella, Joseph S. | serritellaj@pepperlaw.com |
| Shea, Kathleen Ballay | sheaballayk@pepperlaw.com |
| Shire, D. | shired@pepperlaw.com |
| Smith, D. | smithdg@pepperlaw.com |
| Smith, N. | smithn@pepperlaw.com |
| Spangler, L. | spanglerl@pepperlaw.com |
| Spitofsky, Amy | spitofszkya@pepperlaw.com |
| Stephenson, Kathleen A. | stephensonk@pepperlaw.com |
| Strauss, Benjamin | straussb@pepperlaw.com |
| Street, R. | streetr@pepperlaw.com |
| Sullivan, Mark | sullivanm@pepperlaw.com |
| Surbeck, David | surbeckd@pepperlaw.com |
| Tanner, Neil B. | tannern@pepperlaw.com |
| Thompson, J. | thompsonj@pepperlaw.com |
| Townsend, J. | townsendj@pepperlaw.com |
| Unterberger, Andrea | unterbergera@pepperlaw.com |
| Vargo, Brian S. | vargob@pepperlaw.com |
| | vargobs@pepperlaw.com |
| Wallen, John | wallenj@pepperlaw.com |
| Warren, Laura D. | warrenl@pepprlaw.com |
| Weisensee, Barbara D. | weisenseeb@pepperlaw.com |
| | weisenseebd@pepperlaw.com |
| Woodward, Matthew A. | woodwardm@pepperlaw.com |
| | woodwardma@pepperlaw.com |

## Dilworth Paxson LLP Attorneys and Staff:

Any email address ending in "dilworthlaw.com"

## Other Counsel:

**Brownstein, Hyatt & Farber, P.C.**

| | |
|---|---|
| Farbes, Hubert A. | hfarbes@bhf-law.com |
| Gill, Terence C. | tgill@bhf-law.com |
| Imhoff, Elizabeth Rae | eimhoff@bhf-law.com |
| Keegan, Teresa A. | tkeegan@bhf-law.com |
| Warnkey, Kathleen A. | kwarnkey@bhf-law.com |

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 7

**Powell, Trachtman, Logan, Carrle, Bowman & Lombardo**

| | |
|---|---|
| Curley, C.V. | ccurley@powelltrachtman.com |
| Curry, Michael J. | mcurry@powelltrachtman.com |
| Halberstadt, E.N. | ehalberstadt@powelltrachtman.com |
| Hall, C.B. | chall@powelltrachtman.com |
| Jacobson, M.B. | mjacobson@powelltrachtman.com |
| Maransky, Michael J. | mmransky@powelltrachtman.com |

**Montgomery, McCracken, Walker & Rhoads, LLP**

| | |
|---|---|
| Bloxom, John M. | jbloxom@mmwr.com |
| Newcomer, J.H. | jnewcomer@mmwr.com |

**Fox Rothschild**

| | |
|---|---|
| Berger, Allison | aberger@foxrothschild.com |
| Bonekemper, Andrew W. | abonekemper@foxrothschild.com |
| Baume, Hal | hbaume@foxrothschild.com |
| Cornell, L. Jason | jcornell@foxrothschild.com |
| DeMichele, Anthony P. | ademichele@foxrothschild.com |
| Dorr, Teresa M. | tdorr@forxrothschild.com |
| Gradwohl, David A. | dgradwohl@foxrothschild.com |
| Hinerman, Philip L. | phinerman@foxrothschild.com |
| Jobes, T.H. | tjobes@foxrothschild.com |
| Kelly, Kimberly L. | kkimberly@foxrothschild.com |
| Maransky, Michael J. | mmaransky@foxrothschild.com |
| Menkowitz, Michael G. | mmenkowitz@foxrothschild.com |
| Pileggi, Francis | fpileggi@foxrothschild.com |
| Rennie, Sheldon | srenni@foxrothschild.com |
| Solomon, Robin I. | rsolomon@foxrothschild.com |
| Wanger, William R. | wwanger@foxrothschild.com |

**The Bayard Firm**

| | |
|---|---|
| Astin, Daniel K. | dastin@bayardfirm.com |
| Davis, Charlene D. | cdavis@bayardfirm.com |
| Matthews, Tiffany | cmatthews@bayardfirm.com |
| Richards, Deirdre | drichards@bayardfirm.com |
| Saccullo, Anthony | asaccullo@bayardfirm.com |

**Gardere & Wynne**

| | |
|---|---|
| Nicewander, Dan L. | dnicewander@gardere.com |

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

Brian Dykstra
October 13, 2004
Page 8

**Dorsey & Whitney**
Reeslund, Michael                          reeslund.mike@dorsey.com

**Schwartz, Tobia, Stanziale, Sedita & Campisano**
Crecca, Donald J.                          creccd@kipslaw.com
Diddio, Kim M.                             kim@kipslaw.com
Stanziale, Jr., Charles A.                 stanzch@kipslaw.com
Testa, Jeffrey T.                          testaj@kipslaw.com
Ward, Roger C.                             wardr@kipslaw.com

## Others

William C. Cleveland, III, Esquire         wcleveland@bmsmlaw.com
Richard Hawley, Esquire                    rhawley@k-glaw.com
Chad A. Cicconi                            cicconi@thorpreed.com
Constance R. Ariagno                       cariagno@PattonBoggs.com
Gerald R. Flatten                          RjenDF@aol.com
Rendi Mann-Stadt                           rmann-stadt@mwbavl.com
Heather Goldstein                          hgoldstein@mwbavl.com
Fred Barbour                               fbarbour@mwbavl.com
Russell S. Sayre                           sayre@taftlaw.com
Scott Hickman                              shickman@sherrardroe.com
Stephen Hurd                               shurd@sherrardroe.com
James (Jim) M. Matour                      jmatour@hangley.com
Perry K. Delay                             pdelay@hangley.com
Bruce S. Haines                            bhaines@hangley.com
Kathleen M. Laubenstein                    klaubenstein@hangley.com
Richard J. Zook                            rzook@cdzc.com

# Electronic Evidence Discovery and Analysis

## Statement of Work

### For:

# Royal Indemnity Company
## through
## Sonnenschein Nath & Rosenthal LLP

October 13, 2004

**Prepared For:**

**Mr. Marc Zwillinger, Esq.**
**Sonnenschein Nath & Rosenthal LLP**

## Engagement Summary

Royal Indemnity Company ("ROYAL"), through Sonnenschein Nath & Rosenthal LLP ("SONNENSCHEIN") has retained Red Cliff Consulting, Inc. ("Red Cliff") to provide forensic preservation, forensic and data analysis, file recovery and file processing services. As part of this engagement, Red Cliff will preserve and attempt to recover data from the following servers:

1.  EMC Storage Device – 40-36GB RAID drives – 1.5TB total. EMC owned 20 of the 40 drives, removed those 20 drives and disabled the machine for failure to pay rental fees. The machine has been offline for more than one year. Configuration and server model are unknown. Preserve forensically and attempt to rebuild RAID array and recover data.

2.  Microsoft Exchange 5.5 Email Server – Machine is currently in use supporting 8 user mailboxes, but had supported approximately 200 user mailboxes at one time. Size and server model unknown. Preserve forensically and attempt to recover the previous 192 mailboxes.

3.  File Server – 8-18GB RAID drives. Machine is currently in use. Configuration and server model are unknown. Preserve forensically and attempt to recover data.

Once onsite, Red Cliff will assess the functionality of the servers and determine the exact course of action to take for efficient restoration. Due to the unknown model and state of each of the machines, there may be no relevant data that can be recovered from a particular machine. Red Cliff may engage EMC Professional Services to provide technical background and consulting related to the EMC storage device.

### Engagement Tasks

### Phase I – Preservation and Data Restoration of Identified Hardware

Red Cliff's foremost task and goal will be to preserve the data available on each machine's hard drive(s). Because this project involves a large number of drives that must be preserved individually, Red Cliff will establish an onsite data acquisition lab including multiple acquisition workstations with write-protection hardware. This will enable Red Cliff to preserve multiple drives concurrently to shorten the preservation process.

Provided the Exchange server and the File server are in working order, Red Cliff should be able to complete the restoration and assessment in very short order. However, the fact that drives have been removed from the EMC server increases the potential complexity of the restoration process exponentially due to the fact that each drive must be put back in the exact same order as when the server was being used. In order to maximize the opportunity for a successful restoration of the EMC RAID array, Red Cliff may partner with EMC Professional Services to develop a custom EMC approach to determine the viability of the machine and data drives. EMC may require restitution for any outstanding invoices before any support will be provided. If so, Sonnenschein will instruct Red Cliff how to proceed.

Once the data has been preserved, the following tasks will take place for the specific hardware in order to collect the relevant data:

Privileged and Confidential

A.    EMC Server – Once preserved, if the RAID array cannot be rebuilt onsite with
      EMC's support, Red Cliff will bring the preserved drives back to its lab in
      Fairfax, VA, and use the EnCase forensic software to attempt to reconstruct the
      order and configuration drives. NOTE: This is a manually intensive process with
      a possibility of no success.

B.    Exchange Server – Once preserved, Red Cliff will review the preserved data for
      the Exchange server file (.edb) that may have contained the previous 192
      mailboxes. If it exists, Red Cliff will restore the .edb file and attempt to extract
      any identified mailboxes. If the previous .edb cannot be located or restored, Red
      Cliff will examine the preserved data forensically to determine if any email
      fragments can be recovered.

C.    File Server – If a logical preservation can be made of the file server, Red Cliff
      will allow the server to reconstruct the RAID array and preserve the data directly.
      If a forensic preservation is required, Red Cliff will preserve each drive
      individually and then rebuild the RAID array using either the existing hardware or
      by bringing the data back to Red Cliff's VA lab and reconstructing it using the
      EnCase forensic software.

Due to the availability of EMC Professional Services, Red Cliff may begin work on the
Exchange server and the File Server before beginning work on the EMC server. This will allow
EMC to perform the necessary research into the EMC server's specific history, and Red Cliff and
EMC to prepare for the onsite assessment.

**Phase II –Analysis and Preparation of Resulting Data**

Once the existing data has been preserved and reconstructed, the data will be verified and
reviewed for consistency, and recoverable deleted files will be restored. Due to the processing
requirements for email and user files, the data will be broken into two different processing paths
at this point.

EMAIL – All recovered mailboxes will be screened for exclusion consistent with the
Engagement Protocols at the end of this document, searched, and prepared for review in multiple
formats. Because the mailboxes are a structured format, Red Cliff will convert each email
message into an HTML representation of the message, establish an automated link between the
email and any attachments (only to the extent that the email message containing the attachment
was not already excluded pursuant to the Engagement Protocols at the end of this document), and
de-duplicate the email messages.

Cost estimates provided for these tasks will be based on the assumption that only 25 PSTs need
to be recovered from the Exchange server. Final determination on the approach to take will be
made by Sonnenschein once the volume of data is identified.

USER FILES – These are non-email files that are typically found on custodian's computers or on
file servers that custodians have access to (this could also include email file stores which will be
processed as described above). Red Cliff's standard approach for processing user files is to
begin by filtering out known files that are not specific to the custodians including system
executable files (e.g., .exe, .dll, .sys, etc.). The remaining files are then filtered to exclude non-

business documents which are typically not relevant to litigation (e.g., .gif, .avi, .mp3, etc.). The remaining business documents will be de-duplicated to remove multiple versions of the same file. The resulting files will be indexed and searched according to Sonnenschein's instructions.

## Engagement Protocols

**Red Cliff will adhere to the following protocol in connection with this engagement:**

1.      There are three categories of information that *must not* and *will not* be provided to Sonnenschein or its client Royal Indemnity Company ("Royal"):

   A.      Any and all email messages (along with any attachments thereto) in which an address in either or both of the "TO:" and/or "FROM:" fields (but not including the "CC:" field) contain any of the email addresses on the attached Schedule A; and

   B.      Any file or other data that was initially created after September 29, 2003.

2.      Red Cliff shall not, under any circumstances, disclose the contents of any files or other data located on the Servers to any person or entity other than Royal (through Sonnenschein), SFC (through Dilworth Paxson), SLS (through Saul Ewing LLP), or a judicial officer, unless required by law to do so.

3.      After the acquisition phase, Red Cliff will provide to SFC (through the Trustee or his counsel) a single copy of all information acquired from the Servers in the same form and manner as such information was provided to Royal.

4.      Red Cliff will access the SLS-owned Servers outside of SLS' normal business hours and will observe any other reasonable requests made by SLS with respect to Red Cliff's onsite activities.

Privileged and Confidential



INTELLIGENT INFORMATION SECURITY

Stephen J. Shapiro
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Re: Subpoena

Dear Mr. Shapiro:

We received your subpoena dated November 17, 2006. As you know,
Mandiant acquired the data referenced in your subpoena pursuant to a
multi-party agreement. Releasing the data you requested without the
consent of all parties to that original agreement would be a breach of
our confidentiality obligations.

We understand that negotiations are underway among counsel to
find a way to make this information available. We will address your
subpoena once those negotiations conclude. If you have any questions,
please contact Shane McGee at 202-408-9216.

Regards,

Michael Malin
Executive Vice President & CFO
Mandiant Corporation

cc: Shane M. McGee, Esq.

US006778160B2

(12) **United States Patent**
Kubota et al.

(10) **Patent No.:** US 6,778,160 B2
(45) **Date of Patent:** Aug. 17, 2004

(54) **LIQUID-CRYSTAL DISPLAY, LIQUID-CRYSTAL CONTROL CIRCUIT, FLICKER INHIBITION METHOD, AND LIQUID-CRYSTAL DRIVING METHOD**

(75) Inventors: **Tetsu Kubota**, Fujisawa (JP); **Akihiro Funakoshi**, Kamakura (JP); **Takuya Ishikawa**, Hino (JP)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 218 days.

(21) Appl. No.: **09/760,131**

(22) Filed: **Jan. 12, 2001**

(65) **Prior Publication Data**

US 2001/0024181 A1 Sep. 27, 2001

(30) **Foreign Application Priority Data**

Jan. 17, 2000 (JP) ...................................... 2000-007816

(51) Int. Cl.[7] ................................................. G09G 3/36
(52) U.S. Cl. ............................. **345/89**; 345/98; 345/77; 345/88; 345/690
(58) Field of Search .............................. 345/88, 63, 89, 345/77, 90, 87, 611, 690, 147, 148, 211, 102, 212

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,347,294 A  *  9/1994  Usui et al. .................... 345/89

| | | | | |
|---|---|---|---|---|
| 5,483,634 A | * | 1/1996 | Hasegawa | 359/162 |
| 5,956,014 A | * | 9/1999 | Kuriyama et al. | 345/147 |
| 6,064,359 A | * | 5/2000 | Lin et al. | 345/89 |
| 6,075,514 A | * | 6/2000 | Ryan | 345/601 |
| 6,326,938 B1 | * | 12/2001 | Ishida et al. | 345/63 |
| 6,333,727 B2 | * | 12/2001 | Mizumaki | 345/89 |

FOREIGN PATENT DOCUMENTS

| JP | 4-365094 | 12/1992 |
|---|---|---|
| JP | 06-062355 | 3/1994 |
| JP | 07-056532 | 3/1995 |
| JP | 8-8671 | 1/1996 |

* cited by examiner

*Primary Examiner*—Regina Liang
*Assistant Examiner*—Jennifer T. Nguyen
(74) *Attorney, Agent, or Firm*—Derek S. Jennings; David Aker

(57) **ABSTRACT**

A liquid crystal display comprises an input for inputting a video signal from a host and a storage medium for storing the previous brightness level of the video signal input through the input. A determinator is provided for determining an output brightness level based on the previous brightness level stored in the storage medium and the next brightness level of the next video signal input to the input, so as to make the time integration quantity of a brightness change substantially equal to an ideal quantity of light in a stationary state with respect to the next brightness level. Further included are drivers for driving an image displaying liquid crystal cell based on the output brightness level determined by the determinator.

**14 Claims, 11 Drawing Sheets**



[Figure 1]



[Figure 2]



[Figure 4]



[Figure 5]



(a)



(b)

[Figure 6]



[Figure 7]

26 (Graph base table)

| Previous brightness \ Next brightness | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 28 | 48 | 63 | 74 | 83 | 88 | 93 | 96 | 98 | 100 |
| 10 | 0 | 10 | 30 | 45 | 56 | 65 | 70 | 75 | 80 | 90 | 100 |
| 20 | 0 | 10 | 20 | 35 | 46 | 55 | 60 | 70 | 80 | 90 | 100 |
| 30 | 0 | 10 | 20 | 30 | 41 | 50 | 60 | 70 | 80 | 90 | 100 |
| 40 | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| 50 | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| 60 | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |
| 70 | 0 | 10 | 20 | 30 | 40 | 50 | 59 | 70 | 80 | 90 | 100 |
| 80 | 0 | 10 | 20 | 30 | 40 | 45 | 54 | 65 | 80 | 90 | 100 |
| 90 | 0 | 10 | 20 | 25 | 30 | 35 | 44 | 55 | 70 | 90 | 100 |
| 100 | 0 | 2 | 4 | 7 | 12 | 17 | 26 | 38 | 52 | 72 | 100 |

[Figure 8]



[Figure 9]    **PRIOR ART**



[Figure 10]    PRIOR ART



**[Figure 11]**    **PRIOR ART**



US 6,778,160 B2

1

# LIQUID-CRYSTAL DISPLAY, LIQUID-CRYSTAL CONTROL CIRCUIT, FLICKER INHIBITION METHOD, AND LIQUID-CRYSTAL DRIVING METHOD

## FIELD OF THE INVENTION

The present invention relates to a method for compensating poor response time, and in particular, to a method and an apparatus for inhibiting flicker resulting from the poor response time of a liquid crystal display.

## BACKGROUND OF THE INVENTION

In recent years, besides cathode ray tubes (CRTs), liquid crystal displays (LCDs) have come into widespread use as display devices for various types of image displays and monitors for units such as personal computers (PCs) and television sets. The LCDs can be made significantly smaller and lighter than CRTs. In addition, many improvements in the display performance of LCDs, including low geometric distortion as well as considerably high picture quality, have been achieved. For these reasons, the LCDs have gained the spotlight as a mainstream display device used in video equipment of the future.

However, because of the poor response characteristic of the liquid crystal itself, the LCDs has the potential problem of poor response time. That is, in a typical display device used in the industry, the display is refreshed at a frame rate of 60 frames per minute, or every (1÷60=) 16.7 ms. On the other hand, the response time of liquid crystals used in many current LCDs required to change from black to white is 10 to 50 ms, typically 20 to 30 ms. This means that one frame time in the display is shorter than the response time of most liquid crystals. As a result, problems, such as the visual persistence of moving images and inability to keep up with fast-moving images, caused by the response delay of the LCDs have become obvious.

The term "response time" used in the industry refers to the sum of (1) time required to reverse color by applying a voltage to a liquid crystal cell and (2) time required to restore the original color by the removal of the applied voltage. The term "frame" used in the industry represents the scanning of all the images (picture elements) that should form one complete picture on the display.

Some solutions to these poor response time problems with the LCD are disclosed in, for example, Published Unexamined Japanese Patent Applications Nos. 2-153687, 4-365094, 6-62355, and 7-56532.

In Published Unexamined Japanese Patent Application No. 2-153687, a LCD is provided which is configured to discriminate between a static image area having less motion and a fast-moving area and apply a signal process only to the moving area to emphasize time-based changes in an image, thereby improving response time in the image area where better response time is required to reduce visual persistence and noise.

In Published Unexamined Japanese Patent Application No. 4-365094, a LCD is provided which is configured to be driven by reading pre-stored optimum image data according to the direction and degree of a change when the image data changes, thereby allowing the LCD to rapidly follow the fast-changing image.

In Published Unexamined Japanese Patent Application No. 6-62355, a technology is disclosed which superposes a difference component between fields or frames on a video

2

signal to provide pulse stepping drive when the video signal changes between the fields or frames, thereby improving the response of display elements in an LCD.

In Published Unexamined Japanese Patent Application No. 7-56532, a technology is disclosed which provides table memory containing a table of image increase/decrease values and drive a liquid crystal panel (liquid crystal cell) by performing an addition/subtraction in order to improve response changes due to changes in the gray scale in the liquid crystal panel. However, the amount to be added or subtracted is expressed only by the word "optimum" and no specific amount is disclosed.

One problem associated with picture quality in LCDs which does not arise in a CRT display is flicker. When, for example, a wire-frame model in a CAD application is displayed on the LCD and the operator (user) moves it continuously at a relatively low speed, about several tens pixels per minute, the entire wire-frame model appears to blink in a cycle of several to several tens Hz. This effect is called flicker. While this effect does not occur in CRT displays, it occurs in most existing types of LCDs and many customers have requested minimization of the flicker urgingly. The flicker herein differs in symptom and cause from that in CRT displays which is caused by infrequent refresh.

In CAD applications, a wire-frame model is typically displayed using many thin lines in white or other colors against a black background. Assuming that the wire-model is white (all of the colors R (read)/G (green)/B (blue) are "ON") as an example, no problem arises when the model stay stationary on the screen because only a few frames are required to achieve an proper brightness. However, if the operator move the model on the screen, the proper brightness cannot completely be achieved. That is, if a pixel is made light up only in one frame, the brightness of the pixel may not reach the predetermined brightness because the response of the LCD itself is slow as mentioned above. This situation will be described below with reference to the drawings.

FIG. 9 shows the movement of lines when a wire-frame model is moved on the screen. FIG. 10 shows on/off states of the pixels on line (i) in each frame at the time point in FIG. 9. FIG. 11 shows a change in the brightness of pixel (j).

Herein, as shown in FIG. 9, in the case where attention is paid to a particular pixel, assuming that a line of the wire frame 200 moves through frames (n−1) 201 to (n) 202 to (n+1) 203 in sequence. That is, the pixel lights up in a time period equivalent to the frames in which the line passes over the pixel and goes off immediately after that.

Focusing attention on line (i) 205 represented by a dashed line, in particular, on the particular pixel, each frame is driven from OFF to ON by the movement of pixel (j) 206, then one frame after goes back from ON to OFF, as shown in FIG. 10. However, because the response time of commonly-used liquid crystals is longer than 16.7 ms, pixel (j) 206 changes back to black before completely returning from black to white. That is, as shown in FIG. 11, pixel (j) 206 is OFF in frame (n−1) 201, goes ON in frame (n) 202, then goes OFF in frame (n+1) 203. However, the target brightness of pixel (j) 206 is not reached even though it is turned on in order to achieve 100% brightness in frame (n) 202. As a result, the brightness of the line drawing on movement will be low. The inventors have found that when a wire-frame model is continuously moved in a CAD application, the wire-frame model in fact repeatedly alternates between moving and stationary states every several frames and blinks due to a difference in display brightness

**3**

between the moving and stationary states, and this difference causes "flicker."

Many manufacturers have actively sought after a method for improving the response of LCD panels by improving a liquid crystal material itself or narrowing the gap between glass plates in order to reduce flicker of LCDs. Some state-of-the-art products on the market have an improved response time of about 25 ms including rising and falling time. Another LCD technologies for reducing response time to several ms have been disclosed in some academic conferences. However, these approaches to improve an LCD panel itself can hardly to provide mass-production products because of their low reliability, and there are many other problems to be solved to put them into practical use.

In view of these technical problems, it is a primal object of the present invention to inhibit the flicker effect as visual perception by the panel driving circuitry which drives an LCD.

It is another object of the present invention to drive the LCD by applying an offset to a moving model without globally determining whether the model is moving or stationary.

## SUMMARY OF THE INVENTION

To achieve above-mentioned objects, a feature of the present invention includes a liquid crystal display comprises an input for inputting a video signal from a host and a storage medium for storing the previous brightness level of the video signal input through the input. A determinator is provided for determining an output brightness level based on the previous brightness level stored in the storage medium and the next brightness level of the next video signal input to the input, so as to make the time integration quantity of a brightness change substantially equal to an ideal quantity of light in a stationary state with respect to the next brightness level. Further included are drivers for driving an image displaying liquid crystal cell based on the output brightness level determined by the determinator.

Another feature of the present invention includes a liquid crystal display characterized by comprising a driver for driving each of the pixels forming an image for each frame to a liquid crystal cell displaying the image, an input for inputting an moving-state video signal which changes from the off state to the on state on transition to a particular frame in the frames and returns to the off state after the particular frame is completed, and elements for setting an offset for making the quantity of light closer to the quantity of light in a stationary state in which the moving-state video signal is continuously turned on for the particular frame. The liquid crystal display further includes a generator for applying the offset set by the setting elements to the moving-state video signal input through the input means to generate an output video signal, and an output for outputting the output video signal generated by the generation means to the drive means. By configuring the apparatus in this way, a difference in brightness between a stationary state and a moving state which can be considered as the principal cause of flicker can be reduced to inhibit visually perceptible flicker.

Yet another feature of the present invention is further characterized by a liquid crystal control circuit having a function for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by liquid crystal cells. The liquid crystal control circuit includes a storage portion for storing an offset in brightness in a moving state in which the wire-frame model having a predetermined gray scale changes from frame to frame with

**4**

respect to a particular pixel. This is with relation to brightness output in a stationary state in which the wire-frame model having the predetermined gray scale is displayed on the particular pixel across a plurality of frames. Further included is a correction portion for applying the offset stored in the storage portion to the gray scale of the wire-frame model if the input wire-frame model is in a moving state.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram for showing the overall configuration of a liquid crystal display (LCD) apparatus according to one embodiment of the present invention.

FIG. 2 is a graph showing an example of brightness of a wire-frame image in a moving state on the LCD used with the embodiment.

FIG. 3 is a table showing the measurements of response time at the maximum brightness of a liquid crystal used in five LCD models (model A to E).

FIG. 4 shows the response characteristic of an ideal liquid crystal.

FIGS. 5 (a) and (b) are graph showing the response characteristics of models A and B shown in FIG. 3 by brightness versus time when a pixel is turned on for only one frame.

FIG. 6 shows an effect when brightness is set by taking a required offset into consideration.

FIG. 7 shows a relation between brightness L1 and brightness L2 in table form.

FIG. 8 is a graph showing desired brightness versus brightness actually provided when brightness falls.

FIG. 9 shows the movement of a line on the screen when a wire-frame model is moved on the screen.

FIG. 10 shows the ON/OFF states of a pixel on line (i) in each frame.

FIG. 11 shows changes in brightness of pixel (i).

## DETAILED DESCRIPTION OF THE INVENTION

The "ideal quantity of light" herein is, to take an example, the quantity of light based on a response characteristic which provides a target brightness level at a time point at which the frame is turned on and provides a brightness level of zero at the time point at which the frame is turned off on a display device in which each pixel is driven for each frame. The brightness level can be represented as a target brightness value by a gray scale and considered as an indication of the characteristic of human visual sensation to brightness. In addition, a brightness change can be considered as a response characteristic depending on the types of liquid crystal cells (liquid crystal panels). Quantity of light is considered as a time integration quantity of a brightness change and can be expressed as brightness_time, if the brightness is constant. The representation "substantially equal level" refers to a level which is not completely the same but can be accepted as a substantially equivalent level, and includes a level which is closer to an ideal quantity of light than no preventive measures are taken.

The determinator is characterized by comprising a table for storing a brightness level determined by the characteristic of a liquid crystal cell according to a relation between the previous brightness level and the next brightness level, and determining an output brightness level by modifying the next brightness level based on the brightness level read from the table. With this configuration, flicker due to changes in

5

the quantity of light during the movement of the model can be inhibited without globally determining whether a model is in a moving or stationary states. In addition, a correction for a "halftone" can be made, thereby allowing a decrease in brightness level, which is remarkable in halftones, to be addressed properly.

The video signal input through the input consists of a plurality of color signals and the table in the determinator is provided for each of the color signals so that a brightness level correction for each color can be made with respect to flicker perception of the human eye to reduce a difference in brightness, thereby an easy-on-the-eye liquid crystal display can be provided to the user. While the color signals may be R (read), G (green), B (blue) signals used in displays, other display systems can also be used.

The offset set by the setting elements can be determined based on a time integration quantity, which is a change in brightness in the moving-state vide signal integrated with respect to time, and the quantity of light in stationary state, thus a difference in brightness can be preferably reduced in consideration of the human visual perception characteristic to inhibit flicker appropriately.

The moving-state video signal passed through the input consists of a plurality of color signals, the offset set by the setting elements is determined for each of the color signals, and the generator generates the output video signal for each color signal based on the offset determined for each color signal. Thus a difference in brightness between moving and stationary states can be corrected for each color signal to inhibit flicker on a color image display.

The apparatus further comprises a frame buffer for storing the brightness information of the input wire-frame model as the previous brightness, and characterized by that the storage portion stores the offset as table information based on a relation between the previous brightness stored in the frame buffer and the brightness of the next input wire-frame model, thus, flicker in a moving state can be advantageously inhibited without providing separate determining units for moving and stationary states.

Because the wire-frame model in the present invention is a model consisting of a large number of thin lines in white or other colors in a CAD application, for example, in which flicker is especially troublesome, the flicker inhibition by correcting gray scale of such a wire-frame model in a moving state is highly effective.

The liquid crystal control circuit may be implemented as an interface board provided in a liquid crystal display monitor. The liquid crystal display monitor may be one used with a desktop personal computer or a CAD computer as well as one integrated with a host, like a notebook computer.

In another category, the present invention is a flicker inhibition method for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by a liquid crystal cell. The method is characterized by storing a relation between brightness in a stationary state in which a wire-frame model having a predetermined gray scale is displayed on a particular pixel across a plurality of frames and brightness in a moving state in which the wire-frame model having the predetermined gray scale changes from moving to frame with respect to the particular pixel, applying an offset based on the stored relation to the gray scale of the wire-frame model if the input wire-frame model is in a moving state, and driving the liquid crystal cell based on the gray scale to which the offset is applied to display the wire-frame model.

The moving state brightness used for storing the relation is the brightness when the particular pixel changes back to

6

the off state one frame after it is driven from the off state to the on state during the passage of the wire-frame model over the particular pixel.

Furthermore, the brightness in the moving state which is used when the relation is stored is the quantity of light equal to the brightness change integrated with respect to time.

With this configuration, a difference in the brightness of the wire-frame model between its moving state and stationary state can be reduced to inhibit flicker which would otherwise noticeably occur.

Viewing the present invention as a liquid crystal driving method, the liquid crystal driving method of the present invention is characterized by the steps of storing first brightness information for an input pixel in a frame buffer, and applying, based on second brightness information for the next input pixel and the first brightness information stored in the frame buffer, an offset for making the time integration quantity of a brightness change substantially equal to an ideal light quantity which is brightness in a stationary state to the second brightness information. The steps further include the outputting of the second brightness information to which the offset is applied to a driving circuit for driving an liquid crystal cell, and storing the second brightness information for the input pixel in a frame buffer. This liquid crystal driving method allows the inhibition of flicker by using a simple apparatus without globally determining whether a model is moving or stationary.

The present invention is still further characterized in that the input pixel consists of a plurality of color signals and includes the step of storing the first brightness information in the frame buffer stores the first brightness information for each of the color signals, and the step of applying the offset applies the offset to each of the color signals, thus the brightness of each color of a color image consisting of a plurality of color signals can be corrected individually, allowing more adequate flicker inhibition.

The offset applying step is characterized by the step of reading a pre-stored offset based on the relation between the first and second brightness information and applying the read offset to the second brightness information.

The brightness information at a moving time that is used in a storage operation based on the relation is the quantity of light equal to a brightness change for each color signal integrated with respect to time, therefore correction according to the human visual perception characteristics can be made to address the problems resulting from human visual perception of flicker more properly.

The present invention will be described below with respect to the embodiments shown in the accompanying drawings.

FIG. 1 is a drawing for showing the overall configuration of a liquid crystal display according to an embodiment of the present invention. Reference number 10 denotes a liquid crystal display monitor (LCD monitor) as a liquid crystal display panel, which comprises, for example, a liquid crystal module 30 having a thin-film transistor (TFT) structure and an interface (I/F) board 20 connected to a digital or analog interface to a personal computer (PC) or a workstation (WS) system for supplying a video signal to the liquid crystal module 30. If a notebook PC is used, a system unit (not shown) is integrated with the liquid crystal display monitor 10. If a monitor having a display device separated from its system unit is configured, a system unit (not shown) is attached to the LCD monitor 10 to form a liquid crystal display.

The I/F board 20 comprises a input unit 27 for inputting video data from a host such as a PC/WS system, a com-

7

parison logic 24 for comparing the previous brightness with the next brightness for an input video signal, and an Application-Specific Integrate Circuit (ASIC) 21 including a logic having units such as a supplementary correction portion 25 for performing a supplementary correction. The I/F board 20 also comprises a frame buffer 22 for temporarily storing the input video signal and read-only memory (ROM) 23 containing information needed for the operation of the ASIC 21. The frame buffer 22 stores input video signal value input previously and provides it to the ASIC 21. The ROM 23 includes a graph base table 26 which is required for the supplementary correction in the ASIC 21 and is set for each of R/G/B input color signals. The graph base table 26 contains a brightness level to be output based on a relation between the previous brightness and the next brightness in a table form which will be described later.

The liquid crystal module 30 consists of three main blocks a liquid cell control circuit 31, liquid crystal cell 32, and a backlight 33. The liquid cell control circuit 31 consists of panel drivers such as an LCD controller LSI 34, a source driver (X driver) 35, and a gate driver (Y driver) 36. The LCD controller LSI 34 processes signals received from the I/F board 20 via a video interface and outputs appropriate signals to each ICs of the source driver 35 and gate driver 36 with an appropriate timing. The liquid crystal cell 32 outputs an image using a TFT array arranged in a matrix through the application of a voltage from the source driver 35 and the gate driver 36. The backlight 33 has a fluorescent tube (not shown) located on the back or side of the LC cell 32 for illuminating the cells from the back.

FIG. 2 is a graph showing an example of the brightness of a wire-frame model on the LCD panel used in this embodiment. The horizontal scale indicates brightness (%) desired to be provided and the vertical scale indicates brightness (%) actually provided in the Figure. The dashed line 51 indicates the relationship between the desired brightness and actual brightness of the model in a stationary state. The solid line 50 indicates the relationship between the desired brightness and actual brightness of the model in a moving state for an R (red) signal. The alternate long and short two dashes line indicates a G (green) signal in the moving state and the alternate long and short one dash line indicates a B (blue) signal in the moving state. The characteristics in the moving state vary from LCD panel to LCD panel.

Consider the case where a wire-frame model of a halftone, which is 50% brightness, is displayed on the LCD having the characteristics shown in FIG. 2. In the stationary state 51, there is no problem because the 50% brightness of a pixel can be achieved with some frames by driving the liquid crystal with a voltage providing the 50% brightness. On the other hand, in the moving state, as apparent from the line 50 indicating the brightness for the R signal in moving state, actually only 21% brightness can be obtained on the display even by driving the liquid crystal with a voltage equivalent to 50% brightness. To achieve an actual brightness of 50%, the LC must be driven with an voltage equivalent to 83% brightness. That is, an offset of 33% is required to be applied to the input voltage equivalent to 50% brightness. For the B signal, more offset is required. Though the brightness for G signal is somewhat closer to that in the stationary state 51, an offset is still required to be applied.

The relationship between the response characteristic of liquid crystal and flicker will be further discussed below.

FIG. 3 is a table showing the measurements of the response time of liquid crystal at the maximum brightness in

8

five LCD models (models A to E). In a model 61 shown in the first column, the symbol in parentheses indicates the magnitude of flicker at the maximum brightness. Symbol "○" indicates that almost no flicker is visually perceived, symbol "Δ" indicates that flicker level is quite acceptable, and symbol "X" indicates that intensive flicker is perceived. Response rising time 62 is shown in the second column and response falling time 63 is shown in the third column. The light quantity ratio 64 in the forth column represents the ratio of the light quantity of each model to that of an ideal LC. The ratio of the brightness of the drawing in a moving state to that in a stationary state 65 is indicated in the fifth column. The brightness ratio of the drawing in moving state to that in stationary state 65 represents to what degree the brightness of the wire-frame model in the moving state is darkened compared to the brightness of that in the stationary state. It can be seen that while there is almost no reduction in brightness in model A (1.0:1), brightness is reduced in models B (0.8:1), D (0.7:1), and E (0.3:1), on which flicker is perceived.

In terms of whether the response at the maximum brightness is adequately fast, both of the response rising time 62 and the falling time 63 of model A is poor compared to model B. However, when a wire-frame model in an actual CAD application is displayed and moved on these LCD models, flicker in model A is less than in model B. The reason can be explained by considering the characteristics of human visual perception. It is known that the human visual perception is subject to a time integration effect ("Handbook of information technology for television image", 1st edition, pp.39–40, Institute of Television Engineers of Japan, 1990). Brightness of a pixel to the human eye cannot be considered in terms of time required to reach a specified brightness, instead, it should be considered in terms of the quantity of light, that is, a brightness change integrated with respect to time.

FIG. 4 shows the response characteristic of an ideal liquid crystal and indicates the state in which a particular pixel is kept lit up at a brightness of L1, that is in a stationary state. Here, the quantity of light (S) emitted in one frame time (T) is equal to $L1 \times T$ (i.e. brightness$\times$time) as shown in the shaded area in FIG. 4.

FIGS. 5A and 5B show the response characteristic represented by brightness versus time when a pixel stays lit up for one frame time (On→Off) in models A, B shown in FIG. 3. Both of the rising and falling of the response of model A shown in FIG. 5A are gradually. As a result, the quantity of light ($S_A'$) which is almost the same as that in the ideal LC shown in FIG. 4 can be obtained ($S_A' \approx S$). On the other hand, even though the response rising of model B is rapid, the falling is also rapid and steep as shown in FIG. 5B. Accordingly, quantity of light $S_B'$ is only 81% of that of the ideal LC as shown the column "Light quantity ratio" 64 in FIG. 3. Therefore, even though the response time of model B is better than that shown in FIG. 5A, there is a difference in brightness (the brightness in model B is less than model A) due to the difference in light quantity ($S_B' < S_A'$) in stationary/moving states, causing flicker when the wire-frame model is moved on model B. As can be seen from the results for models C, D, E in FIG. 3, displays providing a smaller light quantity ratio 64 provide a smaller brightness ratio 65 of a drawing in a moving state to that in a stationary state, resulting in more flicker.

Although the ultimate solution to these problems is to develop an LC device having an ideal response characteristic as shown in FIG. 4, it will be some time before such a device comes into use. Thus, another solution is required for inhibiting flicker even in LC devices having moderate response time.

**9**

One of the effective solutions may be a method that uses the measurement of a brightness difference between the stationary state 51 and moving state 50 as shown in FIG. 2. That is, a wire-frame model is drawn with an adequate gray scale by taking account of a required offset, which can be read from the graph shown in FIG. 2, during the movement of the wire-frame model.

FIG. 6 shows an effect when brightness is set by taking a required offset into account. If the liquid crystal is driven trying to achieve desired brightness L1 as target, only the quantity of light (S') indicated by reference number 71 can be obtained due to the response time of the liquid crystal described above. The quantity of light (S') 71 is much smaller than the quantity of light (S) provided by the ideal response characteristic shown in FIG. 4. On the other hand, if the liquid crystal is driven with the aim of achieving brightness L2 which is larger than the desired brightness of L1, the quantity of light (S'') indicated by reference number 72 can be obtained. By overdriving the LC to brightness L2, the LC reaches L1 in a short response time and the quantity of light (S'') 72 can be obtained which is approximately the same as the quantity of light (S), which would be provided with the ideal response characteristic (S''≈S). Here, optimum brightness L2 with respect to L1 can be obtained from the data shown in FIG. 2.

FIG. 7 is a table showing a relation between brightness L1 and L2 and represents the content of the graph base table 26 stored in the ROM 23 shown in FIG. 1. The content of the graph base table 26 shown in FIG. 7 represents a relation between the previous brightness and the next brightness for the LC cell 32 having the characteristic shown in FIG. 2, by taking the effect shown in FIG. 6 into consideration. The previous brightness can be obtained from a video signal input through the ASIC21 shown in FIG. 1 and stored in the frame buffer 22. The next brightness can be obtained from the next video signal input to the ASIC 21. The graph base table 26 is constructed for each of the R, G, B color signals and the values in the table vary depending on the characteristic of the LC cell 32.

The first row of the graph base table 26 shown in FIG. 7 indicates brightness output for the next brightness when the previous brightness is 0 and match the readings of the R signal in the moving state line 50 in the graph shown in FIG. 2. For example, if the next brightness is "10", find a value of 10% on the vertical scale and follow the horizontal line from that point to the point at which the line intersects the moving state line 50, and a value 28%, which is the desired brightness, can be read. When brightness rises from a certain halftone to another halftone, the offset difference is added to the previous brightness. For example, if the previous brightness is 10 and the next brightness is 20, then (48−28)+10= 30. If the next brightness is 30, then (63−28)+10 =45. Similarly, if the previous brightness is 20 and the next brightness is 30, then (63−48)+20=35. If the previous brightness is 30 and the next brightness is 40, then (74−63)+30= 41. In this embodiment, if a difference between the previous brightness and the next brightness is greater than an offset, the next brightness is output without change. For example, if the previous brightness is 10 and the next brightness is 80, then the offset is (96−28)=68. If the previous brightness value, 10, is added to this offset, the result would be 78. In this case, the brightness of 80 is output in order to ensure the next brightness.

On the other hand, when brightness falls from a certain halftone to another halftone, the offset is subtracted from the previous brightness. The example in FIG. 7 shows a case where the characteristic of the LC cell 32 when brightness

**10**

rises (the cell is turned on) is the same as that when the brightness falls (the cell is turned off). In this example, if the previous brightness is 100 and the next brightness is 10, the output value will be 100−98=2. The value "98" is equal to the value when the previous brightness is 0 and the next brightness is 90 in FIG. 7. Similarly, if the previous brightness is 100 and the next brightness is 20, then 100−96=4. If the previous brightness is 90 and the next brightness is 30, then 100−75=25. The value "75" is equal to the value when the previous brightness is 10 and the next brightness is 70 in FIG. 7. Similarly, if the previous brightness is 90 and the next brightness is 40, then 100−70=30. The value "70" is equal to the value when the previous brightness is 10 and the next brightness is 60 in FIG. 7.

While in the table in FIG. 7 the values of previous and next brightness are indicated in increments of 10 for clarity, the table in practice is constructed to store all the combinations which can be read from measurements as shown in FIG. 2. For example, brightness values in increments of 1 may be stored, and any other degree of precision may be chosen according to a given device. While brightness is expressed in percent figures in FIG. 7, the expression of addresses and value stored in the table is not limited to percentage, instead, any appropriate quantized values manageable in a given circuit may be used.

FIG. 8 is a graph showing brightness desired to be provided versus brightness provided actually when brightness falls. The liquid crystal in the example in FIG. 8 has brightness which falls with exhibiting a characteristic similar to the rising characteristic shown in FIG. 2. Accordingly, the line 80 indicating a moving state shown in FIG. 8 is the vertically-flipped curve of the line 50 in a moving state shown in FIG. 2. Tick mark labels on the horizontal scale are also inverted. As can be seen from the graph, when the brightness actually provided is 50%, the brightness desired to be provided is 17%. This matches the value when the previous brightness is 100 and the next brightness is 50 in the table in FIG. 7. That is, the moving state line 80 in FIG. 8 exactly indicates the fall of the previous brightness from 100% in FIG. 7.

While the embodiment has been described with respect to the example which exhibits the same rising (from OFF to ON) and falling (from ON to Off) characteristics, these characteristics may vary depending on the types of liquid crystals. Therefore, the embodiment is configured to accommodate the variation of characteristics by modifying the values in FIG. 7 according to the characteristics of a given liquid crystal.

As described above, the embodiment is configured to store offsets in table form based on the relation between a brightness level in a stationary state and that in a moving state in order to obtain an ideal quantity of light. Thus, even during the movement of a display image on the LCD screen, the image can be displayed virtually the same brightness to the eye as in its stationary state, thereby inhibiting flicker on the screen.

In addition, the embodiment is configured to store the previous brightness level (gray scale value) in the frame buffer 22 and a supplementary correction is made by the ASIC 21 using the data in the graph base table 26 based on the relation between the brightness level of the next video data and the previous brightness level. Thus, whether a wire-frame model is moving or stationary is not required to be determined. Instead, the movement of the model can be determined from a difference between the determined brightness and the previous brightness. As a result, flicker can be inhibited by a simple circuit configuration.

**11**

Furthermore, the embodiment addresses the flicker problem resulting from the response time of the LC panel in recognition of the importance of the quantity of light (brightness×time) to visual perception. As a result, slow response of any types of liquid crystals (such as TN, IPS, and MVA) can be compensated by constructing a look-up table adapted to the characteristics of each liquid crystal. Thus, a flexible liquid crystal control circuit and liquid crystal display which can be widely used can be provided.

As described above, according to the invention, flicker of LCDs which poses a considerable problem in applications such as the display of wire-frame model can be made unperceivable to the user's eye by a simple configuration.

While this invention has been described in terms of certain embodiment thereof, it is not intended that it be limited to the above description, but rather only to the extent set forth in the following claims. The embodiments of the invention in which an exclusive property or privilege is claimed are defined in the appended claims.

We claim:

1. A liquid crystal display, comprising:

an input logic for inputting a video signal from a host;

a storage for storing the previous brightness level of the video signal input through said input logic;

a determinator for determining an output brightness level based on the previous brightness level stored in said storage and the next brightness level of the next video signal input to said input logic so as to make a time integration quantity of a brightness change substantially equal to an ideal quantity of light in a stationary state with respect to the next brightness level; and

a driver for driving an image displaying liquid crystal cell based on said output brightness level determined by said determination logic.

2. The liquid crystal display according to claim 1, wherein said determinator comprising a table for storing a brightness level determined by the characteristic of a liquid crystal cell according to a relation between the previous brightness level and the next brightness level, and determining the output brightness level by modifying said next brightness level based on the brightness level read from said table.

3. The liquid crystal display according to claim 2, wherein:

said video signal input through said input logic comprises a plurality of color signals; and

said table in said determinator is provided for each of said color signals.

4. A liquid crystal display, comprising:

a driver for driving each of the pixels forming an image for each frame to a liquid crystal cell displaying said image;

an input logic for inputting a moving-state video signal which changes from the on state to the off state on transition to a particular frame in said frames and returns to the off state after said particular frame is completed;

a setting logic for setting an offset for making the quantity of light closer to the quantity of light in a stationary state in which said moving-state video signal is continuously turned on for said particular frame;

a generator for applying said offset set by said setting logic to said moving-state video signal input through said input logic to generate an output video signal; and

an output logic for outputting said output video signal generated by said generator to said driver.

**12**

5. The liquid crystal display according to claim 4, wherein said offset set by said setting logic can be determined based on a time integration quantity and the quantity of light in said stationary state, said time integration quantity being a change in brightness in said moving-state vide signal integrated with respect to time.

6. The liquid crystal display according to claim 4, wherein:

said moving-state video signal input through said input logic comprises a plurality of color signals;

said offset set by said setting logic is determined for each of said color signals; and

said generator generates the output video signal for each color signal based on said offset determined for each color signal.

7. A liquid crystal control circuit, having a function for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by liquid crystal cells, comprising:

a storage portion for storing an offset in brightness in a moving state in which said wire-frame model having a predetermined gray scale changes from frame to frame with respect to a particular pixel, with relation to brightness output in a stationary state in which the wire-frame model having the predetermined gray scale is displayed on the particular pixel across a plurality of frames; and

a correction portion for applying said offset stored in said storage portion to the gray scale of the wire-frame model if said input wire-frame model is in a moving state.

8. The liquid crystal control circuit according to claim 7, further comprising a frame buffer for storing the brightness information of said input wire-frame model as the previous brightness,

wherein said storage portion stores said offset as table information based on a relation between said previous brightness stored in said frame buffer and the brightness of the next input wire-frame model.

9. A flicker inhibition method for inhibiting flicker caused by a difference in brightness when an input wire-frame model is displayed by a liquid crystal cell, comprising the steps of:

storing a relation between brightness in a stationary state in which a wire-frame model having a predetermined gray scale is displayed on a particular pixel and a plurality of frames and brightness in a moving state in which the wire-frame model having the predetermined gray scale changes frame to frame with respect to the particular pixel;

applying an offset based on said stored relation to the gray scale of said wire-frame model if said input wire-frame model is in a moving state; and

driving said liquid crystal cell based on said gray scale to which said offset is applied to display said wire-frame model.

10. The flicker inhibition method according to claim 9, wherein said storing step said moving state brightness used for storing said relation is the brightness when said particular pixel changes back to the off state one frame after said particular pixel is driven from the off state to the on state during the passage of the wire-model frame over the particular pixel.

11. The flicker inhibition method according to claim 9, wherein said storing step said brightness in the moving state which is used when said relation is stored is the quantity of light equal to a brightness change integrated with respect to time.

US 6,778,160 B2

13

**12**. A liquid crystal driving method, comprising the steps of:

storing first brightness information for an input pixel in a frame buffer;

applying based on second brightness information for the next input pixel and said first brightness information stored in said frame buffer an offset for making the time integration quantity of a brightness change substantially equal to an ideal light quantity which is the brightness in a stationary state to said second brightness information;

outputting said second brightness information to which said offset is applied to a driving circuit for driving an liquid crystal cell; and

storing said second brightness information for the input pixel in a frame buffer.

14

**13**. The liquid crystal driving method according to claim 12, wherein:

said step of storing said first brightness information in the frame buffer stores said first brightness information for each of said color signals and said input pixel comprises a plurality of color signals; and

said step of applying the offset applies said offset to each of said color signals.

**14**. The liquid crystal driving method according to claim 12, wherein said offset applying step comprises the steps of reading a pre-stored offset based on a relation between said first and second brightness information and applying said read offset to said second brightness information.

\* \* \* \* \*

[Figure 3]

| Model (Magnitude of flicker) 61 | Response rising time 62 | Response falling time 63 | Light quantity ratio (to ideal LC) 64 | Brightness ratio of drawing in moving state to that in stationary state 65 |
|---|---|---|---|---|
| Model A ( ○ ) | 20. 3ms | 21. 6ms | 1. 02 : 1 | 1. 0 : 1 |
| Model B ( × ) | 18. 5ms | 10. 0ms | 0. 81 : 1 | 0. 8 : 1 |
| Model C ( △ ) | 10. 0ms | 4. 5ms | 0. 85 : 1 | 0. 9 : 1 |
| Model D ( × ) | 19. 9ms | 7. 9ms | 0. 73 : 1 | 0. 7 : 1 |
| Model E ( × ) | 43. 2ms | 34. 3ms | 0. 53 : 1 | 0. 3 : 1 |